# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| QSL of Medina, Inc., *et. al.*,[1] | ) |
| | ) Case No. 15-52722 |
| Debtors. | ) (Request for Joint Administration |
| | ) Pending) |
| | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

| | |
|---|---|
| STATE OF OHIO | } |
| | } ss: |
| COUNTY OF CUYAHOGA | } |

### AFFIDAVIT AND STATEMENT OF GREGORY R. LIPPERT IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Gregory R. Lippert, hereby declare as follows:

1.      I am the Chief Executive Officer and President of debtor and debtor-in-possession Lube Holdings, Inc. ("Lube Holdings"). I am also the Chief Executive Officer and President of the other above-captioned debtors and debtors-in-possession (collectively with Lube Holdings, the "Debtors"). In this capacity, I am familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 (collectively, the "Chapter 11 Cases") of title 11 of the

---

[1] The Debtors and the last four digits of the Debtors' United States Tax Identification Number following in parentheses are: QSL of Medina, Inc. (8260); QSL Operations, Inc. (2667); QSL Management, Inc. (1988); Quaker Steak & Lube Franchising Corporation (1589); Quaker Steak & Wings, Inc. (7669); QSL Sauces, Inc. (8951); QSL Intellectual Properties Corporation (9985); QSL of Buffalo, Inc. (6439); QSL of Sheffield, Inc. (5326); QSL of Plano, Inc. (6701); QSL of Warren, Inc. (3865); QSL of Independence, Ohio, Inc. (0166); QSL of Newport News, Inc. (3858); QSL of Lakewood, Inc. (1575); QSL of Harrisonburg, Inc. (4832); QSL of Concord, Inc. (9262); QSL of Carrollton, Inc. (7632); QSL of Fort Wayne, Inc. (3079); Lube Holdings, Inc. (6457); Best Wings USA, Inc. (1339); QSL of Wheeling, Inc. (2220); QSL of Vermillion, Inc. (5207); QSL of Springfield, Inc. (9745); QSL of Springfield Realty, Inc. (9589); QSL of Fredericksburg, Inc. (4887); QSL of Medina Reality, Inc. (8418); and Lube Aggregator Inc. (1263).

15-52722-amk    Doc 6    FILED 11/16/15    ENTERED 11/16/15 15:22:09    Page 1 of 66

United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Ohio (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings"). I submit this affidavit and statement (the "Affidavit") in support of the Debtors' Chapter 11 Cases and the First Day Pleadings.

3. Except as otherwise indicated, all statements set forth in this Affidavit are based upon: (a) my personal knowledge as Chief Executive Officer; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; and/or (d) my experience and knowledge of the Debtors' business operations and financial affairs. I have acted as Chief Executive Officer of Lube Holdings since April 2014.

4. The First Day Pleadings are intended to enable the Debtors to operate efficiently and effectively during the Chapter 11 Cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of the Chapter 11 Cases. Among other things, the First Day Pleadings seek relief aimed at sustaining the business operations of the Debtors and maintaining the confidence of the Debtors' customers, employees, franchisees, secured lenders, vendors, landlords, and other creditors. Retaining the support of these key constituencies is critical to the Debtors' efforts to stabilize their business operations and maximize value for the benefit of their creditors. I also believe that, absent immediate access to additional financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as sought under and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their bankruptcy estates.

5.     If called to testify, I could and would testify to the facts set forth in this Affidavit. I am authorized by the Debtors to submit this Affidavit. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operations of, the Debtors' businesses, and (b) maximize and preserve the value of the Debtors' bankruptcy estates. Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.

6.     Part I of this Affidavit describes the Debtors' businesses; Part II describes the circumstances giving rise to the commencement of the Chapter 11 Cases; Part III describes the Debtors' proposed course for the Chapter 11 Cases; and Part IV sets forth certain facts in support of the First Day Pleadings.

## Part I

### Overview of the Debtors' Businesses

7.     Quaker Steak & Lube® is a highly differentiated motorsports themed casual dining restaurant concept developed and refined over the past 41 years. Quaker Steak & Lube® was founded by Gary "Moe" Meszaros and George "Jig" Warren in March of 1974 when the co-founders purchased a vacant automobile service station in Sharon, Pennsylvania and converted it into a restaurant and bar named "Quaker Steak & Lube."

8.     It is from these humble beginnings that the Quaker Steak & Lube® family of restaurants began. Today, Quaker Steak & Lube® is still rescuing muscle cars, vintage cars, trucks and a vast selection of custom and antique motorcycles, giving them good homes hanging from the walls and ceilings in each of its restaurants. The company's signature menu item is its award-winning chicken wings, known as "Best Wings USA", prepared using the company's assortment of 29 signature sauces and rubs.

9.    As of the Petition Date, Quaker Steak & Lube® has 12 corporate-owned or controlled operating locations, one joint venture, and 43 franchised locations operating in 16 states and Canada.  In the fifteen months prior to the Petition Date, Lube Holdings closed 7 corporate owned locations in: (a) Springfield, Illinois; (b) Carrollton, Texas; (c) Concord, North Carolina; (d) Fredericksburg, Virginia; (e) Fort Wayne, Indiana; (f) Plano, Texas; and (g) Buffalo, New York.

10.    Debtor Lube Aggregator, Inc. is a privately-held Delaware corporation.  Lube Aggregator, Inc. in turn owns all of the interests of Lube Holdings.  Lube Holdings is the direct or indirect parent of each of the remaining Debtors.  A corporate organizational chart showing the Debtors' corporate structure is attached hereto as **Exhibit A**, which is incorporated herein by reference.[2]   As of the Petition Date, the directors of Lube Holdings are Debra Koenig (Chairperson), Michael Stack, Lee Cohn, David Strang, and myself.

11.    Debtor QSL of Medina, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Medina").  Medina operates a Quaker Steak & Lube® restaurant located at 4094 Pearl Road, Medina Township, Ohio 44256.  Debtor QSL of Medina Realty, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Medina Realty"). Medina Realty owns the real property on which the Medina restaurant is located.

12.    Debtor Quaker Steak & Lube Franchising Corporation is a Pennsylvania corporation and wholly-owned subsidiary of Lube Holdings ("Franchising"). Franchising is a party to approximately 43 franchise agreements (collectively, the "Franchise Agreements") with

---

[2] Lube Holdings also owns 75% of non-debtor QSL of Austintown Ohio, LLC, an Ohio limited liability company ("Austintown"), and 25% of non-debtor QSL of Austintown Ohio Realty LLC, an Ohio limited liability company ("Austintown Realty").  Austintown Realty owns the real property on which the Austintown restaurant is located. The equity interests of Lube Holdings in Austintown and Austintown Realty are property of its bankruptcy estate. The financial information contained herein excludes Austintown's operating results and rental income paid to Austintown Realty; however, the consolidated financials do include G&A expense related to Austintown and certain of Austintown's bank accounts are referenced in the Debtors' request to continue the use of their existing cash management system.

approximately 22 different franchisees (collectively, the "Franchisees"). Franchising is also a party to four Franchise Agreements where the applicable Franchisee has not yet opened its Quaker Steak & Lube® restaurant. In 2014, seven new franchised Quaker Steak & Lube® restaurants opened. In addition, three new Quaker Steak & Lube® restaurants opened in 2015. Three franchised locations closed in 2014 and four franchised locations closed in 2015. Pursuant to the Franchise Agreements, Franchising provides the Franchisees with use of the Quaker Steak & Lube System, including, without limitation, use of intellectual property and licensed trademarks, recipes, menu items, food products, operating manuals and procedures, operational support, training, and centralization of purchasing. In return, the Franchisees pay certain fees, including initial franchise fees (the "Initial Fees"), a royalty fee equal to five percent (5%) of the Franchisee's weekly net revenue down to four and one-half percent (4.5%) of the Franchisee's weekly net revenue depending on the number of restaurants being operated by the applicable Franchisee; provided, however, that operators of an ancillary facility (such as a facility located at a stadium, airport, arena, university, or amusement park) pay a royalty fee equal to ten percent (10%) of weekly net revenue (collectively, the "Royalty Fees), and 0.75% of weekly net revenue for marketing and other brand development costs (the "Marketing Fees," and collectively with the Royalty Fees and the Initial Fees, the "Franchise Fees"). Although the Franchise Fees vary from year to year, they account for approximately twelve and three tenths percent (12.3%) of the Debtors' consolidated revenue on an annual basis. Failure to pay the Franchise Fees is a terminating event of default under the Franchise Agreements.

13.     Debtor QSL Sauces, Inc. is a Pennsylvania corporation and wholly-owned subsidiary of Lube Holdings ("Sauces"). Sauces generates revenue by selling Quaker Steak & Lube® sauces to retailers such as Walmart and other grocery chains.

14.     Debtor QSL Intellectual Properties Inc. is a Pennsylvania corporation and wholly-owned subsidiary of Lube Holdings ("Intellectual Properties"). Intellectual Properties owns intellectual property and the sauce recipes.

15.     Debtor Quaker Steak & Wings, Inc. is a Pennsylvania corporation and wholly-owned subsidiary of Lube Holdings ("Steak & Wings"). Steak & Wings operates a Quaker Steak & Lube® restaurant located at 435 Boardman-Poland Road, Boardman, Ohio 44512.

16.     Debtor QSL of Sheffield, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Sheffield"). Sheffield operates a Quaker Steak & Lube® restaurant located at 4900 Transportation Drive, Sheffield Village, Ohio 44054.

17.     Debtor QSL of Warren, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Warren"). Warren operates a Quaker Steak & Lube® restaurant located at 2191 Millennium Blvd., Cortland, Ohio 44410.

18.     Debtor QSL of Independence, Ohio, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Independence"). Independence operates a Quaker Steak & Lube® restaurant located at 5935 Canal Road, Valley View, Ohio 44125.

19.     Debtor QSL of Lakewood, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Lakewood"). Lakewood operates a Quaker Steak & Lube® restaurant located at 15312 Detroit Avenue, Lakewood, Ohio 44107.

20.     Debtor QSL of Vermillion, Inc. is an Ohio corporation and wholly-owned subsidiary of Lube Holdings ("Vermillion"). Vermillion operates a Quaker Steak & Lube® restaurant located at 5150 Liberty Avenue, Vermillion, Ohio 44089.

21.     Debtor Best Wings USA, Inc. is a Pennsylvania corporation and wholly-owned subsidiary of Lube Holdings ("Best Wings"). Best Wings operates a Quaker Steak & Lube®

restaurant located at 101 Chestnut Street, Sharon, Pennsylvania 16146. Best Wings also owns real property located at: (a) 101 Chestnut Street, Sharon, Pennsylvania 16146; (b) 110 Connelly Blvd., Sharon Pennsylvania 16146; and (c) 130 S. Dock Street, Sharon, Pennsylvania 16146.

22.     Debtor QSL of Buffalo, Inc. is a New York corporation and wholly-owned subsidiary of Lube Holdings ("Buffalo"). Buffalo operated a Quaker Steak & Lube® restaurant located at 6727 Transit Road, Lancaster, NY 14221. This restaurant closed on or about September 9, 2015.

23.     Debtor QSL of Springfield, Inc. is an Illinois corporation and wholly-owned subsidiary of Lube Holdings ("Springfield"). Springfield operated a Quaker Steak & Lube® restaurant located at 1121 W. Lincolnshire Blvd., Springfield, Illinois 62704. This restaurant closed on or about August 11, 2014. Debtor QSL of Springfield Realty, Inc. is an Illinois corporation and wholly-owned subsidiary of Lube Holdings ("Springfield Realty"). Springfield Realty owns the real property on which Springfield's restaurant is located.

24.     Debtor QSL of Newport News, Inc. is a Virginia corporation and wholly-owned subsidiary of Lube Holdings ("Newport News"). Newport News operates a Quaker Steak & Lube® restaurant located at 12832 Jefferson Avenue, Newport News, Virginia 23608.

25.     Debtor QSL of Harrisonburg, Inc. is a Virginia corporation and wholly-owned subsidiary of Lube Holdings ("Harrisonburg"). Harrisonburg operates a Quaker Steak & Lube® restaurant located at 350 University Blvd., Harrisonburg, Virginia 22801.

26.     Debtor QSL of Fredericksburg, Inc. is a Virginia corporation and wholly-owned subsidiary of Lube Holdings ("Fredericksburg"). Fredericksburg operated a Quaker Steak & Lube® restaurant located at 1300 Central Park Blvd., Fredericksburg, Virginia 22401. This restaurant closed on or about January 27, 2015.

27.     Debtor QSL of Fort Wayne, Inc. is an Indiana corporation and wholly-owned subsidiary of Lube Holdings ("Fort Wayne"). Fort Wayne operated a Quaker Steak & Lube® restaurant located at 407 W. Coliseum Blvd., Fort Wayne, Indiana 46805.  This restaurant closed on or about June 16, 2015.

28.     Debtor QSL of Wheeling, Inc. is a West Virginia corporation and wholly-owned subsidiary of Lube Holdings ("Wheeling"). Wheeling operates a Quaker Steak & Lube® restaurant located at 45 Satterfield Road, Triadelphia, West Virginia 26059.

