| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| QSL of Medina, Inc., *et. al.*,[1] | ) |
| | ) Case No. 15-52722 |
| Debtors. | ) (Request for Joint Administration |
| | ) Pending) |
| | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING
DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING AND USE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE
AUTOMATIC STAY; (IV) SETTING FINAL HEARING;
AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move the Court (the "Motion") for the entry of interim and final orders: (1) authorizing

and approving, pursuant to section 364(c) and (d) of the Bankruptcy Code, the Debtors to obtain

debtor-in-possession financing from the DIP Lender (as defined herein) pursuant to the terms

and conditions of (a) the Interim Order and any Final Order (as defined herein), (b) the DIP

Credit Facility (as defined herein); (2) authorizing and approving, pursuant to sections 361 and

363(c) of the Bankruptcy Code, the Debtors' use of Cash Collateral (as defined herein) of the

Pre-Petition Lenders (as defined herein), solely to the extent that any of the Pre-Petition Lenders

have a valid and perfected security interest in Cash Collateral, in accordance with the provisions

---

[1] The Debtors and the last four digits of the Debtors' United States Tax Identification Number following in parentheses are: QSL of Medina, Inc. (8260); QSL Operations, Inc. (2667); QSL Management, Inc. (1988); Quaker Steak & Lube Franchising Corporation (1589); Quaker Steak & Wings, Inc. (7669); QSL Sauces, Inc. (8951); QSL Intellectual Properties Corporation (9985); QSL of Buffalo, Inc. (6439); QSL of Sheffield, Inc. (5326); QSL of Plano, Inc. (6701); QSL of Warren, Inc. (3865); QSL of Independence, Ohio, Inc. (0166); QSL of Newport News, Inc. (3858); QSL of Lakewood, Inc. (1575); QSL of Harrisonburg, Inc. (4832); QSL of Concord, Inc. (9262); QSL of Carrollton, Inc. (7632); QSL of Fort Wayne, Inc. (3079); Lube Holdings, Inc. (6457); Best Wings USA, Inc. (1339); QSL of Wheeling, Inc. (2220); QSL of Vermillion, Inc. (5207); QSL of Springfield, Inc. (9745); QSL of Springfield Realty, Inc. (9589); QSL of Fredericksburg, Inc. (4887); QSL of Medina Reality, Inc. (8418); and Lube Aggregator, Inc. (1263)..

{5707649:2}

of the Interim Order and any Final Order; (3) granting the Pre-Petition Lenders adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Pre-Petition Collateral (as defined in the Interim Order), (b) Replacement Liens (as defined in the Interim Order), and (c) superpriority administrative expense claims under sections 503 and 507(b) of the Bankruptcy Code, such Replacement Liens and sections 503 and 507(b) superpriority administrative expense claims to be subject to the Carve-Out (as defined herein) and the liens, security interests and superpriority treatment granted to the DIP Lender, as more particularly set forth herein; (4) authorizing the Debtors, subject to the Carve-Out, and only effective upon entry of the Final Order granting such relief, to prohibit surcharging of the Post-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code; (5) subject to the Interim Order and any Final Order, vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the provisions of the DIP Financing Documents and the Interim Order; and (6) granting any further and related relief as the Court deems just and equitable.

In support of this Motion, the Debtor respectfully represents as follows:

## BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.      By this Motion, the Debtors request entry of the proposed interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders").

2.      The DIP Lender has agreed to provide the Debtors with necessary postpetition debtor-in-possession financing in the amount of up to $2,000,000, subject to the terms of the DIP Loan Agreement (as defined below) and the DIP Orders.

3.      By this Motion, the Debtors respectfully request the following relief:

A.    that the Court conduct a preliminary hearing to consider this Motion (the "Interim Financing Hearing") pursuant to Bankruptcy Rule 4001;

B.    that, after the Interim Financing Hearing, the Court enter an interim order substantially in the form of the Interim Order authorizing the Debtors, pursuant to sections 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b), to borrow money under the terms of the DIP Financing Documents to fund the expenses set forth in the budget (the "Budget," a copy of which is attached to the Interim Order as Exhibit A) upon the terms and conditions set forth in the attached Interim Order, pending a final hearing on this Motion;

C.    that the Court authorize the adequate protection proposed in the DIP Financing Documents and summarized below, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, and find that no other adequate protection is necessary to authorize the Debtors' use of Cash Collateral in accordance with the Budget; and

D.    that the Court schedule a final hearing (the "Final Hearing") to approve the relief requested herein on a final basis and, in the absence of a timely filed and served objection, deem the Interim Order to be a final order without further action by the Court.

4.     Pending the Final Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Credit Facility in accordance with the DIP Loan Agreement and the Interim Order. Pursuant to Bankruptcy Rule 4001, the following are the materials provisions of the DIP Loan Agreement and/or the Interim Order.[2]

| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Lube Holdings, Inc. and Quaker Steak and Lube Franchising Corporation |
|---|---|
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | All of the remaining Debtors, with the exception of QSL Operations, Inc., QSL Management, Inc. and Lube Aggregator, Inc., are guarantors of the Borrowers' obligations under the DIP Credit Facility. |
| **DIP Lender**<br>*Bankruptcy Rule* | TravelCenters of America LLC, in its capacity as lender under the DIP Credit Facility, and together with any other entities that may |