29.     Debtor QSL of Concord, Inc. is a North Carolina corporation and wholly-owned subsidiary of Lube Holdings ("Concord").  Concord operated a Quaker Steak & Lube® restaurant located at 7731 Gateway Lane NW, Concord, North Carolina 28027.  This restaurant closed on or about October 12, 2014.

30.     Debtor QSL Operations, Inc. is a Texas corporation and wholly-owned subsidiary of Lube Holdings ("QSL Operations").

31.     Debtor QSL Management, Inc. is a Texas corporation and wholly-owned subsidiary of QSL Operations ("QSL Management").

32.     Debtor QSL of Plano, Inc. is a Texas corporation and wholly-owned subsidiary of QSL Management ("Plano").  Plano operated a Quaker Steak & Lube® restaurant located at 5584 Texas Highway 121, Plano, Texas 75024.  This restaurant closed on or about July 31, 2015.

33.     Debtor QSL of Carrollton, Inc. is a Texas corporation and wholly-owned subsidiary of QSL Management ("Carrollton"). Carrollton's corporate charter was forfeited by the Texas Secretary of State on August 1, 2014. Carrollton operated a Quaker Steak & Lube®

restaurant located at 54109 Highway 121, Carrollton, Texas 75010. This restaurant closed on or about August 11, 2014.

**Owned and Leased Real Property**

34.     With the exception of the owned real property of (a) Medina Realty located at 4094 Pearl Road, Medina Township, Ohio 44256; (b) Springfield Realty located at 1121 W. Lincolnshire Blvd., Springfield, Illinois 62704; and (c) Best Wings located at (i) 101 Chestnut Street, Sharon, Pennsylvania 16146; (ii) 110 Connelly Blvd., Sharon Pennsylvania 16146; and (iii) 130 S. Dock Street, Sharon, Pennsylvania 16146, all of the other corporate-owned Quaker Steak & Lube® restaurants are leased locations.

**Lender Summary**

35.     The Debtors do not have a revolving line of credit to support their business operations. Instead, the Debtors are reliant upon discretionary consumer spending, franchise royalties, and revenues from their wing sauce retail business to fund their liquidity needs.

36.     The Debtors are parties to the following mortgage and equipment loans:

(a)     Wells Fargo Bank, National Association ("Wells Fargo Bank")

(i)     On September 7, 2011, Lube Holdings executed and delivered a Promissory Note in the principal amount of $1,800,000.00 in favor of Wells Fargo Bank ("WF Note One"). Springfield Realty, Springfield, Wheeling, Vermillion, Sauces, Independence, Steak & Wings, Sheffield, Franchising, Intellectual Properties, and Best Wings each guaranteed the obligations on Lube Holdings to Wells Fargo Bank. All of the guarantees are unsecured except with respect to Springfield Realty, Best Wings (see below) and Independence (see below). Springfield Realty executed and delivered that certain Construction Mortgage dated September

7, 2011, up to the maximum amount of $3,600,000.00 in favor of Wells Fargo Bank with respect to its owned real property located at 1121 W. Lincolnshire Blvd., Springfield, Illinois 62704[3] (the "Springfield Real Property Collateral").

(ii)     On November 28, 2011, Springfield executed and delivered a Promissory Note in the principal amount of $591,321.24 in favor of Wells Fargo Equipment Finance ("WF Note Two"). Lube Holdings guaranteed the obligations owed to Wells Fargo Equipment Finance. Springfield executed and delivered a Security Agreement dated as of August 15, 2011. Wells Fargo Equipment Finance filed a UCC-1 financing statement listing certain of Springfield's assets as collateral, including, without limitation, sound and vision equipment, restaurant equipment, signs, 2 bar tops and bar die paneling (collectively, the "Wells Fargo Equipment Collateral").

(iii)     On March 9, 2012, Lube Holdings executed and delivered a Promissory Note in the principal amount of $2,491,000.00 in favor of Wells Fargo Bank ("WF Note Three").  Springfield Realty, Springfield, Wheeling, Vermillion, Sauces, Independence, Steak & Wings, Sheffield, Franchising, Intellectual Properties, and Best Wings each guaranteed the obligations on Lube Holdings to Wells Fargo Bank. All of the guarantees are unsecured except with respect to Springfield Realty (see the Commercial Mortgage referenced above), Best Wings, and Independence.  Best Wings executed and delivered that certain Open-End Mortgage and an Assignment of Rents dated March 9, 2012, up to the maximum amount of $2,491,000.00 in favor of Wells Fargo Bank with respect to its owned real property located at 101 Chestnut Street, Sharon, Pennsylvania 16146, 110 Connelly Blvd., Sharon Pennsylvania 16146, and 130 S. Dock Street, Sharon, Pennsylvania 16146 (the "Sharon Real Property Collateral").  On March

---

[3] The address of the real property subject to the Construction Mortgage was originally listed as 3632 W. Grand Avenue, Springfield, Illinois 62711.  The Construction Mortgage was amended to include the correct address of the real property.

9, 2012, Independence granted Wells Fargo Bank an assignment of its ground lease and rents for the real property located at 5935 Canal Road, Valley View, Ohio 44125 (the "Independence Ground Lease Collateral" and collectively with the Springfield Real Property Collateral, the Wells Fargo Equipment Collateral, and the Sharon Real Property Collateral, the "Wells Fargo Collateral").

(iv)     On December 9, 2014, Wells Fargo Bank sent the borrowers and guarantors a notice of default and reservation of rights letter in which Wells Fargo Bank accelerated the indebtedness owed under WF Note One and WF Note Three, including interest at the default rate.

(v)     According to the books and records of the Debtors, approximately: (a) $1,648,180 is owed to Wells Fargo Bank as of the Petition Date on WF Note One, plus unpaid interest, fees and costs; (b) $48,908 is owed to Wells Fargo Equipment Finance as of the Petition Date on WF Note Two, plus unpaid interest, fees and costs; and (c) $2,307,078 is owed to Wells Fargo Bank as of the Petition Date on WF Note Three, plus unpaid interest, fees and costs.

(b)     <u>United Capital Business Lending, Inc. ("United Capital")</u>

(i)     On January 29, 2013, Wheeling, Vermillion, and Plano, as borrowers, executed and delivered a Promissory Note in the original principal amount of $1,015,289.00 in favor of United Capital ("UC Note One"). The borrowers also executed and delivered that certain Loan and Security Agreement dated January 29, 2013, pursuant to which they granted United Capital a blanket lien on all of their assets. Lube Holdings, Carrollton, and QSL Management executed and delivered guaranty agreements in favor of United Capital. In addition, on December 12, 2013, Wheeling, Vermillion, Plano, Lube Holdings, Carrollton, QSL

Management, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne each executed and delivered that certain Cross Default and Cross Collateral Agreement in favor of United Capital.

(ii)     On March 27, 2013, Carrollton, as a borrower, executed and delivered a Promissory Note in the original principal amount of $802,475.10 in favor of United Capital ("UC Note Two"). Carrollton also executed and delivered that certain Loan and Security Agreement dated March 27, 2013, pursuant to which it granted United Capital a blanket lien on all of its assets. Lube Holdings, QSL Management, Wheeling, Vermillion, and Plano executed and delivered guaranty agreements in favor of United Capital. In addition, on December 12, 2013, Wheeling, Vermillion, Plano, Lube Holdings, Carrollton, QSL Management, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne each executed and delivered that certain Cross Default and Cross Collateral Agreement in favor of United Capital.

(iii)     On December 31, 2013, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne, as borrowers, executed and delivered a Promissory Note in the original principal amount of $1,940,000.00 in favor of United Capital ("UC Note Three"). The borrowers also executed and delivered that certain Development Line Loan and Security Agreement dated December 31, 2013, in the maximum principal amount of $2,752,000.00, pursuant to which they granted United Capital a blanket lien on all of their assets. Lube Holdings, QSL Management, Wheeling, Vermillion, and Plano executed and delivered guaranty agreements in favor of United Capital. In addition, on December 12, 2013, Wheeling, Vermillion, Plano, Lube Holdings, Carrollton, QSL Management, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne each executed and delivered that certain Cross Default and Cross Collateral Agreement in favor of United Capital. The collateral granted by any

of the Debtors to United Capital is referred to herein collectively as the "United Capital Collateral").

(iv)     On November 20, 2014, United Capital sent the borrowers and guarantors a notice of default and reservation of rights letter in which United Capital accelerated the indebtedness owed under UC Note One, UC Note Two, and UC Note Three.

(v)     On February 13, 2015, United Capital filed three complaints in the Circuit Court for Baltimore County, Maryland seeking confessions of judgment in connection with the indebtedness and obligations under the loan documents related to UC Note One, UC Note Two, and UC Note Three.  A confession of judgment was obtained in case number:  (i) 03C15001783 on March 13, 2015 in the amount of $1,808,530.56, with interest from October 1, 2014 at the rate of 11.75% per annum, and attorneys' fees and expenses in an amount to be determined against Plano, Vermillion, Wheeling, Lube Holdings, Carrollton, QSL Management, Concord, Fort Wayne, Fredericksburg, Harrisonburg, and Newport News (collectively, the "UC Judgment Debtors"); (ii) 03C15001784 on March 10, 2015 in the amount of $671,241.34, plus attorneys' fees and expenses in an amount to be determined against the UC Judgment Debtors; and (iii) 03C15001786 on March 23, 2015 in the amount of $840,964.45, interest at the rate of 11.5% per annum, and attorneys' fees and expenses in an amount to be determined, against the UC Judgment Debtors.  The UC Judgment Debtors have moved to vacate, open or modify the confessions of judgment under Maryland Rule 2-611.  No rulings were made with respect to such motions to vacate prior to the Petition Date.

(c)     Cortland Savings and Banking Company ("Cortland")

(i)     On June 3, 2011, Steak & Wings executed and delivered a Promissory Note in the original principal amount of $250,000.00 in favor of Cortland ("Cortland

Note One"). Lube Holdings executed and delivered a guaranty agreement dated June 3, 2011 in favor of Cortland. Steak & Wings executed and delivered that certain Commercial Security Agreement dated June 3, 2011, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note One.

(ii) On June 3, 2011, Steak & Wings executed and delivered a Promissory Note in the original principal amount of $318,750.00 in favor of Cortland ("Cortland Note Two"). Lube Holdings executed and delivered a guaranty agreement dated June 3, 2011 in favor of Cortland. Steak & Wings executed and delivered that certain Commercial Security Agreement dated June 3, 2011, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Two.

(iii) On October 13, 2011, Steak & Wings executed and delivered a Promissory Note in the original principal amount of $95,679.00 in favor of Cortland ("Cortland Note Three"). Lube Holdings executed and delivered a guaranty agreement dated June 11, 2011 in favor of Cortland. Steak & Wings executed and delivered that certain Commercial Security Agreement dated October 13, 2011, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Three.

(iv) On May 23, 2012, Lakewood executed and delivered a Promissory Note in the original principal amount of $822,040.00 in favor of Cortland ("Cortland Note Four"). Lube Holdings executed and delivered a guaranty agreement dated May 23, 2012 in favor of Cortland. Lakewood executed and delivered that certain Commercial Security Agreement dated May 23, 2012, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Four.

(v)     On May 23, 2012, Lakewood executed and delivered a Promissory Note in the original principal amount of $633,477.00 in favor of Cortland ("Cortland Note Five"). Lube Holdings executed and delivered a guaranty agreement dated May 23, 2012 in favor of Cortland.  Lakewood executed and delivered that certain Commercial Security Agreement dated May 23, 2012, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Five.

(vi)     On February 27, 2013, Medina executed and delivered a Promissory Note in the original principal amount of $522,644.00 in favor of Cortland ("Cortland Note Six"). Lube Holdings and Medina Realty are guarantors of the indebtedness owed to Cortland under Cortland Note Six. Medina executed and delivered a Commercial Security Agreement dated February 27, 2013 in favor of Cortland, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Six. In addition, Cortland Note Six is secured by a mortgage lien on the real property owned by Medina Realty pursuant to an Open-End Mortgage dated February 27, 2013.

(vii)     On February 27, 2013, Medina Realty executed and delivered a Promissory Note in the original principal amount of $1,000,000.00 in favor of Cortland ("Cortland Note Seven"). Lube Holdings and Medina are guarantors of the indebtedness owed to Cortland under Cortland Note Seven. Medina Realty executed and delivered a mortgage and assignment of rents dated February 27, 2013 in favor of Cortland with respect to the real estate owned by Medina Realty. In addition, Medina executed and delivered a Commercial Security Agreement dated February 27, 2013 in favor of Cortland, pursuant to which it granted Cortland a blanket lien on its assets to cross-collateralize Cortland Note Seven.[4] The collateral pledged by

---

[4] Non-debtor Austintown executed a Promissory Note, dated March 9, 2006, in the original principal amount of $700,000.00 in favor of Cortland.  Austintown Realty and The Raymond R. Travaglini 1989 Revocable Trust are

the respective Debtors to Cortland, exclusive of the Cortland Austintown Collateral, is referred to herein as the "Cortland Collateral").