---

[2] The summaries and descriptions of the terms and conditions of the DIP Loan Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Loan Agreement and Interim Order. In the event there is a conflict between this Motion and the DIP Loan Agreement or Interim Order, the DIP Loan Agreement or Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| *4001(c)(1)(B)* | hereafter become a lender thereunder (the "DIP Lender"). |
| **DIP Loan**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | A DIP Credit Facility of up to $600,000 prior to entry of the Final Order and up to $1,400,000 after entry of the Final Order through the Maturity Date, reflecting total borrowing under DIP Credit Facility, subject to the Original Budget (as defined in the Interim Order), and any Rolling Budget (as defined in the Interim Order). **Interim Order at 7.**<br><br>Pending the Final Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Financing Documents in accordance with the DIP Financing Documents and the Interim Order. To the extent that the Interim Order and or any Final Order conflicts with the terms and provisions of the DIP Financing Documents, the Interim Order and any Final Order shall control. **Section 17.11 of the DIP Loan Agreement.** |
| **Term**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The earliest to occur of: (a) six months from the Petition Date, (b) the effective date of a sale of all or substantially all of the Debtors' assets or business pursuant to Section 363 of the Bankruptcy Code which is authorized by the Bankruptcy Court; (c) confirmation of a Chapter 11 Plan of Reorganization and (d) the Termination Date. **Section 3.3 of the DIP Loan Agreement.** |
| **Interest Rates**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Non-Default Interest Rate: LIBOR plus four percent (4%) per annum.<br>Default Interest Rate: Applicable rate plus five percent (5%) per annum.<br>**Section 2.11 of the DIP Loan Agreement.** |
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Commitment Fee: $100,000. **Section 2.16 of the DIP Loan Agreement.** |
| **Budget**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | A 13-week budget which shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances, as may be amended, updated or supplemented with prior consent of the DIP Lender.<br>**Interim Order at 7, Exhibit A to the Interim Order.** |
| **Carve-Out**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The aggregate amount of any budgeted and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtors and any professional retained by the Committee that are in accordance with the Original Budget or applicable Rolling Budget (collectively, the "Professionals") to the extent allowed by an order of this Court, plus (a) those fees, costs and expenses incurred by the |

| | |
|---|---|
| | Professionals after the Carve-Out Event and subsequently allowed by order of this Court, subject to the Original Budget or applicable Rolling Budget, in an amount not to exceed $100,000 in the aggregate, plus (b) fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 (collectively, the "Carve-Out"); provided that, in no event shall the total Carve-Out amount to be paid to the Committee's retained professionals exceed $155,000. **Interim Order at 11.** |
| **Borrowing Conditions**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Customary borrowing conditions, including, among other things: (a) entry of the attached Interim Order (including liens and claims identified therein) and (b) meeting of 363 sale milestones.<br>**Sections 3.1 and 3.2 of the DIP Loan Agreement; Exhibit B to the Interim Order.** |
| **Liens and Priorities**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(i)* | Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender will be granted and shall have a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon any and all Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by section 546(b) of the Bankruptcy Code. All of the Collateral whether now or hereafter existing that constitutes: (a) sauces, mixes or marinades, including all ingredients and inventory associated therewith, is owned by, and good and marketable title is in the name of, QSL Sauces, Inc., (b) any franchise agreement and royalties and other proceeds associated therewith is owned by, and good and marketable title is in the name of, Quaker Steak & Lube Franchising Corp., and (c) patents, patent rights, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, copyrights, web addresses, sites and domain names and all applications for such which are in the process of being prepared, is owned or registered by, and good and marketable title is in the name of, QSL Intellectual Properties Corp. **Section 4.1 of the DIP Loan Agreement and Interim Order at 9(a).**<br><br>The Post-Petition Collateral shall not include avoidance actions under sections 502(d), 544, 545, 547. 548,549,550,551,553 and 724(a) of the Bankruptcy Code and shall not include proceeds of avoidance actions for purposes of the Interim Order.  The DIP Lender reserves the right to request liens on avoidance actions and the proceeds of avoidance actions under the Final Order. **Interim Order at 9(x).** |

15-52722-amk    Doc 7    FILED 11/16/15    ENTERED 11/16/15 16:05:23    Page 5 of 29

| | Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender shall have a valid, binding, continuing, enforceable, fully-perfected first priority, priming senior security interest in and lien upon all Pre-Petition Collateral that is subject to the Pre-Petition Liens, specifically including the Cortland Collateral (as limited with respect to the Excluded Pre-Petition Collateral) and the Farmer's Collateral, securing the Pre-Petition Obligations (excluding the Excluded Pre-Petition Collateral), and all other security interests and liens on the Collateral (other than the DIP Liens of the DIP Lender), except with respect to any valid, perfected and unavoidable interests in such property arising out of liens to which the holders of pre-petition liens become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  The Excluded Pre-Petition Collateral is defined as (a) the Wells Fargo Collateral; (b) the Medina property that has a value over and above the amount of $400,000.00, where the Medina property consists of collectively the real property owned by Medina Realty and the personal property and assets owned by Medina; (c) the United Capital Collateral; (d) the Cortland Austintown Collateral; (e) Lube Holdings' membership interests in Austintown Realty and Austintown; (f) the SBW Collateral; (g) the Ally Bank Collateral; and (h) the FNB Collateral (all as defined below). **Section 2.4 of the DIP Loan Agreement and Interim Order at 9.**<br><br>The DIP Liens granted to the DIP Lender shall be senior to and shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor other than as expressly permitted under the DIP Financing Documents. The DIP Liens are subject only to the Carve-Out. **Interim Order at 9(c).**<br><br>The DIP Lender will be granted an allowed superpriority administrative claim (the "DIP Superpriority Claims") in accordance with section 364(c)(1) of the Bankruptcy Code, having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (including, but not limited to, the Pre-Petition Obligations, which for avoidance of doubt are not entitled to treatment as an ordinary or superpriority administrative claim except to the extent of any Adequate Protection Claim, as defined below, for diminution in value or as |

| | |
|---|---|
| | adequate protection for priming by the DIP Credit Facility), now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of any kind including as specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b) (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, whether arising in the Cases or in any superseding chapter 7 cases concerning the Debtors. The DIP Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (without the need to file any proofs of claim). **Section 2.4 of the DIP Loan Agreement and Interim Order at 8.** |
| **Waivers of Rights**<br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | Upon an uncured event of default, the DIP Lender may, free of the restrictions of section 362 of the Bankruptcy Code (a) take immediate reasonable action to protect and preserve the Collateral, and (b) after giving five (5) business days' prior written notice of a Termination Event to the Debtors, the Office of the United States Trustee, counsel to the Pre-Petition Lenders, and the Committee to exercise their rights and remedies pursuant to the DIP Financing Documents |