(viii)    According to the books and records of the Debtors, approximately: (i) $157,484 is owed to Cortland as of the Petition Date on Cortland Note One, plus unpaid interest, fees and costs; (ii) $111,918 is owed to Cortland as of the Petition Date on Cortland Note Two, plus unpaid interest, fees and costs; (iii) $43,553 is owed to Cortland as of the Petition Date on Cortland Note Three, plus unpaid interest, fees and costs; (iv) $618,969 is owed to Cortland as of the Petition Date on Cortland Note Four, plus unpaid interest, fees and costs; (v) $335,265 is owed to Cortland as of the Petition Date on Cortland Note Five, plus unpaid interest, fees and costs; (vi) $388,443 is owed to Cortland as of the Petition Date on Cortland Note Six, plus unpaid interest, fees and costs; and (vii) $960,932 is owed to Cortland as of the Petition Date on Cortland Note Seven, plus unpaid interest, fees and costs.

(d)    The Farmer's National Bank of Canfield ("Farmer's)

(i)    On November 14, 2013, Warren and Lube Holdings, as borrowers, executed and delivered that certain Promissory Note in the original principal amount of $612,000.00 ("Farmer's Note One").    In addition, on November 14, 2013, Warren and Lube Holdings, as borrowers, executed and delivered that certain Promissory Note in the original principal amount of $1,339,000.00 ("Farmer's Note Two"). Warren executed and delivered (i) a Security Agreement for Personal Property dated November 14, 2013, pursuant to which it granted Farmer's a blanket lien on its assets, and (ii) an Open-End Mortgage Deed (leasehold),

---

guarantors.  The obligations owed to Cortland under the note are secured by a blanket lien on Austintown's assets and by a mortgage lien on the real property owned by Austintown Realty. In addition, on February 24, 2006, non-debtor Austintown Realty executed a Promissory Note in the original principal amount of $2,000.000.00 in favor of Cortland.  Austintown is a guarantor.  The obligations owed to Cortland under the note are secured by a blanket lien on Austintown's assets and by a mortgage lien on the real property owned by Austintown Realty (the collateral pledged to Cortland by Austintown and Austintown Realty is collectively referred to herein as the "Cortland Austintown Collateral").

Assignment of Rents & Profits and Security Agreement dated November 14, 2013 (a ground lease mortgage) to secure Warren's obligations and indebtedness owed to Farmer's under Farmer's Note One and Farmer's Note Two. The collateral pledged by Warren to Farmer's is referred to herein as the "Farmer's Collateral".

(ii)     According to the books and records of the Debtors, approximately (i) $443,724 is owed to Farmer's as of the Petition Date on Farmer's Note One, plus unpaid interest, fees and costs, and (ii) $1,258,741 is owed to Farmer's as of the Petition Date on Farmer's Note Two, plus unpaid interest, fees and costs.

(e)     <u>Scott's Buffalo Wings, Inc. ("SBW")</u>

(i)     On August 14, 2013, Buffalo executed and delivered that certain Promissory Note in the original principal amount of $920,000.00 in favor of SBW ("SBW Note One"). Lube Holdings guaranteed the obligations owed by Buffalo to SBW. Buffalo executed and delivered that certain Security Agreement dated August 14, 2013 in favor of SBW, pursuant to which it granted SBW a lien on all equipment, inventory, the cash or non-cash proceeds of the same and all license, franchise and related rights concerning the same. The collateral pledged by Buffalo to SBW is referred to herein as the "SBW Collateral".

(ii)     According to the books and records of the Debtors, approximately $772,543 is owed to SBW as of the Petition Date on SBW Note One, plus unpaid interest, fees and costs.

(f)     <u>Ally Bank</u>

Best Wings executed a Motor Vehicle Retail Installment Sales Contract dated December 19, 2012, for the purchase of a 2010 Chevrolet HHR, in the amount of $12,762.65. Ally Bank has an alleged lien on the vehicle (the "Ally Bank Collateral").  According to the

books and records of the Debtors, approximately $6,165 is owed to Ally Bank as of the Petition Date.

     (g)    <u>First National Bank of Pennsylvania ("FNB")</u>

Independence purchased a 2008 F-250 Ford extended cab super duty truck for the amount of $23,423 on December 20, 2013. FNB has an alleged lien on the truck (the "FNB Collateral"). According to the books and records of the Debtors, approximately $16,346 is owed to FNB as of the Petition Date.

     (h)    <u>IPFS Corporation ("IPFS")</u>

Lube Holdings executed and delivered that certain Premium Finance Agreement dated June 19, 2014, in the original principal amount of $109,807.39 (insurance premium financing for liquor liability insurance). This debt is unsecured. According to the books and records of the Debtors, approximately $35,168 is owed to IPFS as of the Petition Date.

     (i)    <u>Reinhart Foodservice, Inc. ("Reinhart")</u>

Lube Holdings executed and delivered a Promissory Note dated December 12, 2013, in the original principal amount of $324,977.00 in favor of Reinhart. This debt is unsecured. According to the books and records of the Debtors, approximately $216,651 is owed to Reinhart as of the Petition Date under the note.[5]

     (j)    <u>TriMark SS Kemp ("TriMark")</u>

Lube Holdings executed and delivered a Promissory Note dated December 12, 2013, in the original principal amount of $354,000.00 in favor of TriMark. This debt is unsecured. According to the books and records of the Debtors, approximately $105,667 is owed to TriMark as of the Petition Date under the note.

---

[5] This amount owing to Reinhart is a separate debt from the ordinary trade payables owing to Reinhart in the ordinary course of the Debtors' business operations.

37.     The Debtors are current on all of their insurance obligations.  The Debtors intend to maintain appropriate insurance coverage during the pendency of the Chapter 11 Cases.

38.     In addition, to the obligations referenced above, the Debtors' books and records show that, as of the Petition Date, approximately $3,712,000 is owed in the aggregate to the Debtors' general unsecured creditors (excluding any potential claims for rejection damages arising in the Chapter 11 Cases).

## Part II

## Events Leading to the Chapter 11 Cases

39.     Like other casual dining restaurant chains, the Debtors' financial performance is sensitive to volatility in consumer discretionary spending.  Since December 2013, the Debtors' corporate EBITDA has deteriorated due to the acquisition of certain underperforming units and select corporate owned units with negative same-store sales.   The Debtors closed certain underperforming corporate owned restaurants and implemented a restructuring plan to address the reality that the Debtors did not have sufficient liquidity to make debt service payments to their secured lenders.   In July 2014, the Debtors retained Mastodon Ventures, Inc. as its investment banker ("Mastodon").   Mastodon completed a comprehensive analysis of the Debtors' debt service requirements, operations, and financial performance, including, minimum EBITDA, revenue levels, occupancy costs, and same store sales.   Based on Mastodon's analysis, the Debtors determined that they could not service their existing secured debt and concluded that a financial and operational restructuring was necessary to preserve the valuable Quaker Steak & Lube® brand and to continue operations at profitable restaurants.

40.     Since September 2014, the Debtors have been engaged in extensive discussions and negotiations with their secured lenders in an attempt to restructure their existing capital

15-52722-amk    Doc 6    FILED 11/16/15    ENTERED 11/16/15 15:22:09    Page 19 of 66

structure. Ultimately, those negotiations were not successful. Simultaneously, the Debtors, through Mastodon, attempted for several months to find a replacement lender or bridge loan lender to provide the Debtors with sufficient liquidity to implement their operational restructuring strategy. Several parties expressed interest and signed confidentiality agreements to conduct due diligence. Certain of those parties issued formal letters of intent or expressions of interest (with one even obtaining exclusivity as the parties attempted to formalize a workable transaction structure). However, the efforts to find a financial partner that could provide sufficient liquidity in the form of debt or equity were ultimately not successful. As a result, the Debtors refocused their efforts on marketing the business for a sale to potential buyers.

41. During the past year, several of the landlords for the Debtors' closed locations, as well as United Capital, Wells Fargo and SBW, commenced lawsuits against certain of the Debtors in numerous jurisdictions across the country. While these lawsuits are in various stages and the Debtors are defending them, they are reaching the point where it is no longer economically viable to contend with these lawsuits in multiple forums. Accordingly, these pre-Petition Date litigation matters, along with United Capital's decision to obtain the confessions of judgment and the lack of a financial partner willing to provide liquidity outside of a bankruptcy filing all contributed to the Debtors' need to commence the Chapter 11 Cases.

## Part III

### Proposed Course of the Chapter 11 Cases

42. The Debtors' filed the Chapter 11 Cases to preserve the significant value of the Quaker Steak & Lube® brand and to maximize the value of their assets for the benefit of all stakeholders. The Debtors have executed an Asset Purchase Agreement with TravelCenters of America LLC (the "Stalking Horse Bidder") to sell substantially all of their assets via a chapter

11 bankruptcy. The Debtors will be filing motions seeking the approval of bidding procedures and the ultimate sale of substantially all of their assets. The Debtors intend to solicit higher and better offers through a transparent and competitive sale process that will result in the distribution of net transaction proceeds to satisfy the valid and allowed claims of their secured and unsecured creditors, and potentially, the return of value to Lube Aggregator's shareholders.

43.    Absent material developments or the preferences of the Stalking Horse Bidder or other successful bidder, the Debtors do not anticipate closing any additional restaurants during pendency of the Chapter 11 Cases.

## Part IV

## Facts in Support of First Day Pleadings[6]

44.    Concurrently with the filing of the Chapter 11 Cases, the Debtors have filed a number of First Day Motions, each of which is described briefly below. I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption; and (b) constitutes a critical element in maintaining the value of the Debtors' assets during the chapter 11 process.

**Debtors' Motion for an Order (i) Directing Joint Administration of Cases; and (ii) Approving Caption for Jointly Administered Cases (the "Joint Administration Motion")**

45.    The Debtors consist of 27 separate legal entities that are in one way or another related to the Quaker Steak & Lube® restaurant brand and operations. The Debtors, however, operate in an integrated manner that requires the Chapter 11 Cases to be jointly administered. Because of this integrated nature of operations, the expense and potential confusion of running

---

[6] Capitalized terms not defined within this Part IV shall have the meanings ascribed to such terms in the respective First Day Pleadings.

separate chapter 11 cases would materially hamper the Debtors' restructuring efforts and drive up administrative costs.

46.     I understand that the Bankruptcy Code and Bankruptcy Rules permit the joint administration of Chapter 11 Cases for procedural purposes only where the Debtors are corporate entities and are affiliated through common ownership.

47.     The Debtors are seeking joint administration of their cases because such joint administration will have a number of beneficial effects.  Joint administration will permit the Clerk of this Court to utilize a single general docket for these cases, which will assist both the Court and all parties in interest to more easily track substantive matters related to the cases.  The Debtors anticipate that numerous notices in these cases will affect each of the Debtors and their estates.  Joint administration will allow the Debtors and the Court, as appropriate, to combine those notices, thus significantly reducing the noticing burden in the cases.  Joint administration will also in many instances significantly reduce the volume of paperwork and make administrative tasks of the Court and parties in interest less burdensome, costly, and time-consuming.

48.     The Joint Administration Motion is not a motion for the substantive consolidation of the Debtors' estates, so the rights of parties in interest will not be prejudiced or otherwise affected in any way by the entry of an order directing the joint administration of the Chapter 11 Cases.

49.     The Joint Administration Motion requests a specific official caption to be used by all parties in all pleadings in the jointly administered cases.  The Debtors believe that use of this simplified caption, naming QSL of Medina, Inc. as the first of the Debtors, and omitting reference to each Debtor's respective state of incorporation, addresses, tax identification

numbers, and previous names, will eliminate cumbersome and confusing procedures, and ensure a uniformity of pleading identification. Such information is included in the petitions for each respective Debtor, and such petitions are publicly available to parties in interest or will be provided by the Debtors upon request.

**Debtors' Motion for Interim and Final Orders: (i) Authorizing Debtors to Obtain Financing and Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying the Automatic Stay; (iv) Setting Final Hearing; and (v) Granting Related Relief (the "DIP Financing Motion")**

51. The Debtors require money for the operation of their businesses and administration of their bankruptcy estates, including but not limited to the payment of critical pre-and postpetition wages, salaries, and other expenses, which are essential to the preservation of the estates. The continued operation of Debtors is in the best interests of creditors, the estates and all interested parties because it will preserve going concern values and provide the prospect of greater potential recoveries for creditors than would the immediate termination and liquidation of the Debtors' business. Accordingly, as provided in the Interim Order and any Final Order, the Debtors have requested that: (i) the Pre-Petition Lenders make available to the Debtors, all of Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral[7] or the proceeds thereof (the "Cash Collateral")[8] and (ii) the Debtors' postpetition secured lender (the "DIP Lender") to provide post-petition financing pursuant to the terms and conditions of (a) the proposed Interim Order and any Final Order (as defined herein), (b) the DIP Loan Agreement (as defined herein) and all ancillary documents referred to in the

---

[7] Capitalized terms used in this section regarding the DIP Financing Motion that are not otherwise defined have the meanings ascribed to them in the DIP Financing Motion.

[8] None of the Pre-Petition Lenders have dominion over the Debtors' cash or deposit accounts. In addition, the Debtors have not executed and delivered any account control agreements in favor of any of the Pre-Petition Lenders. None of the Pre-Petition Lenders have a lien on the assets of QSL Franchising and/or Sauces.