15-52722-amk    Doc 7    FILED 11/16/15    ENTERED 11/16/15 16:05:23    Page 7 of 29

| | |
|---|---|
| | and/or applicable law, including, without limitation, to foreclose on all or any portion of the Post-Petition Collateral, collect accounts receivable and other monies owing to the Debtors and apply the proceeds thereof in satisfaction of the Post-Petition Obligations unless, prior to the passage of such five (5) business days, the Court shall have entered an order, after a hearing upon notice to the DIP Lender, limiting or restraining the DIP Lender from exercising any or all such rights and remedies. **Section 9 of the DIP Loan Agreement and Interim Order at 16.** |
| **Adequate Protection for Prepetition Lenders** *Bankruptcy Rule 4001(c)(1)(B)(ii)* | The Pre-Petition Lenders will be granted the Replacement Liens as set forth in the Interim Order subject to unavoidable, duly perfected liens existing as of the Petition Date. The Replacement Liens granted to the Pre-Petition Lenders will be (1) prior and senior to all liens and encumbrances (other than fees arising under 28. U.S.C. §1930) of all other secured creditors in and to such property granted, or arising, subsequent to the date of the Interim Order, and (2) any security interest or lien that is avoided or otherwise preserved for the benefit of the Debtors' estate pursuant to section 551 of the Bankruptcy Code, and (3) junior and subordinate to the Carve-Out and the DIP Liens granted to the DIP Lender, to which the Replacement liens shall be immediately junior and subordinate. **Interim Order at 10.**

The claims of the Pre-Petition Lenders for any diminution in the value of their respective  interests in the Pre-Petition Collateral from the Petition Date resulting from (a) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Pre-Petition Collateral by the Debtors, and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code shall constitute allowed claims against the Debtors with priority over all administrative expenses (other than any fees arising under 28 U.S.C. §1930), diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), |

726, 1113 or 1114 of the Bankruptcy Code (collectively, the "Pre-Petition Lenders Superpriority Claims"), whether or not such expenses or claims may become secured by judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed Pre-Petition Lenders Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof; provided, however, that the Pre-Petition Lenders Superpriority Claims granted to Pre-Petition Lenders shall be junior and subordinate to the Carve-Out and the DIP Superpriority Claims; The Pre-Petition Lenders reserve their rights to seek additional adequate protection; provided that any adequate protection provided hereafter shall be junior and subordinate to the DIP Liens, the Carve-Out and DIP Superpriority Claims. **Interim Order at 10(ii).**

The Pre-Petition Lenders Superpriority Claim shall not include avoidance actions or the proceeds of avoidance actions. **Interim Order at 10(ii).**

| **Events of Default**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Events of default that are usual and customary for DIP financings, including:<br>     (a)    the Cases is either dismissed or converted to cases under chapter 7 of the Bankruptcy Code;<br>     (b)    a trustee or an examiner with expanded powers is appointed in the Cases;<br>     (c)    any plan(s) of reorganization of the Debtors is filed which does not provide for the payment in full in cash of the Post-Petition Obligations upon the effective date of the plan(s);<br>     (d)    the Debtors cease operations of their business or take any material action for the purpose of effecting such cessation without the prior written consent of the DIP Lender;<br>     (e)    the Interim Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall materially adversely affect the rights of the DIP Lender or materially and adversely affects the priority of any or all the DIP Lender's claims, liens or security interests and which is not acceptable to the DIP Lender in its reasonable discretion;<br>     (f)    the Final Order is not entered on or before thirty (30) days after the Petition Date;<br>     (g)    the Debtors fail to comply with or perform, in any material respect, the terms and provisions of the Interim Order or any DIP Financing Document, including, without limitation, using Loans or Cash Collateral other than in accordance with the provisions of the Interim Order;<br>     (h)    any sale or other disposition of Collateral or Cash Collateral is approved without the consent of the DIP Lender; |
| --- | --- |

15-52722-amk   Doc 7   FILED 11/16/15   ENTERED 11/16/15 16:05:23   Page 9 of 29

| | |
|---|---|
| | (i)      any superpriority claim or lien equal or superior in priority to that granted to the DIP Lender or the Pre-Petition Lenders are granted;<br><br>(j)      the automatic stay of Bankruptcy Code section 362 is lifted so as to allow a party other than the DIP Lender to proceed against any material asset of the Debtors that are Collateral of the DIP Lender;<br><br>(k)      the Court enters an order confirming, a plan of reorganization, which plan is not in form and substance acceptable to the DIP Lender;<br><br>(l)      the 363 Sale Milestones are not met within the period specified therefor, as the same may be extended in the reasonable discretion of the DIP Lender; or<br><br>(m)      the asset purchase agreement with the stalking horse bidder is terminated other than by reason of the Court's approval of a 363 Sale Transaction to a purchaser other than the stalking horse bidder under the asset purchase agreement.<br>**Section 8 of the DIP Loan Agreement and Interim Order at 19.** |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | All DIP Liens and Replacement Liens granted for the benefit of the DIP Lender and/or the Pre-Petition Lender shall be valid, enforceable and deemed perfected, effective upon entry of the Interim Order, and no further action shall be required to effect such perfection. **Interim Order at 9 and 10.** |

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.      On November 16, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

7.      The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed.

8.      The factual background regarding the Debtors, including their business operations, capital and debt structure, and the events leading to the filing of the chapter 11 cases, is set forth in detail in the Affidavit and Statement of Gregory R. Lippert in Support of Chapter 11 Petitions and First Day Motions (the "Lippert Affidavit"), filed contemporaneously with this Motion and fully incorporated herein by reference.[3]