Interim Order, the DIP Loan Agreement or any final order and/or required to be executed by the Debtors in connection therewith (the "DIP Financing Documents"), and (c) the Original Budget and any Rolling Budget (each as defined below) (collectively with the DIP Financing Documents, the "DIP Credit Facility").

52.     The ability of the Debtors to continue their business and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing from the DIP Lender.  The DIP Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described in the DIP Financing Motion, solely in accordance with the proposed Interim Order and any Rolling Budget and pursuant to the terms and conditions of the DIP Credit Facility.

53.     By the DIP Financing Motion, the Debtors seek an order authorizing them to obtain secured post-petition financing on an interim basis pending entry of a final order in accordance with the proposed Original Budget and any Rolling Budget.  The DIP Lender has indicated a willingness to lend money to the Debtors for the purposes described in the DIP Financing Motion upon the terms and conditions set forth in the DIP Credit Facility, subject to the limitations imposed by the Original Budget and any Rolling Budget.  The DIP Loan Agreement is attached to the DIP Financing Motion as Exhibit B and incorporated therein by reference.

54.     The Debtors have attempted to obtain and presently are unable to borrow additional funds on an unsecured basis under any conditions.  The Debtors will be able to borrow additional funds under from the DIP Lender, provided that the relief requested in the Interim Order and any Final Order is entered by the Court.

55.     As set forth in the DIP Financing Motion, the Debtors need entry of the proposed interim order substantially in the form attached to the DIP Financing Motion as Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"). Pending the Final Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Credit Facility in accordance with the DIP Loan Agreement and the Interim Order.   A summary of the material provisions of the DIP Credit Agreement and/or the Interim Order[9] are set forth as follows:

| | |
|---|---|
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Lube Holdings, Inc. and Quaker Steak and Lube Franchising Corporation |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | All of the remaining Debtors, with the exception of QSL Operations, Inc., QSL Management, Inc. and Lube Aggregator, Inc., are guarantors of the Borrowers' obligations under the DIP Credit Facility. |
| **DIP Lender**<br>*Bankruptcy Rule 4001(c)(1)(B)* | TravelCenters of America LLC, in its capacity as lender under the DIP Credit Facility, and together with any other entities that may hereafter become a lender thereunder. |
| **DIP Loan**<br>*Bankruptcy Rule 4001(c)(1)(B)* | A revolving facility of up to $600,000 prior to entry of the Final Order and up to $1,400,000 after entry of the Final Order through the Maturity Date, reflecting total borrowing under DIP Credit Facility, subject to the Original Budget, and any Rolling Budget. **Interim Order at 7**.<br><br>Pending the Final Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Financing Documents in accordance with the DIP Financing Documents and the Interim Order. To the extent that the Interim Order and or any Final Order conflicts with the terms and provisions of the DIP Financing Documents, the Interim Order and any Final Order shall control. **Section 17.11 of the DIP Loan Agreement**. |

---

[9] The summaries and descriptions of the terms and conditions of the DIP Loan Agreement and Interim Order set forth in the DIP Financing Motion and this Affidavit are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Loan Agreement and Interim Order. In the event there is a conflict between this Affidavit, the DIP Financing Motion, the DIP Loan Agreement or the Interim Order, the DIP Loan Agreement or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Term**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The earliest to occur of: (a) six months for the Petition Date, (b) the effective date of a sale of all or substantially all of the Debtors' assets or business pursuant to Section 363 of the Bankruptcy Code which is authorized by the Bankruptcy Court (and in the event of a series of transactions resulting in the sale of all or substantially all of the Debtors' assets or businesses, the latest of such sale); (c) confirmation of a Chapter 11 Plan of Reorganization and (d) Termination Date. **Section 3.3 of the DIP Loan Agreement**. |
| **Interest Rates**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Non-Default Interest Rate:  LIBOR plus four percent (4%) per annum.<br>Default Interest Rate:  Applicable rate plus five percent (5%) per annum.<br>**Section 2.11 of the DIP Loan Agreement**. |
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Commitment Fee:  $100,000. **Section 2.16 of the DIP Loan Agreement**. |
| **Budget**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | To set forth a 13-week budget which shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances, as may be amended, updated or supplemented with prior consent of the DIP Lender. **Interim Order at 7, Exhibit A to the Interim Order**. |
| **Carve-Out**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The aggregate amount of any budgeted and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtors and any professional retained by the Committee that are in accordance with the Original Budget or applicable Rolling Budget (collectively, the "Professionals") to the extent allowed by an order of this Court (the "Budgeted Professional Fees"), plus (a) those fees, costs and expenses incurred by the Professionals after the Carve-Out Event and subsequently allowed by order of this Court, subject to the Original Budget or applicable Rolling Budget, in an amount not to exceed $100,000 in the aggregate, plus (b) fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 (collectively, the "Carve-Out"); provided that, in no event shall the total Carve-Out amount to be paid to the Committee's retained professionals exceed $155,000. **Interim Order at 11**. |
| **Borrowing Conditions**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Customary borrowing conditions, including, among other things: (i) entry of the attached Interim Order (including liens and claims identified therein) and (ii) meeting of 363 Sale Milestones. **Sections 3.1 and 3.2 of the DIP Loan Agreement; Exhibit B to** |

{5376164:7}

26

| | |
|---|---|
| | **the Interim Order**. |
| **Liens and Priorities**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(i)* | Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender will be granted and shall have a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon any and all Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code. All of the Collateral whether now or hereafter existing that constitutes (i) sauces, mixes or marinades, including all ingredients and inventory associated therewith, is owned by, and good and marketable title is in the name of, QSL Sauces, Inc., (ii) any franchise agreement and royalties and other proceeds associated therewith is owned by, and good and marketable title is in the name of, Quaker Steak & Lube Franchising Corp., and (iii) patents, patent rights, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, copyrights, web addresses, sites and domain names and all applications for such which are in the process of being prepared, is owned or registered by, and good and marketable title is in the name of, QSL Intellectual Properties Corp. **Section 4.1 of the DIP Loan Agreement and Interim Order at 9(a)**.<br><br>The Post-Petition Collateral shall not include avoidance actions under sections 502(d), 544, 545, 547. 548,549,550,551,553 and 724(a) of the Bankruptcy Code and shall not include proceeds of avoidance actions for purposes of the Interim Order. The DIP Lenders reserve the right to request liens on avoidance actions and the proceeds of avoidance actions the Final Order. **Interim Order at 9(x)**.<br><br>Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender shall have a valid, binding, continuing, enforceable, fully-perfected first priority, priming senior security interest in and lien upon all Pre-Petition Collateral that is subject to the Pre-Petition Liens securing the Pre-Petition Obligations, excluding the Excluded Pre-Petition Collateral, and all other security interests and liens on the Collateral (other than the DIP Liens of the DIP Lender), except with respect to any valid, perfected and unavoidable interests in such property arising out of liens to which the holders of pre-petition liens become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. The Excluded Pre-Petition Collateral is defined as (a) the |

Wells Fargo Collateral; (b) the Medina property that has a value over and above the amount of $400,000.00, where the Medina property consists of collectively the real property owned by Medina Realty and the personal property and assets owned by Medina; (c) the United Capital Collateral; (d) the Cortland Austintown Collateral; (e) Lube Holdings' membership interests in Austintown Realty and Austintown; (f) the SBW Collateral; (g) the Ally Bank Collateral; and (h) the FNB Collateral (all as defined below). **Section 2.4 of the DIP Loan Agreement and Interim Order at 9**.

The DIP Liens granted to the DIP Lender shall be senior to and shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor other than as expressly permitted under the DIP Financing Documents. **The DIP Liens are subject only to the Carve-Out. Interim Order at 9(c)**.

The DIP Lender will be granted an allowed superpriority administrative claim (the "DIP Superpriority Claims") in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (including, but not limited to, the Pre-Petition Obligations, which for avoidance of doubt are not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value or as adequate protection for priming by the DIP Credit Facility), now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b) (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, whether arising in the Cases or in any superseding chapter 7 cases concerning the Debtors. The DIP Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (without the need to file any proofs of claim). **Section 2.4 of the DIP Loan Agreement and Interim Order at 8**.

| | |
|---|---|
| **Waivers of Rights**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(x)* | Upon an uncured event of default, the DIP Lender may, free of the restrictions of section 362 of the Bankruptcy Code, (i) take immediate reasonable action to protect and preserve the Collateral, and (ii) after giving five (5) business days' prior written notice of a Termination Event to the Debtors, the Office of the United States Trustee, counsel to the Pre-Petition Lenders, and the Committee to exercise their rights and remedies pursuant to the DIP Financing Documents and/or applicable law, including, without limitation, to foreclose on all or any portion of the Post-Petition Collateral, collect accounts receivable and other monies owing to the Debtors and apply the proceeds thereof in satisfaction of the Post-Petition Obligations unless, prior to the passage of such five (5) business days, the Court shall have entered an order, after a hearing upon notice to the DIP Lender, limiting or restraining the DIP Lender from exercising any or all such rights and remedies. **Section 9 of the DIP Loan Agreement and Interim Order at 16**. |
| **Adequate Protection for Prepetition Lenders**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ii)* | The Pre-Petition Lenders will be granted the Replacement Liens as set forth in the Interim Order subject to (a) unavoidable, duly perfected liens existing as of the Petition Date. The Replacement Liens granted to the Pre-Petition Lenders will be (1) prior and senior to all liens and encumbrances (other than fees arising under 28. U.S.C. §1930) of all other secured creditors in and to such property granted, or arising, subsequent to the date of the Interim Order, and (2) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estate pursuant to section 551 of the Bankruptcy Code, and (3) junior and subordinate to the Carve-Out and the DIP Liens granted to the DIP Lender, to which the Replacement liens shall be immediately junior and subordinate. **Interim Order at 10**.<br><br>The claims of the Pre-Petition Lenders for any diminution in the value of their respective  interests in the Pre-Petition Collateral from the Petition Date resulting from (a) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Pre-Petition Collateral by the Debtors, and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code shall constitute allowed claims against the Debtors with priority over all administrative expenses (other than any fees arising under 28 U.S.C. §1930), diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (collectively, the "Pre- |

| | |
|---|---|
| | Petition Lenders Superpriority Claims"), whether or not such expenses or claims may become secured by judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed Pre-Petition Lenders Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof; provided, however, that the Pre-Petition Lenders Superpriority Claims granted to Pre-Petition Lenders shall be junior and subordinate to the Carve-Out and the DIP Superpriority Claims; The Pre-Petition Lenders reserve their rights to seek additional adequate protection; provided that any adequate protection provided hereafter shall be junior and subordinate to the DIP Liens, the Carve-Out and DIP Superpriority Claims. **Interim Order at 10(ii)**.<br><br>The Pre-Petition Lenders Superpriority Claim shall not include avoidance actions or the proceeds of avoidance actions. **Interim Order at 10(ii)**. |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Events of default that are usual and customary for DIP financings, including:<br>     (a)    the Cases is either dismissed or converted to cases under chapter 7 of the Bankruptcy Code;<br>     (b)    a trustee or an examiner with expanded powers is appointed in the Cases;<br>     (c)    any plan(s) of reorganization of the Debtors is filed which does not provide for the payment in full in cash of the Post-Petition Obligations upon the effective date of the plan(s);<br>     (d)    the Debtors cease operations of their business or take any material action for the purpose of effecting such cessation without the prior written consent of the DIP Lender;<br>     (e)    the Interim Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall materially adversely affect the rights of the DIP Lender or materially and adversely affects the priority of any or all the DIP Lender's claims, liens or security interests and which is not acceptable to the DIP Lender in its reasonable discretion;<br>     (f)    the Final Order is not entered on or before thirty (30) days after the Petition Date;<br>     (g)    the Debtors fail to comply with or perform, in any material respect, the terms and provisions of the Interim Order or any DIP Financing Document, including, without limitation, using Loans or Cash Collateral other than in accordance with the provisions of the Interim Order;<br>     (h)    any sale or other disposition of Collateral or Cash Collateral is approved without the consent of the DIP Lender;<br>     (i)    any superpriority claim or lien equal or superior in priority to that granted to the DIP Lender or the Pre-Petition |

| | |
|---|---|
| | Lenders are granted;<br><br>      (j)    the automatic stay of Bankruptcy Code section 362 is lifted so as to allow a party other than the DIP Lender to proceed against any material asset of the Debtors that are Collateral of the DIP Lender;<br><br>      (k)    the Court enters an order confirming, a plan of reorganization, which plan is not in form and substance acceptable to the DIP Lender;<br><br>      (l)    the 363 Sale Milestones are not met within the period specified therefor, as the same may be extended in the reasonable discretion of the DIP Lender; or<br><br>      (m)    the asset purchase agreement with the stalking horse bidder is terminated other than by reason of the Court's approval of a 363 Sale Transaction to a purchaser other than the stalking horse bidder under the asset purchase agreement. **Section 8 of the DIP Loan Agreement and Interim Order at 19**. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | All DIP Liens and Replacement Liens granted for the benefit of the DIP Lender and/or the Pre-Petition Lender shall be valid, enforceable and deemed perfected, effective upon entry of the Interim Order, and no further action shall be required to effect such perfection. **Interim Order at 9 and 10**. |

### Why the DIP Facility Should Be Approved

56.    The Debtors' need for financing is immediate. In the absence of the DIP Credit Facility, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates would occur. The preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization or sale of the Debtors' assets under chapter 11 of the Bankruptcy Code.