**Summary of Capital Structure and Current Business Operations**

9.      The Debtors do not have a revolving line of credit to support their business operations. Instead, the Debtors are reliant upon discretionary consumer spending to fund their liquidity needs. As of the Petition Date, the Debtors were party to various mortgage and equipment loans as set forth below:

(a)     Wells Fargo Bank, National Association ("Wells Fargo Bank")

(i)      On September 7, 2011, Lube Holdings executed and delivered a Promissory Note in the principal amount of $1,800,000.00 in favor of Wells Fargo Bank ("WF Note One"). Springfield Realty, Springfield, Wheeling, Vermillion, Sauces, Independence, Steak & Wings, Sheffield, Franchising, Intellectual Properties, and Best Wings each guaranteed the obligations on Lube Holdings to Wells Fargo Bank. All of the guarantees are unsecured except with respect to Springfield Realty, Best Wings (see below) and Independence (see below). Springfield Realty executed and delivered that certain Construction Mortgage dated September 7, 2011, up to the maximum amount of $3,600,000.00 in favor of Wells Fargo Bank with respect

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lippert Affidavit.

to its owned real property located at 1121 W. Lincolnshire Blvd., Springfield, Illinois 62704[4] (the "Springfield Real Property Collateral").

(ii)     On November 28, 2011, Springfield executed and delivered a Promissory Note in the principal amount of $591,321.24 in favor of Wells Fargo Equipment Finance ("WF Note Two"). Lube Holdings guaranteed the obligations owed to Wells Fargo Equipment Finance. Springfield executed and delivered a Security Agreement dated as of August 15, 2011. Wells Fargo Equipment Finance filed a UCC-1 financing statement listing certain of Springfield's assets as collateral, including, without limitation, sound and vision equipment, restaurant equipment, signs, 2 bar tops and bar die paneling (collectively, the "Wells Fargo Equipment Collateral").

(iii)     On March 9, 2012, Lube Holdings executed and delivered a Promissory Note in the principal amount of $2,491,000.00 in favor of Wells Fargo Bank ("WF Note Three"). Springfield Realty, Springfield, Wheeling, Vermillion, Sauces, Independence, Steak & Wings, Sheffield, Franchising, Intellectual Properties, and Best Wings each guaranteed the obligations on Lube Holdings to Wells Fargo Bank. All of the guarantees are unsecured except with respect to Springfield Realty (see the Commercial Mortgage referenced above), Best Wings, and Independence.   Best Wings executed and delivered that certain Open-End Mortgage and an Assignment of Rents dated March 9, 2012, up to the maximum amount of $2,491,000.00 in favor of Wells Fargo Bank with respect to its owned real property located at 101 Chestnut Street, Sharon, Pennsylvania 16146, 110 Connelly Blvd., Sharon Pennsylvania 16146, and 130 S. Dock Street, Sharon, Pennsylvania 16146 (the "Sharon Real Property Collateral").   On March 9, 2012, Independence granted Wells Fargo Bank an assignment of its ground lease and rents for the real

---

[4] The address of the real property subject to the Construction Mortgage was originally listed as 3632 W. Grand Avenue, Springfield, Illinois 62711.  The Construction Mortgage was amended to include the correct address of the real property.

property located at 5935 Canal Road, Valley View, Ohio 44125 (the "Independence Ground Lease Collateral" and collectively with the Springfield Real Property Collateral, the Wells Fargo Equipment Collateral, and the Sharon Real Property Collateral, the "Wells Fargo Collateral").

(iv)　　On December 9, 2014, Wells Fargo Bank sent the borrowers and guarantors a notice of default and reservation of rights letter in which Wells Fargo Bank accelerated the indebtedness owed under WF Note One and WF Note Three, including interest at the default rate.

(v)　　According to the books and records of the Debtors, approximately: (a) $1,648,180 is owed to Wells Fargo Bank as of the Petition Date on WF Note One, plus unpaid interest, fees and costs; (b) $48,908 is owed to Wells Fargo Equipment Finance as of the Petition Date on WF Note Two, plus unpaid interest, fees and costs; and (c) $2,307,078 is owed to Wells Fargo Bank as of the Petition Date on WF Note Three, plus unpaid interest, fees and costs.

(b)　　United Capital Business Lending, Inc. ("United Capital")

(i)　　On January 29, 2013, Wheeling, Vermillion, and Plano, as borrowers, executed and delivered a Promissory Note in the original principal amount of $1,015,289.00 in favor of United Capital ("UC Note One"). The borrowers also executed and delivered that certain Loan and Security Agreement dated January 29, 2013, pursuant to which they granted United Capital a blanket lien on all of their assets. Lube Holdings, Carrollton, and QSL Management executed and delivered guaranty agreements in favor of United Capital. In addition, on December 12, 2013, Wheeling, Vermillion, Plano, Lube Holdings, Carrollton, QSL Management, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne each executed and delivered that certain Cross Default and Cross Collateral Agreement in favor of United Capital.

(ii)     On March 27, 2013, Carrollton, as a borrower, executed and delivered a Promissory Note in the original principal amount of $802,475.10 in favor of United Capital ("UC Note Two"). Carrollton also executed and delivered that certain Loan and Security Agreement dated March 27, 2013, pursuant to which it granted United Capital a blanket lien on all of its assets. Lube Holdings, QSL Management, Wheeling, Vermillion, and Plano executed and delivered guaranty agreements in favor of United Capital. In addition, on December 12, 2013, Wheeling, Vermillion, Plano, Lube Holdings, Carrollton, QSL Management, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne each executed and delivered that certain Cross Default and Cross Collateral Agreement in favor of United Capital.