57.    Given the Debtors' current financial condition and capital structure, the Debtors cannot obtain unsecured credit in the amount of the DIP Credit Facility and for the working capital purposes that the DIP Credit Facility will enable. I have been informed that financing on a post-petition basis is not otherwise available without the Debtors (i) granting claims having

priority over any and all administrative expenses, and (ii) securing the indebtedness and obligations to be owed under the DIP Credit Facility with security interests in and liens on the Debtors' personal property and real property as provided in the DIP Loan Documents and the Interim Order and any Final Order.

58.    The terms of the DIP Loan Documents between the Debtors and the DIP Lender, pursuant to which the DIP Credit Facility and other credit accommodations may be made or provided to the Debtors by the DIP Lender, were negotiated in good faith and at arms' length, and such terms and agreements are in the best interests of the Debtors, their creditors and their estates.

### Why Interim Approval of the DIP Financing Should Be Granted

59.    The relief requested by the DIP Financing Motion is necessary, essential and appropriate and is in the best interests of, and will benefit, the Debtors, their estates, and their creditors.  Specifically, granting the limited relief set forth in the Interim Order pending the Final Financing Hearing on the DIP Financing Motion will provide the Debtors with the necessary liquidity to: (a) minimize disruption to the Debtors' businesses and on-going operations; (b) preserve and maximize the value of the Debtors' estates for the benefit of all creditors; and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees and their assets.  Thus, the use of loans under the DIP Credit Facility is necessary to avoid immediate and irreparable damage to the Debtors' estates.

60.    Without immediate access to the loans under the DIP Credit Facility, the Debtors expect to suffer an acute cash shortage immediately, which shortage would threaten their ability to maintain operations in the short term — even through the date of any final hearing.

Accordingly, the Debtors require entry of the proposed Interim Order authorizing interim borrowings on the DIP Credit Facility in an amount up to $600,000.

### Need for Use of Cash Collateral

61.     In addition to the need for the loans under the DIP Financing Documents, the Debtors also require the use of cash collateral for the purposes and expenses set forth above. Accordingly, Debtors also need an order authorizing use of the Cash Collateral on an interim basis pending entry of a final order in accordance with the proposed Original Budget or any Rolling Budget. None of the Pre-Petition Lenders have dominion over the Debtors' cash or deposit accounts. In addition, the Debtors have not executed and delivered any account control agreements in favor of any of the Pre-Petition Lenders. None of the Pre-Petition Lenders have a lien on the assets of QSL Franchising and/or Sauces.

**Debtors' Motion for Order Granting the Debtors Additional Time to File Schedules and Statements (the "Extension Motion")**

62.     I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtors to file with the Court within 15 days of the Petition Date: (a) their schedules of assets and liabilities, (b) their statements of financial affairs, (c) their schedules of current income and expenditures, (d) their statements of executory contracts and unexpired leases, and (e) their list of equity security holders required (collectively, the "Schedules and Statements").

63.     By the Extension Motion, the Debtors are seeking entry of an order extending their time for filing the Schedules and Statements for an additional 30 days (for a total of 45 days from the Petition Date) through and including December 31, 2015.

64.     The Debtors are filing the Extension Motion because they have numerous creditors or other interested parties.  Moreover, the Debtors manage 12 corporate-owned restaurants located in multiple states.  Given the size and nature of their businesses, the number

of Debtor entities, and the large number of parties in interest, the Debtors have not had ample opportunity to gather the necessary information to prepare and file their respective Schedules and Statements.

65.     The Debtors have commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but the Debtors believe that the 15-day automatic extension of time to file such Schedules and Statements provided by the Bankruptcy Rules is not sufficient to permit completion of the Schedules and Statements.

66.     Although the Schedules and Statements were not filed with the Debtors' petitions, annexed to the Debtors' chapter 11 petitions are lists containing the names and addresses of the Debtors' 20 largest unsecured creditors on a consolidated basis.

67.     The Debtors estimate that an extension of 30 additional days (for a total of 45 days) will provide sufficient time to prepare and file the Schedules and Statements.  By way of the Extension Motion, the Debtors are requesting that the Court establish December 31, 2015, as the date on or before which they must file their Schedules and Statements, without prejudice to the Debtors' right to seek any further extensions from this Court, or to seek a waiver of the requirement of filing certain schedules.

**Debtors' Motion for Entry of an Order (i) Authorizing Debtors to Pay Certain Employee Obligations and (ii) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Employee Benefits Motion")[10]**

68.     The Debtors' Employees are all co-employed by FBS (as hereafter defined) and Lube Holdings, Inc. or one of its Debtor subsidiaries.  As of the Petition Date, the Debtors employ approximately 101 salaried Employees and 847 hourly Employees throughout the restaurant system.   The Employees include the Debtors' valuable servers, hosts, cooks,

---

[10] For purposes of the Employee Benefits Motion, the term "Employees" includes all persons, as of the Petition Date, entitled to compensation, benefits, reimbursement or any other similar payment as a consequence of being employed by the Debtors.

managers, salespeople, clerical personnel and corporate management. The Employees are the backbone of the Debtors' operations, and are critical to the ultimate success of the Debtors' restructuring efforts.

69. The Debtors have costs and obligations associated with their Employees that arose prior to the Petition Date. Certain of those obligations are outstanding and due and payable as of the Petition Date and certain will become due and payable in the ordinary course of business after the Petition Date.

70. The Debtors estimate that, as of the Petition Date, the aggregate amount of outstanding, due and payable Employee Obligations is approximately $510,000. This estimate is exclusive of any obligations that are not cash pay obligations of the Debtors as of the Petition Date, such as paid vacation.

**Professional Employer Organization – FBS**

71. Since January 1, 2012, the Debtors have engaged a professional employer organization, Fortune Business Solutions ("FBS"), to administer many of their human resources functions. FBS provides a broad range of human resources and benefits administration services through a co-employment model whereby the Debtors and FBS share employer responsibilities. The Debtors maintain day-to-day control over, dictate the roles and responsibilities of and manage the Employees, and FBS manages human resources management and benefits administration responsibilities. For instance, FBS provides the Debtors with payroll, tax and employee benefits administration and helps ensure the Debtors are compliant with regulatory and legal requirements with regard to the Employee Obligations.

72. To facilitate payment of many of the Employee Obligations (including, Wage Obligations, Payroll Taxes (as hereinafter defined) and certain payments, such as insurance

premiums, required to maintain many of the Employee Benefits offered by the Debtors), the Debtors advance funds from Debtors applicable banks and other financial institutions (collectively, the "Banks") to FBS at least forty eight (48) hours prior to the Debtors' regularly scheduled payroll (the "FBS Advance"), and FBS then makes payments to (i) the Employees in connection with the Wage Obligations, (ii) the Taxing Authorities (as hereinafter defined) in connection with the Payroll Taxes and (iii) to certain providers of the Employee Benefits on behalf of the Debtors. The Debtors pay FBS fees of approximately $3,250 upon the funding of each bi-weekly payroll (the "FBS Service Fees") in connection with their co-employment agreement. Payment of these modest fees is crucial for the Debtors' seamless entry into chapter 11 and to ensure that there is no disruption in payment of the Wage Obligations or Payroll Taxes or the administration of the Employee Benefits.

**Wages**

73. The Debtors typically pay obligations relating to Employee wages, salary, and compensation (the "Wage Obligations") on a bi-weekly basis by providing the FBS Advance to FBS, and FBS then either (i) provides direct deposits into the Employees' private bank accounts or (ii) issues checks to the Employees. The Debtors estimate that their gross bi-weekly payroll for the Wage Obligations is approximately $510,000. The Debtors' last payroll was made on November 6, 2015, which includes payment of Wage Obligations through November 1, 2015 (the end of the bi-weekly pay period). The Debtors estimate that as of the Petition Date, they have approximately $510,000 in Wage Obligations that are accrued and outstanding. Moreover, compensation may be due and owing as of the Petition Date because of, among other things, potential discrepancies between amounts paid and the amounts that certain Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to

such Employees. The Debtors' next regularly scheduled payroll occurs on November 20, 2015, but the funds will be directed to FBS on November 18, 2015.

74.     In addition to the regular Wage Obligations, the Debtors maintain certain discretionary performance-based bonus programs for certain employees: (i) for general managers, the General Manager 2012 Incentive Plan provides each general manager the ability to earn up to 25% of his base salary; (ii) for certain support center team members, the 2011 Quaker Steak & Lube® Incentive Plan provides certain Employees designated by a committee of the board of directors the ability to earn additional income tied to a percentage of the company's earnings; and (iii) for the general manager of Debtor QSL Sauces, Inc., 5% of profit growth (collectively, the "Bonus Program"). 59 Employees are eligible to participate in the Bonus Program. The Debtors have no accrued and outstanding obligations under the Bonus Program as of the Petition Date, due to the discretionary nature of the Bonus Program.

**Payroll Taxes/Garnishment**

75.     FBS, in its co-employer role, is required by law to withhold amounts related to federal, state and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") from the Wage Obligations and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities"). FBS is also required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Debtors include the amounts required by FBS to pay the Payroll Taxes

in the FBS Advance. The Debtors do not believe that any prepetition Payroll Taxes are due and payable to the Taxing Authorities as of the Petition Date.

76.     The Debtors, through their co-employment relationship with FBS, also withhold certain amounts for various writs of garnishment (such as tax levies, child support, payments to bankruptcy trustees and student loans).

### Expense Reimbursement

77.     The Debtors' Employees incur various expenses in connection with their employment duties, such as special events, travel and meal expenses. Such expenses incurred in the course of their employment and in furtherance of the Debtors' businesses are reimbursed (the "Expense Reimbursements") on a periodic basis after submission of appropriate approval and documentation to the Debtors' accounting department. Because of the irregular nature of requests for reimbursements, it is difficult to determine the amount of Expense Reimbursements outstanding at any given time. The Debtors, however, estimate that the amount of accrued but un-submitted outstanding Expense Reimbursements, as of the Petition Date, is approximately $8,000.

### Employee Benefit Plans

78.     The Debtors, through their co-employment relationship with FBS, have established certain benefits plans and policies for their Employees that provide, among other benefits, medical, dental and vision plans, worker's compensation insurance, life insurance, short and long term disability insurance, a 401(k) plan, reimbursement of moving expenses and paid time off (collectively, the "Employee Benefits"). The Debtors deduct specified amounts from the Employees' wages in connection with certain of the Employee Benefits. Virtually all of the

Employee Benefits are administered by FBS. All of the Debtors' Employees are eligible for the Employee Benefits, but not every Employee chooses to participate in every Employee Benefit.

79.     The Debtors, through their co-employment relationship with FBS, currently offer medical, dental and vision plans for Employees.

80.     Employees can choose between 3 separate medical insurance plans provided by FBS through CIGNA: (i) a high deductible health plan ("HDHP"); or (ii) a preferred provider organization medical plan(s). The Debtors, through FBS, pay approximately 89% (a blended rate for all plans) of the premium amounts across all medical insurance plans and deduct the remaining premium amounts from the Employees' wages. The Debtors' average monthly cost with regard to medical insurance premiums is approximately $53,000. As of the Petition Date, the Debtors believe that no payments for the Employees' medical insurance premiums are accrued and outstanding.

81.     The Debtors, through their co-employment relationship with FBS, participate in a dental plan through Guardian and a vision plan through USP Vision Care. The Debtors, through FBS, pay 75% of the monthly premium for the dental plan and the remaining 25% is deducted from the Employees' wages. The Debtors' average monthly cost with regard to the dental plan and the vision plan is approximately $3,100. As of the Petition Date, the Debtors believe that no payments are accrued and outstanding in connection with the dental plan premiums.

82.     The Debtors, through their co-employment relationship with FBS, offer short-term and long-term disability insurance to certain Employees (i.e., salaried managers). The Debtors, through FBS, pay 100% of the premium amounts due for all participating Employees under both programs.  As of the Petition Date, the Debtors believe that they are current on the

payment of the short-term and long-term disability insurance premiums and have no payments accrued and outstanding.

### Workers' Compensation Insurance

83.     Under the laws of various states and, in certain foreign countries, local laws and regulations where the Debtors operate, the Debtors required to maintain workers' compensation policies and programs to provide their Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors. The Debtors, through their co-employment relationship with FBS, maintain a workers' compensation program through Zurich for non-Ohio Employees, and through the Ohio Bureau of Workers' Compensation for Ohio Employees (collectively, the "Workers' Compensation Program") for that purpose. FBS administers the Workers' Compensation Program for the Debtors and processes any Workers' Compensation claims that may arise.  The Debtors pay FBS for this service as part of the FBS Service Fee.  The Debtors also pay an additional sum of approximately $25,000 a month to FBS in connection with the claims made under the Workers' Compensation Program.  FBS also pays the annual premium each year that is calculated based on the Debtors' projected payroll and historic loss rates.  FBS is current on premiums for the present policy year.