(iii)    On December 31, 2013, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne, as borrowers, executed and delivered a Promissory Note in the original principal amount of $1,940,000.00 in favor of United Capital ("UC Note Three"). The borrowers also executed and delivered that certain Development Line Loan and Security Agreement dated December 31, 2013, in the maximum principal amount of $2,752,000.00, pursuant to which they granted United Capital a blanket lien on all of their assets. Lube Holdings, QSL Management, Wheeling, Vermillion, and Plano executed and delivered guaranty agreements in favor of United Capital. In addition, on December 12, 2013, Wheeling, Vermillion, Plano, Lube Holdings, Carrollton, QSL Management, Concord, Fredericksburg, Harrisonburg, Newport News and Fort Wayne each executed and delivered that certain Cross Default and Cross Collateral Agreement in favor of United Capital. The collateral granted by any of the Debtors to United Capital is referred to herein collectively as the "United Capital Collateral").

(iv)     On November 20, 2014, United Capital sent the borrowers and guarantors a notice of default and reservation of rights letter in which United Capital accelerated the indebtedness owed under UC Note One, UC Note Two, and UC Note Three.

(v)     On February 13, 2015, United Capital filed three complaints in the Circuit Court for Baltimore County, Maryland seeking confessions of judgment in connection with the indebtedness and obligations under the loan documents related to UC Note One, UC Note Two, and UC Note Three.  A confession of judgment was obtained in case number:  (i) 03C15001783 on March 13, 2015 in the amount of $1,808,530.56, with interest from October 1, 2014 at the rate of 11.75% per annum, and attorneys' fees and expenses in an amount to be determined against Plano, Vermillion, Wheeling, Lube Holdings, Carrollton, QSL Management, Concord, Fort Wayne, Fredericksburg, Harrisonburg, and Newport News (collectively, the "UC Judgment Debtors"); (ii) 03C15001784 on March 10, 2015 in the amount of $671,241.34, plus attorneys' fees and expenses in an amount to be determined against the UC Judgment Debtors; and (iii) 03C15001786 on March 23, 2015 in the amount of $840,964.45, interest at the rate of 11.5% per annum, and attorneys' fees and expenses in an amount to be determined, against the UC Judgment Debtors.  The UC Judgment Debtors have moved to vacate, open or modify the confessions of judgment under Maryland Rule 2-611.  No rulings were made with respect to such motions to vacate prior to the Petition Date.

(c)     Cortland Savings and Banking Company ("Cortland")

(i)     On June 3, 2011, Steak & Wings executed and delivered a Promissory Note in the original principal amount of $250,000.00 in favor of Cortland ("Cortland Note One"). Lube Holdings executed and delivered a guaranty agreement dated June 3, 2011 in favor of Cortland.   Steak & Wings executed and delivered that certain Commercial Security

Agreement dated June 3, 2011, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note One.

(ii) On June 3, 2011, Steak & Wings executed and delivered a Promissory Note in the original principal amount of $318,750.00 in favor of Cortland ("Cortland Note Two"). Lube Holdings executed and delivered a guaranty agreement dated June 3, 2011 in favor of Cortland. Steak & Wings executed and delivered that certain Commercial Security Agreement dated June 3, 2011, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Two.

(iii) On October 13, 2011, Steak & Wings executed and delivered a Promissory Note in the original principal amount of $95,679.00 in favor of Cortland ("Cortland Note Three"). Lube Holdings executed and delivered a guaranty agreement dated June 11, 2011 in favor of Cortland. Steak & Wings executed and delivered that certain Commercial Security Agreement dated October 13, 2011, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Three.

(iv) On May 23, 2012, Lakewood executed and delivered a Promissory Note in the original principal amount of $822,040.00 in favor of Cortland ("Cortland Note Four"). Lube Holdings executed and delivered a guaranty agreement dated May 23, 2012 in favor of Cortland. Lakewood executed and delivered that certain Commercial Security Agreement dated May 23, 2012, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Four.

(v) On May 23, 2012, Lakewood executed and delivered a Promissory Note in the original principal amount of $633,477.00 in favor of Cortland ("Cortland Note Five"). Lube Holdings executed and delivered a guaranty agreement dated May 23, 2012 in favor of Cortland.

Lakewood executed and delivered that certain Commercial Security Agreement dated May 23, 2012, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Five.

(vi)     On February 27, 2013, Medina executed and delivered a Promissory Note in the original principal amount of $522,644.00 in favor of Cortland ("Cortland Note Six"). Lube Holdings and Medina Realty are guarantors of the indebtedness owed to Cortland under Cortland Note Six. Medina executed and delivered a Commercial Security Agreement dated February 27, 2013 in favor of Cortland, pursuant to which it granted Cortland a blanket lien on its assets to secure the indebtedness owed to Cortland under Cortland Note Six. In addition, Cortland Note Six is secured by a mortgage lien on the real property owned by Medina Realty pursuant to an Open-End Mortgage dated February 27, 2013.

(vii)     On February 27, 2013, Medina Realty executed and delivered a Promissory Note in the original principal amount of $1,000,000.00 in favor of Cortland ("Cortland Note Seven"). Lube Holdings and Medina are guarantors of the indebtedness owed to Cortland under Cortland Note Seven. Medina Realty executed and delivered a mortgage and assignment of rents dated February 27, 2013 in favor of Cortland with respect to the real estate owned by Medina Realty. In addition, Medina executed and delivered a Commercial Security Agreement dated February 27, 2013 in favor of Cortland, pursuant to which it granted Cortland a blanket lien on its assets to cross-collateralize Cortland Note Seven.[5] The collateral pledged by

---

[5] Non-debtor Austintown executed a Promissory Note, dated March 9, 2006, in the original principal amount of $700,000.00 in favor of Cortland. Austintown Realty and The Raymond R. Travaglini 1989 Revocable Trust are guarantors. The obligations owed to Cortland under the note are secured by a blanket lien on Austintown's assets and by a mortgage lien on the real property owned by Austintown Realty. In addition, on February 24, 2006, non-debtor Austintown Realty executed a Promissory Note in the original principal amount of $2,000,000.00 in favor of Cortland. Austintown is a guarantor. The obligations owed to Cortland under the note are secured by a blanket lien on Austintown's assets and by a mortgage lien on the real property owned by Austintown Realty (the collateral pledged to Cortland by Austintown and Austintown Realty is collectively referred to herein as the "Cortland Austintown Collateral").

the respective Debtors to Cortland, exclusive of the Cortland Austintown Collateral, is referred to herein as the "Cortland Collateral").