### 401(k) Plan

84.     The Debtors, through their co-employment relationship with FBS, also provide Employees the option of contributing to a 401(k) Plan set up by the Debtors. The Debtors no longer provide a matching contribution to the 401(k) plan.

### Group Life Insurance

85.     The Debtors, through their co-employment relationship with FBS, offer Employees the option to participate in a group life insurance program through Sun Life that

provides a death benefit equal to five times an Employee's base salary not to exceed certain caps based on the plan. As of the Petition Date, the Debtors believe that there are no payments in connection with the group life insurance premiums accrued and outstanding.

86.     The Debtors provide their Employees a number of other benefits through their co-employment relationship with FBS, including, but not limited to, an employee discount program, an employee assistance program, paid vacation and a flexible spending account. These additional Employee Benefits are all administered by FBS and included in the FBS Service Fee.

87.     The relief sought in the Employee Benefits Motion is necessary because it will ensure that the Debtors' Employees are able to focus on their immediate tasks by providing them with assurances that they will continue to receive their wages, salaries, and benefits and is essential to the continued operation of the Debtors. Paying the Wage Obligations will ensure that the Employees will remain committed partners of the business enterprise during the pendency of the Chapter 11 Cases.

88.     Any delay or failure to pay the Wage Obligations would irreparably impair the Employees' morale, dedication, confidence and cooperation, and would adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to the Debtors' success in chapter 11. At this juncture, the Debtors cannot afford the risk of substantial damage to their businesses that would inevitably result from a decline in their Employees' morale, or worse, a decline in their Employee ranks as Employees seek other opportunities they believe will provide better assurances of regular payment of wages, salaries and benefits.

89.     Without the relief requested in the Employee Benefits Motion, and in light of the personal consequences to the Debtors' Employees, as noted above, it is a distinct possibility that

otherwise loyal and driven Employees will seek more stable employment elsewhere. Additionally, it would be inequitable to require the Debtors' Employees to personally bear the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be timely reimbursed.

90.     With respect to Payroll Taxes, the payment of such taxes will similarly not prejudice other creditors of the Debtors' estates as the relevant Taxing Authorities will generally hold priority claims under the Bankruptcy Code with respect to the Payroll Taxes. Moreover, the portion of the Payroll Taxes withheld from an Employee's wages on behalf of the applicable Taxing Authority are held in trust by the Debtors, and thus, are not property of the Debtors' estates.  Additionally, failure to remit Payroll Taxes to a Taxing Authority may give rise to personal liability for the Debtors' officers and directors, and payment of Payroll Taxes is reasonable and in the best interest of the Debtors' estates and all parties in interest.

91.     Additionally, it is necessary to continue payment of the FBS Service Fees to FBS as co-employer to the Employees and administrators of many of the Debtors' Employee Obligations and to the administrators of programs related to Employee Benefits. Without the continued services of these administrators (including, but not limited to FBS) the Debtors will be unable to continue to honor their Employee Obligations in an efficient and cost-effective manner. Importantly, the FBS service fee is paid contemporaneously with the Debtors' paying their payroll.

92.     The Employee Benefits Motion does not seek to alter Debtors' Employees' compensation, vacation, or other benefits policies at this time. The Employee Benefits Motion is intended only (i) to permit the Debtors, in their sole discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving the

Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) to permit the Debtors, in their discretion, to continue to honor their practices, programs and policies with respect to their Employees, as such practices, programs and policies were in effect as of the Petition Date. Payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors and all parties in interest and will enable the Debtors to continue to operate their business in an economic and efficient manner without disruption.

93. The Employee Benefits Motion further requests that the Court authorize and direct the Banks to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic funds transfers requested or to be requested by the Debtors relating to the Employee Obligations, the FBS Advance and the FBS Service Fee. The Employee Benefits Motion also requests authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or transfer requests on account of the Employee Obligations, the FBS Advance or the FBS Service Fee dishonored or rejected as a result of the commencement of the Chapter 11 Cases.

**Debtors' Motion for an Order (i) Authorizing Continued Use of Existing Cash Management System, (ii) Authorizing Maintenance of Existing Bank Accounts, (iii) Authorizing Continued Use of Existing Business Forms, and (iv) Waiving Certain Investment and Deposit Requirements (the "Cash Management Motion")**

94. By this Cash Management Motion, the Debtors are seeking entry of an order (i) authorizing the continued use of their existing cash management system (the "Cash Management System"), (ii) authorizing the maintenance of existing bank accounts (the "Bank Accounts"), (iii) authorizing the continued use of existing business forms and checks (the "Business Forms"), and (iv) waiving certain investment and deposit requirements.

95.     I have been informed that the Operating Instructions and Reporting Requirements for Chapter 11 Cases promulgated by the Office of the United States Trustee for the Northern District of Ohio require that a debtor, among other things:  (i) close all bank accounts and open new debtor-in-possession bank accounts; (ii) establish a separate debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain separate debtor-in-possession accounts for cash collateral; and (iv) obtain checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of account.  Without the relief requested in the Cash Management Motion, the Debtors would experience significant disruptions to their operations.

### The Cash Management System

96.     As of the Petition Date, the Debtors, in the ordinary course of their business, uses an automated and integrated centralized cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made.

97.     The Cash Management System consists of 56 separate Bank Accounts maintained at 10 different financial institutions – Bank of America/Merrill Lynch ("BofA"), Citizens Bank, Cortland Bank, Farmer's National Bank of Canfield, FirstMerit Bank, First National Bank of Pennsylvania, Huntington Bank, PNC Bank, Talmer Bank and Wesbanco.[11]  The Bank Accounts are utilized by the Debtors to manage cash receipts, credit card payments, transfers, and disbursements for the Debtors' entire corporate enterprise.   The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from and between the Bank Accounts by various

---

[11]  The financial institutions where the Bank Accounts are maintained are collectively referred to herein as the "Banks."   Certain of the Banks Accounts in the Debtors' Cash Management System relate to closed locations.  While those Bank Accounts remain open, the Debtors typically do not use them.   The Debtors are, however, including them in the relief requested in the Cash Management Motion as they remain property of the Debtors' estates.

methods, including checks, automatic clearing house ("ACH") and other electronic fund transfers, and direct deposits. A schedule of all the Bank Accounts maintained by the Debtors, including the names of the Banks, the Bank Account numbers, and the general purpose of each Bank Account, is attached to the Cash Management Motion as Exhibit A.[12] A chart demonstrating the flow of funds through the Cash Management System is attached to the Cash Management Motion as Exhibit B.

### The Bank Accounts

98. The Bank Accounts exist for a variety of reasons. The Debtors maintain one consolidated account out of which most of the Debtors' general operations are conducted, an account from which payroll is funded, a checking account and an ACH account to make payments to vendors and payroll, store-level depository accounts, petty cash accounts for smaller purchases, and various other required accounts relating real property taxes, advertising and franchise fees.

99. In addition to operating and disbursement accounts, the Debtors maintain a number of deposit accounts to facilitate daily cash receipts from each restaurant. These depository accounts are also maintained at the store-level and hold daily payments from restaurant customers. Cash receipts at the store level depositories are swept daily from the depository accounts to a main operating account. The Debtors contract with outside security-service vendors, such as Brinks Incorporated, to assist with collection and depository requirements. For example, funds from the store-level depositories at PNC Bank are swept daily into the main operating account located at Bank of America, which is, in turn, is drawn upon to fund payroll and other disbursement to vendors. The Debtors maintain entries on their books and

---

[12] Only the last four digits for the account numbers are identified in order to protect estate resources.

records to track receipts and payments attributable to each Debtor entity. These books and bank balances are monitored on a daily basis and reconciled at least monthly.

100. The principal components of the current Cash Management System, and the flow of funds through the Bank Accounts within that system, are described as they exist as of the Petition Date as follows:

a. <u>Consolidated Operating Account</u>. The Debtors maintain a main operating account with Bank of America ("BofA Operating Account"). Receipts are swept from the various depository accounts, from credit card purchases, revenue from the sauce business and the payment of franchise fees to the BofA Operating Account on a daily basis. In turn, all BofA Disbursement Accounts (defined below) are funded by the BofA Operating Account.

b. <u>Disbursement Accounts</u>. The Debtors maintain disbursement accounts with Bank of America: (i) a dedicated ACH account for Reinhart, which is set up for weekly withdrawals to the Debtors' primary vendor; (ii) check disbursement account, which is utilized to issue checks for various vendors; (iii) an ACH account, which is used to make ACH transfers to vendors and to pay the Debtors' payroll obligations; and (iv) the consolidated petty cash account, which is used to fund petty cash needs throughout the company (collectively, the "Disbursement Accounts"). All of the Disbursement Accounts are zero balance accounts.

c. <u>Zero Balance Accounts</u>. The Debtors maintain 16 other zero balance accounts with Bank of America, which are used for transferring funds into the BofA Operating Account (the "Zero Balance Accounts").

d. <u>Depository Accounts</u>. The Debtors maintain store-level depository accounts (collectively, the "Store Level Depository Accounts"). On a daily basis, funds deposited into the Store Level Depository Accounts are swept into the BofA Operating Account.

e. <u>Petty Cash Accounts</u>. The Debtors maintain several store-level petty cash accounts (collectively, the "Store-Level Petty Cash Accounts"). The Store-Level Petty Cash Accounts are funded by the Store Level Depository Accounts and are generally used to pay for liquor and other store-level supplies. The Debtors have been in the process of transitioning all of the Store-Level Petty Cash Accounts to BofA.

f. <u>Gift Card Account</u>. The Debtors maintain an account with BofA (and still hold one with First National Bank) that collects all of the payments from the third party seller of gift cards at retail locations (i.e. Blackhawk) (the "Gift Card Account"). Funds in the Gift Card Account are allocated

between franchisees and corporate-owned stores and are disbursed accordingly. Corporate unit allocations are made directly into the BofA Operating Account.

g.    RPM Account. The Debtors maintain an account with First National Bank that collects all of the advertising and marketing payments from the Debtors' franchisees (i.e. system-wide, stores are required to deposit 0.75% of sales for advertising and marketing expenses) (the "RPM Account"). Funds in the RPM Account are used to pay system-wide advertising and marketing programs.

h.    Cadillac Operating Account. The Debtors maintain a depository account with PNC Bank that collects all payments from the Debtors' retail sauces business (the "Cadillac Account"). Funds in the Cadillac Account are swept daily into the BofA Operating Account.

i.    Franchise Account. The Debtors maintain a depository account with First National Bank that collects all royalty payments from the Debtors' franchisees (the "Franchise Account"). Funds in the Franchise Account are swept daily into the BofA Operating Account.

101.    The Cash Management System constitutes customary and essential business practices and is similar to those commonly employed by corporate enterprises of comparable size and complexity, especially in the casual dining industry. Multi-entity businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative costs by facilitating the movement of funds and the development of timely and accurate account balances and presentation information. Granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into chapter 11.

102.    Given the Debtors' corporate and financial structure, it would be burdensome for the Debtors to establish an entirely new Cash Management System at this time. Any disruption of the Debtors' accounting and cash management procedures would be cumbersome and costly to the Debtors' operations and could have an adverse impact on the Debtors' efforts to

restructure, maintain operations, interrupt the supply of goods to the Debtors' restaurants, and provide consistent services to customers. Thus, under the circumstances, maintaining the Cash Management System is in the best interests of the Debtors' estates, customers and creditors.

### Continued Use of the Bank Accounts

103.    As set forth in the Cash Management Motion, the Debtors utilize the Bank Accounts within the Cash Management System on a regular basis. To avoid substantial disruption to the Debtors' business, the Debtors need authority to continue using the Bank Accounts on a postpetition basis. Allowing these accounts to be maintained with the same account numbers will assist the Debtors in making a smooth transition to operating in chapter 11 and ensure that the Debtors' cash flow is not interrupted.

104.    The Debtors will be subject to certain administrative burdens and expenses that would prove distracting for the Debtors' management in the early, critical stages of the Debtors' restructuring process if the Debtors are required to close all the Bank Accounts, open new accounts, and create an entirely new system of accounts for issuing checks and paying postpetition obligations. Accordingly, to avoid these burdens and expenses, the Debtors need authority to continue utilizing the Bank Accounts and, further, that the Bank Accounts be deemed "debtor-in-possession" accounts. Bankruptcy courts routinely permit a debtor to utilize its existing bank accounts, finding that such relief is entirely consistent with the applicable provisions of the Bankruptcy Code.

105.    If the relief requested in the Cash Management Motion is granted, Debtors will not pay, and the Banks will be directed not to pay, any debts incurred by the Debtors before the

Petition Date other than as authorized by this Court.[13]  To protect against the inadvertent payment of prepetition claims, unless otherwise ordered by the Court, on the Petition Date, the Debtors will advise the Banks that checks issued prior to the Petition Date should not be honored, except as otherwise ordered by the Court.