(viii)   According to the books and records of the Debtors, approximately: (i) $157,484 is owed to Cortland as of the Petition Date on Cortland Note One, plus unpaid interest, fees and costs; (ii) $111,918 is owed to Cortland as of the Petition Date on Cortland Note Two, plus unpaid interest, fees and costs; (iii) $43,553 is owed to Cortland as of the Petition Date on Cortland Note Three, plus unpaid interest, fees and costs; (iv) $618,969 is owed to Cortland as of the Petition Date on Cortland Note Four, plus unpaid interest, fees and costs; (v) $335,265 is owed to Cortland as of the Petition Date on Cortland Note Five, plus unpaid interest, fees and costs; (vi) $388,443 is owed to Cortland as of the Petition Date on Cortland Note Six, plus unpaid interest, fees and costs; and (vii) $960,932 is owed to Cortland as of the Petition Date on Cortland Note Seven, plus unpaid interest, fees and costs.

(d)   The Farmer's National Bank of Canfield ("Farmer's)

(i)   On November 14, 2013, Warren and Lube Holdings, as borrowers, executed and delivered that certain Promissory Note in the original principal amount of $612,000.00 ("Farmer's Note One").  In addition, on November 14, 2013, Warren and Lube Holdings, as borrowers, executed and delivered that certain Promissory Note in the original principal amount of $1,339,000.00 ("Farmer's Note Two"). Warren executed and delivered (i) a Security Agreement for Personal Property dated November 14, 2013, pursuant to which it granted Farmer's a blanket lien on its assets, and (ii) an Open-End Mortgage Deed (leasehold), Assignment of Rents & Profits and Security Agreement dated November 14, 2013 (a ground lease mortgage) to secure Warren's obligations and indebtedness owed to Farmer's under

Farmer's Note One and Farmer's Note Two. The collateral pledged by Warren to Farmer's is referred to herein as the "Farmer's Collateral".

(ii)     According to the books and records of the Debtors, approximately (i) $443,724 is owed to Farmer's as of the Petition Date on Farmer's Note One, plus unpaid interest, fees and costs, and (ii) $1,258,741 is owed to Farmer's as of the Petition Date on Farmer's Note Two, plus unpaid interest, fees and costs.

(e)     Scott's Buffalo Wings, Inc. ("SBW")

(i)     On August 14, 2013, Buffalo executed and delivered that certain Promissory Note in the original principal amount of $920,000.00 in favor of SBW ("SBW Note One"). Lube Holdings guaranteed the obligations owed by Buffalo to SBW. Buffalo executed and delivered that certain Security Agreement dated August 14, 2013 in favor of SBW, pursuant to which it granted SBW a lien on all equipment, inventory, the cash or non-cash proceeds of the same and all license, franchise and related rights concerning the same. The collateral pledged by Buffalo to SBW is referred to herein as the "SBW Collateral".

(ii)     According to the books and records of the Debtors, approximately $772,543 is owed to SBW as of the Petition Date on SBW Note One, plus unpaid interest, fees and costs.

(f)     Ally Bank

Best Wings executed a Motor Vehicle Retail Installment Sales Contract dated December 19, 2012, for the purchase of a 2010 Chevrolet HHR, in the amount of $12,762.65. Ally Bank has an alleged lien on the vehicle (the "Ally Bank Collateral"). According to the books and records of the Debtors, approximately $6,165 is owed to Ally Bank as of the Petition Date.

     (g)     <u>First National Bank of Pennsylvania ("FNB")</u>

Independence purchased a 2008 F-250 Ford extended cab super duty truck for the amount of $23,423 on December 20, 2013. FNB has an alleged lien on the truck (the "FNB Collateral"). According to the books and records of the Debtors, approximately $16,346 is owed to FNB as of the Petition Date.

**REQUEST FOR AUTHORITY TO USE CASH COLLATERAL AND
TO INCUR SECURED POSTPETITION FINANCING**

10.    The Debtors require money for the operation of their businesses and administration of their bankruptcy estates, including but not limited to the payment of critical pre-and postpetition wages, salaries, and other expenses, which are essential to the preservation of the estates. The continued operation of the Debtors is in the best interests of creditors, the estates and all interested parties because it will preserve going concern values and provide the prospect of greater potential recoveries for creditors than would the immediate termination and liquidation of the Debtors' businesses. Accordingly, as provided in the Interim Order and any Final Order, the Debtors have requested that: (a) the Pre-Petition Lenders[6] make available to the Debtors, all of Debtors' cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral or the proceeds thereof (the "Cash Collateral")[7] and (b) the DIP Lender provide post-petition financing pursuant to the terms and conditions of (i) the proposed Interim Order and any Final Order, (ii) the DIP Loan Agreement and all ancillary documents referred to in the Interim Order, the DIP Loan Agreement or any final order and/or

---

[6] Wells Fargo Bank, United Capital, Cortland, Farmer's, SBW, Ally Bank and FNB are collectively referred to herein as the "Pre-Petition Lenders."

[7] None of the Pre-Petition Lenders have dominion over the Debtors' cash or deposit accounts. In addition, the Debtors have not executed and delivered any account control agreements in favor of any of the Pre-Petition Lenders. None of the Pre-Petition Lenders have a lien on the assets of QSL Franchising and/or Sauces.

required to be executed by the Debtors in connection with the DIP Credit Facility, and (iii) the Original Budget and any Rolling Budget (collectively with the DIP Financing Documents, the "DIP Credit Facility").