### Continued Use of the Business Forms

106.    The Debtors use their Business Forms in the ordinary course of their business.  By virtue of the nature and scope of the business in which the Debtors are engaged and the number of customers and suppliers with whom the Debtors transacts business, it is important for the Debtors to continue using the Business Forms without alteration or change.   To prevent unnecessary delay, confusion, and accrual of further expense to their estates, the Debtors need the Court to waive any requirement of adding a "Debtor-in-Possession" legend or number to the Business Forms other than checks.   In this case in particular, requiring a change of Business Forms, when the Debtors have specific menus, advertising and other intellectual property will be confusing to the marketplace.  The Debtors will begin using a "Debtor-in-Possession" stamp or legend for all checks as soon as possible.   The continued use of existing Business Forms employed in the ordinary course of a debtor's prepetition business has been approved in a number of other bankruptcy cases.

107.    The Debtors believe that their use of the Bank Accounts substantially conforms to the approved investment practices identified in the Bankruptcy Code and that all deposits and investments into the Bank Accounts are safe, prudent, and designed to yield the maximum reasonable net return on the funds invested.  Nonetheless, out of an abundance of caution, to the

---

[13]  As described in other motions filed contemporaneously herewith, the Debtors have requested authority to pay certain prepetition debts.

extent that such deposits do not conform to the approved practices identified in the Bankruptcy Code, the Debtors require a waiver of such requirements.

108. The Bank Accounts maintained by the Debtors are not maintained in high-risk or volatile investments. Rather, they are standard accounts at insured and bonded financial institutions. Second, the amounts that are typically held in any Petty Cash Accounts or Store Level Depository Accounts typically fall under the $5,000 range. Moreover, the Deposits are swept on a daily basis.

**Debtors' Motion for an Order (i) Authorizing the Debtors to Pay Prepetition Taxes and Fees and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Prepetition Taxes Motion")**

### Taxes and Fees

109. In the ordinary course of their businesses, the Debtors collect from point of sale at the Debtors' various restaurants sales taxes that are held by the Debtors and remitted periodically to the appropriate taxing authority (collectively, the "Taxes"). Furthermore, the Debtors pay, on their own behalf, certain fees for, among other things, business licenses and health permits (the "Fees"). Once approved, the Debtors remit the Taxes and Fees to the appropriate state and local taxing and governmental entities (collectively, the "Authorities") in accordance with their ordinary payment schedule, as more fully described below.

a. <u>Sales Tax</u>. The Debtors collect sales tax from customers in four states and numerous localities. In the aggregate, the Debtors remit (on a monthly basis) approximately $185,000 to the Authorities in sales taxes. The Debtors are current with respect to the Taxes (that were due to be paid as of the Petition Date). However, based on the timing of the filing, the Debtors have likely collected additional Taxes and have not yet remitted them to the Authorities. As of the Petition Date, the Debtors believe that approximately $240,000 of Taxes in the aggregate has been collected and is owing to the Authorities.

| STATE | APPROXIMATE TOTAL SALES TAX (PER MONTH) |
|---|---|
| Pennsylvania | $13,000 |
| Ohio | $102,000 |
| West Virginia | $20,000 |
| Virginia | $50,000 |

b.     Business License Fees and Health Permits.  To continue to operate their businesses, the Debtors incur, and are required to remit, fees for business licenses (and the renewals thereof) and health permits.  The timing of remittance by the Debtors of such fees varies greatly by market location and depends on the particular city or state's requirements.  As such, some fees are paid monthly, some quarterly and some at longer intervals.  The Debtors remit to the Authorities, in total, approximately $43,000 on a yearly basis.  As of the Petition Date, the Debtors believe that approximately $5,000 of Fees is due and owing to the Authorities.

| TYPE | BUSINESS LICENSE AND PERMIT FEES (YEARLY) |
|---|---|
| Liquor Licenses | $28,038 |
| Food Licenses | $4,555 |
| Business Licenses | $9,445 |

110.    The Debtors believe that they are current on their obligations related to the Taxes and Fees.  However, the Debtors estimate that there are Taxes relating to the prepetition period that have been collected and not been remitted and Fees relating to the prepetition period that have either not yet been billed to the Debtors or that are not yet due under the Debtors' ordinary payment schedule.  In light of this, the Debtors need authority to pay the prepetition Taxes and Fees as they become due in the ordinary course of business — but only up to $240,000 in the aggregate for Taxes and up to $5,000 in the aggregate for Fees.

**Authorization to Honor Checks and Transfers**

111.    The Debtors further need the Court to authorize and direct financial institutions to process checks, electronic transfers and other transfers — provided that sufficient funds are available in the applicable accounts — to pay the Taxes and Fees, whether those checks were presented prior to or after the Petition Date.  The Debtors represent that each of these checks or transfers can be readily identified as relating directly to the authorized payment of the Taxes and Fees.  Accordingly, the Debtors believe that checks and transfers other than those relating to authorized payments will not be honored inadvertently.

112.    The Debtors wish to remain current on their outstanding Taxes and Fees and avoid shutdown and potential liability for non-payment.  The Debtors' failure to pay the Taxes and Fees would have a detrimental impact on their ability to operate their businesses in the ordinary course.  Furthermore, if the Debtors failed to pay the Taxes and Fees, it is likely that the Authorities would become active in the Debtors' bankruptcy cases, possibly creating undue delay and complications to the Debtors' restructuring efforts.

113.    The Taxes do not constitute property of the Debtors' estates, and such amounts are not available to the Debtors' creditors.  Therefore, immediate payment of the Taxes to the appropriate Authorities will not adversely affect the Debtors' estates or their creditors.

114.    Generally, many state and local taxing authorities impose personal liability on officers and directors of entities responsible for collecting trust fund taxes when such taxes are collected without being remitted to the appropriate taxing authorities.  Thus, if any of the Taxes remain unpaid, the Debtors' officers and directors may be subject to lawsuits or even criminal prosecution.  Such proceedings would constitute a significant distraction for the officers and directors at a time when they should be focused on the Debtors' efforts to stabilize their

postpetition business operations and develop and implement a successful restructuring strategy. Moreover, some of the Authorities may cause the Debtors to be audited if the Taxes are not paid promptly. Such audits would further divert attention and resources from the reorganization process. Finally, non-payment of the Fees may jeopardize the Debtors' ability to maintain the necessary permits to conduct business in certain states and localities. Uninterrupted business operations are necessary for the Debtors to maintain the proper cash flows in order to restructure their businesses.

115. The Debtors' Taxes have been timely collected by the Debtors on behalf of the Authorities. The Debtors have sufficient cash to promptly pay all of their obligations for the Taxes and Fees in the ordinary course of their businesses, based on the Debtors' general operating revenues. Based on the foregoing, the Debtors believe that the estates will not be materially harmed if the Court permits the Taxes and Fees to be paid.

**Debtors' Motion for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices and (ii) Establishing Procedures for Determining Requests for Additional Assurance (the "Utilities Motion")**

116. In connection with the operation of their business, the Debtors obtain gas, water, sewer, electric, telephone, wireless, and other services (collectively, the "Utility Services") from certain utility companies (each a "Utility Company," and collectively, the "Utility Companies") for the operation of their restaurants and main office. The Utility Companies provide the Debtors with a seasonal aggregate total of approximately $110,000 in Utility Services each month. A summary of average monthly utility payments made by the Debtors to the Utility Companies are identified on <u>Exhibit A</u> to the Utilities Motion[14] (the "Utility Services List"). The

---

[14] <u>Exhibit A</u> to the Utilities Motion identifies (a) the name and address of the Utility Company, (b) the account number under which the Utility Company provides services to the Debtors, and (c) the average monthly payment to each Utility Company. The inclusion of any entity on, as well as any omission of any entity from, <u>Exhibit A</u> is not an admission by the

Debtors estimate that their postpetition use of the Utility Companies' services will remain at approximately the same levels, although seasonal effects and variations in the prices of such services may result in variations in the Debtors' average monthly utility expenses.

117.   As of the Petition Date, the Debtors are current in their payments to all Utility Companies currently providing Utility Services to the Debtors.  Currently, there are no deposits being held by the Utility Companies.

118.   Uninterrupted Utility Services are critical to the Debtors' ability to sustain their operations during the pendency of the Chapter 11 Cases.   Any interruption in the Utility Services, however slight, would jeopardize not only the restructuring efforts of the Debtors, but also the Debtors' ability to operate their business, maintain food inventories and ensure high quality service to the Debtors' restaurant patrons.   By the Utilities Motion, the Debtors seek interim and final orders (the "Interim Utility Order" and "Final Utility Order," respectively): (i) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services (as defined below) to, or discriminating against, the Debtors on account of amounts outstanding prior to the Petition Date or any perceived inadequacy of the Debtors' proposed adequate assurance; (ii) determining that the Utility Companies, including, but not limited to, those listed on the Utility Services List (defined below), have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (iii) approving the Debtors' proposed procedures for determining requests for additional adequate assurance of payment to Utility Companies for future utility services.

---

Debtors that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code.  The Debtors reserve their rights with respect thereto.  In addition, the Debtors are requesting that the Utilities Motion apply to all of the Debtors' Utility Companies, whether or not any given Utility Company is included on the Utility Service List.  The Debtors have proposed a procedure for supplementing the Utility Service List.  Additionally, it is possible that certain entities may have been inadvertently included on the Utility Service List.  The Debtors, therefore, reserve the right to assert that any such entities are not Utility Companies for the purposes of the Utilities is Motion or section 366 of the Bankruptcy Code.

## The Proposed Adequate Assurance

119.    The Debtors fully intend to pay all postpetition obligations owed to the Utility Companies in a timely manner.  The Debtors expect to have sufficient cash during the Chapter 11 Cases to pay all postpetition obligations for Utility Services.

120.    However, as adequate assurance required by the Bankruptcy Code, the Debtors propose to provide a deposit equal to two weeks of the average seasonal cost of Utility Service to any Utility Companies, so long as such Utility Company is not the beneficiary of an escrow or other security arrangement or that such Utility Company is not currently paid in advance for its services (an "Adequate Assurance Deposit").  As a condition of accepting an Adequate Assurance Deposit, the Requesting Utility shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of future payment to such Utility Company, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of the Chapter 11 Cases.  Upon the effective date of any plan of reorganization or upon the closing of a sale of substantially all of the Debtors' assets, with regard to any Utility Company that receives an Adequate Assurance Deposit, the Debtors request that they be entitled to: (i) in the case of a confirmed plan, have that deposit credited to any amounts owed to such Utility Company as of that date or in the future; or (ii) in the case of a sale, receive the return of such Adequate Assurance Deposit upon the cessation of such Utility Company's services to the Debtors post-closing.

121.    The Adequate Assurance Deposits, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes that the Proposed Adequate Assurance is insufficient, the procedures

requested by the Utilities Motion provide that such Utility Company may request additional assurance pursuant to the procedures set forth more fully below.

### Adequate Assurance Procedures

122.   If, however, a Utility Company is not satisfied with the Proposed Adequate Assurance, the Debtors propose the following procedures for seeking additional adequate assurance (the "Additional Adequate Assurance Procedures"):

> a.   If a Utility Company does not believe that the Proposed Adequate Assurance is sufficient (the "Objecting Utility"), it shall contact the Debtors in writing to attempt to resolve its request but shall have 14 days from entry of the Interim Order to file a notice with the Court requesting a hearing on additional adequate assurance.

> b.   If a Utility Company requires additional adequate assurance, it must serve the request on:  (i) the Debtors, 101 Chestnut Ave., Sharon, PA 16146 (Attn:  John Lane); and (ii) counsel to the Debtors, McDonald Hopkins LLC, 600 Superior Avenue E., Suite 2100, Cleveland, OH 44114-2653 (Attn:  Scott N. Opincar and Michael J. Kaczka).

> c.   If the Debtors and the Objecting Utility do not come to an agreement on additional adequate assurance, the Court shall hold a hearing to determine whether the Objecting Utility is entitled to additional adequate assurance.

> d.   In the event that no Objecting Utility files a notice seeking additional adequate assurance within 14 days from entry of the Interim Order, then the Interim Order shall become the Final Order without the need for a further hearing.

**Debtors' Motion for an Order Authorizing them to Continue Certain Prepetition Customer Programs (the "Customer Program Motion")**

123.   The Debtors maintain several customer programs in the ordinary course of their businesses which are designed to enhance satisfaction and thereby encourage the continued patronage by the Debtors' customers.   The customer programs consist of the following (collectively, the "Customer Programs"):

> a.   <u>Gift Cards</u>.  In the ordinary course of business, the Debtors sell gift cards (the "Gift Cards") to customers in various denominations.  Customers can purchase the Gift Cards directly at the Debtors' restaurants (including any restaurant operated by the Debtors'

franchisees) or from the Debtors' website. Customers can also purchase Gift Cards from third party outlets (e.g., online retail, Giant Eagle). Gift card programs of this nature are commonplace and popular in the casual dining industry, and the Debtors' competitors offer similar programs to their customers. As of the Petition Date, the Debtors estimate that their customers hold Gift Cards with an outstanding aggregate value in excess of $2,000,000.[15] The Gift Cards do not have an expiration date. The Debtors desire to honor all Gift Cards purchased prepetition and intend to continue selling them postpetition in the ordinary course of business.

  b. <u>Gift Certificates and Coupons</u>. From time to time, the Debtors issue gift certificates, which are given for future use. The Debtors also offer discount coupons and promotions at participating restaurants in order to enhance customer loyalty.

  c. <u>Employee Discount</u>. Pursuant to the Debtors' policies, each of the Debtors' employees are provided with a 25% discount on all point-of-sale purchases made at the Debtors' restaurants. Those employees working at the Debtors' support center in Sharon, PA, receive free food from the restaurant during work hours. Certain employees receive monthly food card allowance that can be used at any of the Debtors' locations. Also, the Debtors offer free and/or discounted food for an employee during the course of such employee's shift.