11.     The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing from the DIP Lender.  The DIP Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, solely in accordance with the proposed Interim Order and any Rolling Budget and pursuant to the terms and conditions of the DIP Credit Facility.

**A.     <u>Request to Obtain Secured Post-Petition Financing</u>**

12.     By this Motion, the Debtors seek an order authorizing them to obtain secured post-petition financing on an interim basis pending entry of a final order in accordance with the proposed Original Budget and any Rolling Budget.  The Debtors' request to obtain such financing is authorized pursuant to section 364(c) of the Bankruptcy Code.  Section 364 (c) and (d) provide in relevant part:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364

13.     The DIP Lender has indicated a willingness to lend money to the Debtors for the above-described purposes upon the terms and conditions set forth in the DIP Credit Facility, subject to the limitations imposed by the Original Budget and any Rolling Budget.  The DIP Loan Agreement is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

14.     The Debtors have attempted to obtain and presently are unable to borrow additional funds on an unsecured basis under any conditions set forth in section 364(a) or (b) of the Bankruptcy Code.  The Debtors will be able to borrow additional funds under section 364(c) and (d) from the DIP Lender, provided that the relief requested in the Interim Order and any Final Order is entered by the Court.

**<u>The DIP Facility Should Be Approved</u>**

15.     The Debtors' need for financing is immediate. In the absence of the DIP Credit Facility, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates would occur. The preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization or sale of the Debtors' assets under chapter 11 of the Bankruptcy Code.

16.     Given the Debtors' current financial condition and capital structure, the Debtors cannot obtain unsecured credit allowable under sections 364(a) and 503(b)(1) of the Bankruptcy Code as an administrative expense in the amount of the DIP Credit Facility and for the working capital purposes that the DIP Credit Facility will enable. Financing on a post-petition basis is not otherwise available without the Debtors (a) granting, pursuant to section 364(c)(1) of the

Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code and otherwise, and (b) securing, pursuant to section 364(c) and (d) of the Bankruptcy Code, the indebtedness and obligations to be owed under the DIP Credit Facility with security interests in and liens on the Debtors' personal property and real property as provided in the DIP Loan Documents, the Interim Order and any Final Order.

17. The terms of the DIP Loan Documents between the Debtors and the DIP Lender, pursuant to which the DIP Credit Facility and other credit accommodations may be made or provided to the Debtors by the DIP Lender, were negotiated in good faith and at arms' length, and such terms and agreements are in the best interests of the Debtors, their creditors and their estates. Accordingly, the Interim Order is subject to, and the DIP Lender is entitled to the benefits of section 364(e) of the Bankruptcy Code

**Interim Approval of the DIP Financing Should Be Granted**

18. The Debtors submit that the relief requested by this Motion is necessary, essential and appropriate and is in the best interests of, and will benefit, the Debtors, their estates, and their creditors. Specifically, granting the limited relief set forth in the Interim Order pending the Final Hearing on this Motion will provide the Debtors with the necessary liquidity to: (a) minimize disruption to the Debtors' businesses and on-going operations; (b) preserve and maximize the value of the Debtors' estates for the benefit of all creditors; and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees and their assets. Thus, the use of loans under the DIP Credit Facility is necessary to avoid immediate and irreparable damage to the Debtors' estates, and the Debtors submits that interim relief pursuant to Bankruptcy Rule 4001 is appropriate.

19. Without immediate access to the loans under the DIP Credit Facility, the Debtors expect to suffer an acute cash shortage immediately, which shortage would threaten their ability to maintain operations in the short term — even through the date of any Final Hearing. Accordingly, the Debtors request that the Court enter the proposed Interim Order authorizing interim borrowings on the DIP Credit Facility in an amount up to $600,000.

**The Automatic Stay Should be Modified.**

20. In order to effectuate the DIP Financing Documents, the automatic stay should be modified to the extent necessary to permit the DIP Lender to receive, collect and apply payments and proceeds with respect to the Post-Petition Collateral and the Post-Petition Obligations (as defined in the Interim Order).

**The Postpetition Liens Should be Deemed Effective.**

21. In order to effectuate the DIP Financing Documents, the DIP Liens (as defined in the Interim Order) should be (a) deemed effective and perfected in all respects as of the Petition Date and without the necessity of the Debtors or the DIP Lender preparing, executing, entering into, recording or filing any financing statements, mortgages, notices of lien, control agreements, pledge agreements, or similar instruments in any jurisdiction, and without the necessity of the DIP Lender taking possession or control of any Post-Petition Collateral or DIP Lender taking any other action to attach or prefect the DIP Liens conceived of in the DIP Financing Documents, and (b) shall extend and attach to all Post-Petition Collateral and any proceeds of Post-Petition Collateral which is presently in existence or hereafter is acquired or arises (whether acquired or arising before, on or after the Petition Date) and in which the Debtors have any legal or equitable interest, whether held by the Debtors or by any other person for the Debtors' account, and wherever located. Notwithstanding the foregoing, the DIP Lender should be allowed, in its sole discretion, to file such financing statements, mortgages, notices of liens and other similar

documents without seeking modification of the automatic stay under section 363 of the Bankruptcy Code and all such financing statements, mortgages, notices of liens and other similar documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of these chapter 11 cases.

## B. <u>Request for Use of Cash Collateral</u>

22.     In addition to the need for the loans under the DIP Financing Documents, the Debtors also require the use of cash collateral for the purposes and expenses set forth above. Accordingly, Debtors also seek an order authorizing use of the Cash Collateral on an interim basis pending entry of a Final Order in accordance with the proposed Original Budget or any Rolling Budget. None of the Pre-Petition Lenders have dominion over the Debtors' cash or deposit accounts. In addition, the Debtors have not executed and delivered any account control agreements in favor of any of the Pre-Petition Lenders. None of the Pre-Petition Lenders have a lien on the assets of QSL Franchising and/or Sauces. The Debtors assert that the Pre-Petition Lenders are adequately protected by virtue of the Replacement Liens and superpriority administrative expense claim and, therefore, the Debtors' use of the Cash Collateral is authorized pursuant to Section 361 and 363(c) of the Bankruptcy Code. Section 361 provides as follows:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

23.    Section 363(c) provides as follows:

    (1)    If the business of the Debtors is authorized to be operated under section 721, 1108, 1203, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

    (2)    The Trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

        (A)    each entity that has an interest in cash collateral consents; or

        (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provision of this section.