124. If the Debtors were not able to continue to honor the Customer Programs, they would suffer irreparable harm to their businesses, their brand and going concern value. The casual dining industry is highly competitive. The Debtors cannot afford to dishonor the Customer Programs if they are to maintain the value of the Quaker Steak & Lube® brand and operate as a going concern. Moreover, in certain regions, the Gift Cards are a strong source of revenue during the holiday gift giving season. The failure of the Debtors to continue to maintain the Customer Programs will likely lead to a loss of customers those who could easily decide to defect to other casual dining chains offering better deals.

125. But for the filing of the petitions, the Debtors' Customer Programs are maintained in the ordinary course of Debtors' business. In most cases, honoring the terms of the Customer Programs are ordinary course transactions for which Debtors do not require Court approval. However, to the extent obligations under Customer Programs arose prior to the Petition Date and the Debtors propose to honor them post-Petition Date, they may not be considered to be in the

---

[15] The Gift Cards are also available for purchase and use at all of the Debtors' franchised locations.

ordinary course of business. Moreover, in order to avoid any confusion with counterparties under the Customer Programs, the Debtors, out of an abundance of caution, are seeking an order of the Court authorizing the Debtors to continue to honor and perform their obligations under the Customer Programs.

126. The use of the prepetition programs involving customers sought to be approved by the Customer Programs Motion is crucial to the Debtors' ongoing business. The Debtors are need the ability to honor certain prepetition obligations to customers, and will be doing so at minimal cash expense. While the Debtors will be using postpetition assets when honoring gift cards and coupons, the reality is that doing so will continue to keep customers coming to the restaurants, which generates additional revenue opportunities. The ability to maintain streamlined operations and avoid disruptions is a good business justification for permitting continued use of the Customer Programs.

127. For the Debtors, good relations with customers are the core of Debtors' past success, and are crucial to ongoing operations. Other parties in interest also benefit from the Debtors continuing to keep customers happy — including the Debtors' franchisees that offer these same types of programs. The Customer Programs will assist the Debtors in continuing good relations with the sources of future revenue more than if Debtors jeopardize those relations.

**Debtors' Motions for an Order Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors (the "Critical Vendor Motion")**

128. The Debtors are fundamentally dependent upon the Critical Vendors (those parties listed on Exhibit A to the Critical Vendor Motion) to supply essential goods and/or services that are necessary for the Debtors to operate their restaurants. As is set forth in more detail below, the Debtors' ability to run the business and sell Quaker Steak & Lube® products is entirely reliant on the continued business with the Critical Vendors. In most instances, the

Debtors have no other sources for the Critical Vendors' goods and/or services other than to purchase those provided by the Critical Vendors. The process of identifying the Critical Vendors was undertaken by the Debtors' senior management in conjunction with the Debtors' advisors. The Debtors placed a significant emphasis on the sole source nature of the Critical Vendors.

129.     The Debtors need entry of an order authorizing, but not obligating, them to pay, in the reasonable exercise of their business judgment, all valid prepetition amounts due in the ordinary course of business to the Critical Vendors. The Debtors also need the Court to authorize and direct banks and financial institutions at which the Debtors maintain disbursement and other accounts, at the Debtors' instruction, to receive, honor, process, and pay to the extent of funds on deposit, any and all checks or electronic funds transfers relating to the prepetition claims of the Critical Vendors.

### Necessity of the Critical Vendors

130.     As set forth on Exhibit A to the Critical Vendor Motion, the Debtors are seeking authority to deem three vendors as "critical," such that their prepetition claims should be paid in the ordinary course of business or similar trade terms. One of the vendors is the single-source food and sundry vendor that is exclusively approved to supply Quaker Steak & Lube® restaurants (including the Debtors' franchisees) in the regions the Debtors operate restaurants. The other group includes the Debtors' primary produce vendors. Because the Debtors do not have any alternatives to obtain substitute goods and/or services from other suppliers in a material or timely manner, they must have authority, in their discretion, to satisfy the prepetition claims of these parties in the ordinary course of business to ensure that these parties continue to supply without interruption.

131.    Ongoing support from the Critical Vendors is vital to maintaining the going concern value of the Debtors' businesses and to achieve the maximum return to creditors.  At this precarious stage and based on the Debtors' liquidity issues, an interruption in the goods and services provided to the Debtors by the Critical Vendors would have an extremely negative effect upon the Debtors and their estates.  The goods and/or services provided by the Critical Vendors must continue unabated if loss of enterprise value is to be avoided.  Many of these Critical Vendors also supply the Debtors' franchisees.  In most instances, no other manufacturer or supplier is permitted to supply the required goods needed for the parties of a Quaker Steak & Lube® restaurant.  In instances where substitute goods and/or services may exist, the Debtors believe that an alternate supplier cannot provide goods and services that meet the Debtors' requirement for quality and quantity in a time frame that would avoid material disruption to business operations.  Nor can an alternate supplier ensure availability on a cost-efficient and timely basis in the appropriate geographic areas.  Accordingly, the interests of all of the Debtors and their estates and creditors will be best served if the Debtors are authorized to pay the obligations due to the Critical Vendors.

### Identities of the Critical Vendors

132.    The Critical Vendors are as follows:

a.    <u>Primary Distributor</u>.  Reinhart Foodservice, L.L.C. ("Reinhart") supplies all Quaker Steak & Lube®-approved food and sundry items to both corporate locations and franchisees.  In addition to meats, vegetables, potatoes, and other foods, Reinhart also supplies items like trash liners, sponges, cups, silverware, soap, and various other cleaning and dining items (some of which bear the Quaker Steak & Lube® proprietary markings).  In the aggregate, the Debtors incur approximately $183,714 per week in costs to Reinhart on 30-day terms.  The Debtors pay Reinhart on Monday based on an invoice on the prior Friday.  As of the Petition

Date, the Debtors owe approximately $800,836[16] to Reinhart for obligations arising prepetition.

b.   <u>Produce Vendors</u>.  The Debtors utilize the following produce vendors as sources of fresh produce for the restaurants:

i.   For all locations outside of Virginia, the Debtors use Sirna & Sons ("Sirna") as their supplier of fresh produce. The Debtors' incur approximately $7,078 to Sirna on 30-day terms.  As of the Petition Date, the Debtors owed approximately $37,918 to Sirna.

ii.   For their Virginia locations, the Debtors use Keany Produce Inc. ("Keany" and with Sirna, the "Produce Suppliers") as their supplier fresh produce. The Debtors' incur approximately $1,000 to Keany on 10-day terms.  As of the Petition Date, the Debtors owed approximately $5,222 to Keany.

### Proposed Terms and Conditions of Payment

133.   As set forth in the Critical Vendor Motion, the Debtors intend to use their discretion to pay only those amounts absolutely necessary to provide for an uninterrupted flow of necessary goods and services and to maintain the going concern value of their businesses.

134.   The Debtors propose to condition the payment of prepetition sums to Critical Vendors on their agreement to continue supplying goods and services to the Debtors on the same terms that existed prior to the Petition Date during the pendency of the Chapter 11 Cases, or such other favorable trade practices as are at least as favorable to the Debtors as those in effect on the Petition Date.  The Debtors, however, are reserving the right to negotiate new trade terms with any Critical Vendor.

### Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals (the "Fee Procedures Motion")

135.   Pursuant to the Fee Procedures Motion, the Debtors are seeking an administrative order pursuant to sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a)

---

[16] This amount is separate than any amounts owing under the promissory note to Reinhart.

authorizing and establishing procedures for the payment of fees and reimbursement of expenses for court appointed professionals (collectively, the "Professionals") retained pursuant to an order of this Court. Section 331 of the Bankruptcy Code allows courts discretion in determining the frequency of disbursements of professional fees and expenses. The Debtors are requesting in the Fee Procedures Motion that the Court exercise its discretion and allow monthly compensation for Professionals in the Chapter 11 Cases in accordance with the procedures set forth below.

136.    Contemporaneously with the filing of the Fee Procedures Motion, the Debtors filed an application with the Court to retain McDonald Hopkins LLC as their counsel. The Debtors anticipate that, as these cases progress, they may need to retain other professionals in connection with their efforts to restructure their business operations. In addition, if a statutory committee is appointed, it will likely seek to retain counsel to assist it in fulfilling its role in these bankruptcy cases. Implementation of compensation procedures (the "Compensation Procedures") will provide an efficient structure for disbursing compensation to the Professionals and will allow all parties in the bankruptcy cases to monitor the proposed Compensation Procedures. The Fee Procedures Motion requests that Professionals be paid 80% of their fees on a monthly basis and 100% of their expenses. Professionals will be required to file interim applications with the Court for approval of the fees and payment of the remaining 20% holdback.

137.    The Fee Procedures Motion further seeks to allow each member of any statutory committee appointed in these cases, if any, be permitted to submit statements of expenses (excluding fees and expenses of the committee member's counsel) and supporting documents to counsel to the respective committee, which will collect and submit the members' requests for reimbursement in accordance with the Compensation Procedures.

138.     As set forth in the Fee Procedures Motion, the Debtors will include all payments made to Professionals in accordance with the Compensation Procedures in their monthly operating reports, identifying the amount paid to each Professional.

**Debtors' Emergency Motion for an Order Scheduling Expedited Hearing to Consider Certain First Day Motions and Approving Notice Thereof ("Emergency Hearing Motion")**

139.     The First Day Motions described above involve matters that require an emergency and expedited hearing, and the Debtors are requesting that the Court, on an *ex parte* basis, schedule the First Day Hearing as soon as the Court's schedule will permit and that the Court approve the form of notice thereof.

140.     The relief requested in the Emergency Hearing Motion is necessary to obtain expedited relief on the First Day Motions.  As described in detail in each of the First Day Motions, the expedited relief requested in the First Day Motions is essential to: (a) obtain financing; (b) ensure a smooth transition into chapter 11; (c) maintain the Debtors' operations and businesses throughout the Chapter 11 Cases; (d) efficiently administer the bankruptcy cases; and (e) establish the basis for the Debtors' restructuring efforts.  The Emergency Hearing Motion and the First Day Motions are of the type typically heard on an emergency or expedited basis, and any delay in authorizing the relief therein could have a severe and irreparable effect on the Debtors' operations and their transition into operating as chapter 11 debtors in possession.

141.     Pending entry of an order approving the Emergency Hearing Motion, the Debtors propose to serve the "Notice of Expedited Hearing on First Day Motions" (the "Notice") is attached to the Expedited Hearing Motion as <u>Exhibit A</u> as soon as possible on November 16, 2015, via e-mail, overnight delivery or facsimile transmission to (i) the United States Trustee for the Northern District of Ohio; (ii) those creditors listed on the Debtors' Consolidated List of Creditors Holding 20 Largest Unsecured Claims as identified in their chapter 11 petitions;

(iii) the Debtors' secured lenders under their prepetition financing facilities or their counsel; (iv) the District Director of Internal Revenue; and (v) each party whose rights are affected by such First Day Motion, as such parties are listed in the "Notice" paragraph of the applicable First Day Motion (collectively, the "Notice Parties"). The Notice will inform the Notice Parties of the hearing date and time, provide them with a list of the First Day Motions, and tell them how they may obtain copies of the First Day Motions.

**Conclusion**

142.    For all of the reasons stated herein, I believe that the approval of the First Day Motions is in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

[This space intentionally left blank.]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief. Further affiant sayeth naught.

_____
President and Chief Executive Officer

# EXHIBIT A

5383826



Quaker Steak & Lube® Corporate Structure

- Lube Aggregator, Inc.
  - Lube Holdings, Inc.
    - Best Wings USA, Inc.
    - Quaker State & Wings, Inc.
    - QSL of Independence, Ohio, Inc.
    - QSL Wheeling, Inc.
    - QSL of Sheffield, Inc.
    - QSL of Vermilion, Inc.
    - QSL of Springfield, Inc.
    - QSL of Lakewood, Inc.
    - QSL of Medina, Inc.
    - QSL of Buffalo, Inc.
    - QSL of Warren, Inc.
    - Quaker Steak & Lube Franchising Corp.
      - QSL Intellectual Properties, Inc.
      - QSL Sauces, Inc.
      - QSL of Springfield Realty, Inc.
      - QSL of Medina Realty, Inc.
      - QSL of Newport News, Inc.
      - QSL of Concord, Inc.
      - QSL of Harrisonburg, Inc.
      - QSL of Fredericksburg, Inc.
      - QSL of Fort Wayne, Inc.
    - QSL Operations, Inc.
      - QSL Management, Inc.
      - QSL Carrollton, Inc.
      - QSL Plano, Inc.