24.    Pursuant to Section 363(a) of the Bankruptcy Code, cash collateral is defined as, *inter alia*, cash, deposit accounts, or other cash equivalents, whenever acquired, in which the estate and an entity other than the estate have an interest, and includes the proceeds, products, offspring, rents or profits of property subject to the security interest as provided under Section 552(b) of the Bankruptcy Code, whether existing before or after the commencement of a case under the Bankruptcy Code.

25.    The cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Pre-Petition Collateral or the proceeds thereof constitute "cash collateral," as such term is defined in Bankruptcy Code section 363(a), of the Pre-Petition Lenders.

26.    Pursuant to Sections 363(c)(2)(A) and 363(c)(2)(B) of the Bankruptcy Code, a debtor-in-possession may use cash collateral if (A) each entity that has an interest in such cash

collateral consents; or (B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this Section.

27.     Accordingly, the Debtors request authority to utilize Cash Collateral on an interim basis.  All such funds shall be utilized for costs and expenses incurred in the administration of the Debtors' chapter 11 cases, and shall be utilized for such other costs and expenses that may be approved by the Court.  Such expenditures are necessary to avoid immediate and irreparable harm to the Debtors.

## **REQUEST FOR FINAL HEARING**

28.     Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on this Motion to use Cash Collateral and obtain financing may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize use of cash collateral to avoid immediate and irreparable harm to the Debtors' estates.  *See* Bankruptcy Rule 4001(b)(2) and (c)(2).

29.     The Debtors request that the Court (a) conduct an expedited hearing with respect to this Motion and (b) schedule the final hearing on the use of cash collateral at the earliest possible date in accordance with Bankruptcy Rule 4001(b) and (c).

30.     Because this Motion presents no novel issues of law and the authorities relied upon are stated herein, the Debtors respectfully request that this Court waive the requirement contained in Local Bankruptcy Rule 9013-1(a) that the Debtors files a separate memorandum of law in support of this Motion.

31.     <u>Waiver of Page Limit Restrictions</u>.

Local Rule 9013-2(a) provides that "No motion or response thereto…shall exceed 20 pages in length, exclusive of appendices, unless the party has sought and obtained leave of

Court....Where such leave is granted, a table of contents containing a summary of all points raised shall be included with the brief or memorandum." The Debtors respectfully request leave, retroactive to the Petition Date and pursuant to Local Rule 9013-2(a), to exceed the 20 page limit and to waive the table of contents requirement with respect to this Motion. Given the size and complexity of the Debtors' bankruptcy cases and the length of the factual and procedural assertions set forth in the Motion, there is good cause for the Court to waive the requirements of Local Rule 9013-2(a) in this limited instance.

## NOTICE

32. As of the date of the filing of this motion, no creditors' committee has been appointed in the Chapter 11 cases. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Debtors' 20 largest unsecured creditors, (b) the United States Trustee, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Ave., East - Suite 441, Cleveland, OH 44114; (c) counsel to the Debtors, McDonald Hopkins LLC, 600 Superior Ave. E, #2100, Cleveland, Ohio 44114, Attn: Scott Opincar and Michael Kaczka; (d) counsel to TravelCenters of America, LLC, Drinker Biddle & Reath LLP, 1177 Avenue of the Americas, 41st Floor, New York, NY 10036-2714, Attn.: James M. Millar; (e) counsel to Wells Fargo Bank National Association, Ulmer & Berne LLP, 1660 West 2nd Street, Suite 1100, Cleveland, Ohio 44113-1448, Attn.: Michael S. Tucker; (f) counsel to United Capital Business Lending, Wombyl Carlyle Sandridge & Rice, LLP, 250 W. Pratt Street, Suite 1300, Baltimore, Maryland 21201, Attn.: David B. Hamilton; (g) counsel to Cortland Savings and Banking Company, Nadler Nadler & Burdman Co., L.P.A., 6550 Seville Drive, Suite B, Canfield, Ohio 44406, Attn.: Timothy M. Reardon; (h) counsel to The Farmer's National Bank of Canfield, Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A., 6 Federal Plaza Central, Suite 1300, Youngstown, Ohio 44503, Attn.: Richard J. Thomas; (i) counsel to Scott's Buffalo

Wings, Inc., Knox McLaughlin Gornall & Sennett, P.C., 120 West Tenth Street, Erie, PA 16501-1461, Attn.: Guy C. Fustine; (j) First National Bank of Pennsylvania, 410 E. State Street, Hermitage, PA 16148; and (k) Ally Bank, P.O. Box 380902, Minneapolis, MN 55438-0902. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

<u>**NO PRIOR REQUEST**</u>

33.     No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE,** the Debtors respectfully requests entry of interim and final orders granting the relief requested herein.


Dated:  November 16, 2015                          Respectfully submitted,

                                                   /s/Michael J. Kaczka
                                                   Scott N. Opincar (0064027)
                                                   Michael J. Kaczka (0076548)
                                                   McDONALD HOPKINS LLC
                                                   600 Superior Avenue, East, Suite 2100
                                                   Cleveland, OH 44114-2653
                                                   Phone (216) 348-5400
                                                   Fax (216) 348-5474
                                                   sopincar@mcdonaldhopkins.com
                                                   mkaczka@mcdonaldhopkins.com

                                                   PROPOSED COUNSEL FOR DEBTORS
                                                   AND DEBTORS IN POSSESSION