UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| QSL of Medina, Inc., *et. al.*,[1] | ) |
| | ) Case No. 15-52722 |
| Debtors. | ) (Request for Joint Administration |
| | ) Pending) |
| | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

**DEBTORS' MOTION FOR AN ORDER: (A) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING AND SCHEDULING AN AUCTION; (C) SCHEDULING HEARING FOR APPROVAL OF THE SALE OF ASSETS FREE AND CLEAR OF LIENS AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO THE SUCCESSFUL BIDDER; (D) APPROVING BREAKUP FEE AND EXPENSE REIMBURSEMENT; (E) APPROVING PROCEDURES AND SETTING DEADLINES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING CURE AMOUNTS RELATING THERETO; (F) APPROVING CERTAIN DEADLINES AND THE FORM, MANNER AND SUFFICIENCY OF NOTICE; AND <u>(G) GRANTING OTHER RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, for the entry of an order, the proposed form of which is attached hereto as <u>Exhibit A</u> (the "Bid Procedures Order"): (a) approving bidding procedures for the sale of substantially

---

[1] The Debtors and the last four digits of the Debtors' United States Tax Identification Number following in parentheses are: QSL of Medina, Inc. (8260); QSL Operations, Inc. (2667); QSL Management, Inc. (1988); Quaker Steak & Lube Franchising Corporation (1589); Quaker Steak & Wings, Inc. (7669); QSL Sauces, Inc. (8951); QSL Intellectual Properties Corporation (9985); QSL of Buffalo, Inc. (6439); QSL of Sheffield, Inc. (5326); QSL of Plano, Inc. (6701); QSL of Warren, Inc. (3865); QSL of Independence, Ohio, Inc. (0166); QSL of Newport News, Inc. (3858); QSL of Lakewood, Inc. (1575); QSL of Harrisonburg, Inc. (4832); QSL of Concord, Inc. (9262); QSL of Carrollton, Inc. (7632); QSL of Fort Wayne, Inc. (3079); Lube Holdings, Inc. (6457); Best Wings USA, Inc. (1339); QSL of Wheeling, Inc. (2220); QSL of Vermillion, Inc. (5207); QSL of Springfield, Inc. (9745); QSL of Springfield Realty, Inc. (9589); QSL of Fredericksburg, Inc. (4887); QSL of Medina Reality, Inc. (8418); and Lube Aggregator Inc. (1263).

of the Debtors' assets; (b) setting a date for and authorizing an auction (the "Auction") to sell substantially all of the Debtors' assets; (c) scheduling a hearing (the "Sale Hearing") for approval of a sale of the Debtors' assets free and clear of liens, claims, encumbrances and other interests, and the assumption and assignment of certain executory contracts and unexpired leases; (d) authorizing payment of a breakup fee and expense reimbursement; (e) approving procedures and setting deadlines for the assumption and assignment of executory contracts and unexpired leases, including cure amounts relating thereto; (f) approving certain deadlines and the form, manner and sufficiency notice of the foregoing; and (g) granting other related relief (the "Motion").

In support of the Motion, the Debtors represent as follows:

## Background

1. On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their business, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of Debtors' chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The factual background regarding the Debtors, including their business operations, capital and debt structure, and the events leading to the filing of the chapter 11 cases, is set forth in detail in the Affidavit and Statement of Gregory R. Lippert in Support of Chapter

11 Petitions and First Day Motions (the "Lippert Affidavit"), filed contemporaneously with this Motion and fully incorporated herein by reference.[2]

### Company Background

4. Quaker Steak & Lube® is a highly differentiated motorsports themed casual dining restaurant concept developed and refined over the past 41 years. Quaker Steak & Lube® was founded by Gary "Moe" Meszaros and George "Jig" Warren in March of 1974 when the co-founders purchased a vacant automobile service station in Sharon, Pennsylvania and converted it into a restaurant and bar named "Quaker Steak & Lube."

5. It is from these humble beginnings that the Quaker Steak & Lube® family of restaurants began. Today, Quaker Steak & Lube® is still rescuing muscle cars, vintage cars, trucks and a vast selection of custom and antique motorcycles, giving them good homes hanging from the walls and ceilings in each of its restaurants. The company's signature menu item is its award-winning chicken wings, known as "Best Wings USA", prepared using the company's assortment of 29 signature sauces and rubs.

6. As of the Petition Date, Quaker Steak & Lube® has 12 corporate-owned or controlled operating locations, one joint venture, and 43 franchised locations operating in 16 states and Canada.[3]

### The Initial Restructuring Process

7. The Debtors hired Mastodon Ventures, Inc. ("Mastodon") as their financial advisor and investment banker in July 2014 to assist the Debtors with a financial restructuring. After meeting with the Debtors' board of directors and managers, and reviewing financial and

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Lippert Affidavit.

[3] In the fifteen months prior to the Petition Date, Lube Holdings closed 7 corporate-owned locations in: (a) Springfield, Illinois; (b) Carrollton, Texas; (c) Concord, North Carolina; (d) Fredericksburg, Virginia; (e) Fort Wayne, Indiana; (f) Plano, Texas; and (g) Buffalo, New York.

operating results, Mastodon assessed the company's financial condition and presented its assessment and a proposed restructuring plan to the board of directors in late 2014. The restructuring plan was a multifaceted attempt to stabilize the Debtors' operations while Mastodon searched for a financial or strategic partner that could bolster the Debtors' capital structure.

8. Mastodon completed a comprehensive analysis of the Debtors' debt service requirements, operations, and financial performance, including, minimum EBITDA, revenue levels, occupancy costs, and same store sales. Based on Mastodon's analysis, the Debtors determined that they could not service their existing secured debt and concluded that a financial and operational restructuring was necessary to preserve the valuable Quaker Steak & Lube® brand and to continue operations at profitable restaurants.

9. As part of the restructuring plan, Mastodon prepared and maintained a 13-week rolling cash flow forecast in order to assist the Debtors with managing their liquidity. Mastodon also commenced ongoing negotiations with the Debtors' landlords and with certain of their lenders, including Wells Fargo Bank, National Association ("Wells Fargo Bank"); United Capital Business Lending, Inc. ("United Capital"); Cortland Savings and Banking Company ("Cortland"); The Farmer's National Bank of Canfield ("Farmer's"); Scott's Buffalo Wings, Inc. ("SBW", and with Wells Fargo Bank, United Capital Cortland and Farmer's, the "Prepetition Secured Lenders"). Mastodon also advised and assisted the Debtors with the identification and closure of seven underperforming locations.

**The Initial Marketing Process**

10. Beginning in December 2014, Mastodon, with the assistance of the Debtors and their other professional advisors, marketed the Debtors to raise new equity, refinance existing debt or locate a potential purchaser. The Debtors, through Mastodon, attempted for several

months to find a replacement lender or bridge loan lender to provide the Debtors with sufficient liquidity to implement their operational restructuring strategy. The Debtors undertook a "dual-track" process whereby they were negotiating with both (a) financial partners that could provide equity, bridge or take-out financing and (b) strategic and financial partners that were interested in purchasing the Debtors in either a stock or asset sale.

11. As part of the marketing process, Mastodon assisted in: (a) preparing and negotiating confidentiality agreements for prospective purchasers; (b) preparing detailed information about the Debtors' business, operations and financial condition; (c) identifying and contacting potential purchasers; (d) establishing a data room for due diligence to be conducted by prospective purchasers; (e) evaluating proposals from prospective purchasers; and (f) negotiating a stalking horse offer.

12. As part of their marketing efforts to raise new equity, refinance existing debt and/or a possible sale, Mastodon contacted over 70 potential investors/buyers. Of those contacted, 40 executed confidentiality agreements and were given operational, organizational and financial information on the Debtors. The Debtors received 7 letters of intent from the interested parties.

13. In May 2015, the Debtors provided exclusivity to one of the interested parties for an out-of-court equity sale of the Debtors. The exclusivity period lasted until August 2015 after the parties were not able to consummate a transaction. Once that transaction fell through, Mastodon re-marketed the company to several parties who had expressed a prior interest as well as a new potential purchaser.

14. After the approval of the Bidding Procedures, Mastodon will conduct a postpetiton marketing process to qualify any additional buyers and sell the assets to the highest and best bidder through a Court-approved auction process as set forth in the Bidding Procedures.

### The Stalking Horse Offer

15. In October 2015, the Debtors received an offer to purchase substantially all of the assets of the Debtors[4] from TravelCenters of America LLC (the "Stalking Horse Bidder").

16. After consultation with their advisors, the Debtors determined that the offer of the Stalking Horse Bidder was presently the highest and best offer and provided the greatest opportunity for the Debtors to realize the greatest return for all of their stakeholders (the "Stalking Horse Bid"). Accordingly, the Debtors and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement, dated November 16, 2015, and attached hereto as Exhibit B ("Stalking Horse APA"), which is subject to higher and better offers and conditioned upon approval of the Bankruptcy Court.[5]

17. The sale terms proposed by the Stalking Horse Bidder are set forth with particularity in the Stalking Horse APA. Under the Stalking Horse APA, other than specifically "Excluded Assets," the Debtors will sell (and the Stalking Horse Bidder, will buy) all of the Debtors' right, title and interest in, to and under all assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), whether presently existing or hereafter acquired, owned, leased, licensed or used or held for use in or

---

[4] The Debtors listed as the "Sellers" are set forth in the Stalking Horse APA as attached hereto as Exhibit B.

[5] The party closing under the Stalking Horse APA will be either TravelCenters of America LLC or its designee, which will be wholly-owned (directly or indirectly) by TravelCenters of America LLC.

related to the operation of the Debtors' operating business (the "Assets").[6] The Assets include, among other things, certain of the Debtors' owned real property, leased property, cash, accounts receivable, furniture, fixtures and equipment, certain contracts, intellectual property, inventory, leases, certain avoidance claims arising under the Bankruptcy Code, all rights under insurance policies or rights to proceeds goodwill and general intangibles, and other tangible personal property.

18. The Base Cash Component for the Assets under the Stalking Horse APA is $25,000,000 plus additional cash consideration for certain working capital assets, plus the assumption of certain liabilities (all of the foregoing, subject to certain adjustments set forth in the Stalking Horse APA).

19. The Stalking Horse APA also provides, among other things, as follows:

(a) The Assets will be sold free and clear of liens, claims, encumbrances and other interests.

(b) The Court shall approve payment to the Stalking Horse Bidder (as a general administrative expense) of a break-up fee in an amount equal to $750,000 (the "Break-Up Fee") and an expense reimbursement in an amount not to exceed $500,000 (the "Expense Reimbursement") for the Stalking Horse Bidder's reasonable and documented out-of-pocket expenses incurred in connection with the transaction contemplated hereby. The Break-Up Fee and the Expense Reimbursement shall be paid to the Stalking Horse Bidder from the proceeds (the "Alternative Transaction Proceeds") of sale on the closing of an Alternative Proposal (defined in the Stalking Horse APA) approved by Bankruptcy Court. Such payments shall be made to the Stalking Horse Bidder (i) on the closing date of the Alternative Proposal and (ii) prior to any other distributions to creditors (or otherwise) from the Alternative Transaction Proceeds.

(c) The Stalking Horse Bidder will assume certain liabilities associated with certain contracts and customer programs.

---

[6] As used herein, the term Assets has the same meaning as "Purchased Assets" in the Stalking Horse APA. In the event of a conflict between the summary descriptions of the Stalking Horse APA contained herein and the Stalking Horse APA, the latter shall control.

(d) Certain executory contracts and unexpired leases will be assumed by the Debtors and assigned to the Stalking Horse Bidder, with the payment of all cure costs being deducted from the purchase price and paid by the Stalking Horse Bidder in accordance with the terms of the Stalking Horse APA.

(e) Except as expressly stated in the Stalking Horse APA, the Debtors are making no representation or warranties whatsoever, express or implied, with respect to any matter relating to the Assets. The Assets are being sold "AS IS," "WHERE IS," and "WITH ALL FAULTS."

(f) The Staking Horse APA provides for the rehiring of substantially all of the Debtors' restaurant-level employees actively at work on the closing date.

**Approval of Bidding Procedures**

20. The Debtors propose that the sale and bidding procedures attached as Exhibit C (the "Bidding Procedures") are fair and reasonable and should be approved. The Bidding Procedures are designed to provide an organized process for the receipt and review of bids from potential purchasers with an ability to close on the sale of the assets and to maximize value to the Debtors' estates. The requirement of a deposit and evidence of financial wherewithal is designed to confirm that auction participants are *bona fide* bidders with the ability and desire to consummate any proposed transaction.

21. The Bidding Procedures contemplate a timeline for the marketing of assets, identification of potential bidders, submission of qualified bids, the timing of an auction and the scheduling of a sale hearing. The Debtors are requesting that the Auction (if there is more than one qualified bidder) be scheduled at the law offices of McDonald Hopkins LLC, 600 Superior Avenue, E., Suite 2100, Cleveland, Ohio 44114, on February 9, 2016. The Debtors believe the requested timing strikes the appropriate balance between affording potential bidders a sufficient opportunity to bid on the one hand, and tailoring the process to the needs of the Debtors and their ability to get to a sale closing, on the other.

22. A debtor may sell, after notice and a hearing, their assets outside the ordinary course of business. See 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)). To that end, bidding procedures must "facilitate an open and fair public sale designed to maximize value for the estate." In re Nashville Senior Living, No. 08-07254, 2008 WL5062366, at *1 (Bankr. M.D. Tenn. Oct. 22, 2008)(quoting In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998))(internal quotations omitted).

23. The Bidding Procedures, in the Debtors' opinion, will ensure the Debtors receive the highest or otherwise best offer for the Assets and will maximize the value of the Assets for the Debtors' estates. The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for such debtor's estate. The Debtors submit that the adoption of the Bidding Procedures will properly subject the Assets to competitive bidding while preserving the bid of the Stalking Horse Bidder, thereby providing a floor price for the Assets.

**Breakup Fee and Expense Reimbursement**

24. In recognition of the value of having a stalking horse bidder, the risk of approval of a higher and better bid, and the extensive time and expense incurred by the Stalking Horse Bidder in conducting due diligence and in negotiations with the Debtors, the Stalking Horse APA provides that in the event the Court approves a sale to another party, the Stalking Horse Bidder will be paid a Breakup Fee and Expense Reimbursement as more fully described above and Section 4.7 of the Stalking Horse APA.

25. The Stalking Horse Bidder was unwilling to enter into the Stalking Horse APA without the inducement of the Break-Up Fee and Expense Reimbursement on these terms. Without the Stalking Horse Bidder, the Debtors would not be able to obtain a sale price of at least the purchase price, thus, the Break-Up Fee and Expense Reimbursement preserves value of the Stalking Horse Bid for the estates. See Corradino v. Lamb (In re Lamb), 2002 WL 31508913, at *2 (Bankr. D. Md. 2002) (stating that a break-up fee should be in the best interest of the estate and necessary).

26. Bidding incentives such as break-up fees are "carefully scrutinized" in asset sales under section 363(b) of the Bankruptcy Code to ensure that a debtor's estate "is not unduly burdened and that the relative rights of the parties are protected." See In re Hupp Indus. Inc., 140 B.R. 191, 195-6 (Bankr. N.D. Ohio 1992). Courts must consider whether a break-up fee is "reasonable in relation to the bidder's efforts and to the magnitude of the transaction…." ); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)(internal citation omitted). In reviewing break-up fees, courts in the Sixth Circuit consider a totality of the circumstances in determining the reasonableness of a break-up fee. Nashville Senior Living, 2008 WL5062366, at *2. Courts also look to whether (i) whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price; (ii) whether the subject break-up fee is so

substantial that it provides a "chilling effect" on other potential bidders; and (iii) whether there exists substantial adverse impact upon unsecured creditors. Id.

28. In this case, the Break-Up Fee and Expense Reimbursement are proper. First, the combined the Break-Up Fee and Expense Reimbursement are within the range of appropriate percentages granted by courts in the Sixth Circuit. See In re Schwab Indus., No. 10-60702, 2010 Bankr. LEXIS 5935, at *10-14, *25 (Bankr. N.D. Ohio May 28, 2010) (approving a break-up fee of $1,900,000.00, "which [was] inclusive of any expense reimbursement," and represented just under 4% of the proposed purchase price).; In re Sumner Reg'l Health Sys., No. 3:10-bk-04766, 2010 Bankr. LEXIS 6173, at *5, *21-22 (Bankr. M.D. Tenn. May 18, 2010) (order approving bid procedures relating to sale motion at Docket no.7, including actual expenses of stalking horse bidder not to exceed $1,000,000.00 which, when added to break-up fee, constituted a total payment of 2.27% of the $154,108,687.00 purchase price); Hupp Indus., 140 B.R. at 195 (finding that a reimbursement for actual expenses of stalking horse bidder capped at $50,000 and a break-up fee of $100,000 for a transaction totaling $4,750,000.00 was reasonable, but denying debtor's motion on other grounds).

28. The proposed Break-Up Fee and Expense Reimbursement are a fair and reasonable percentage in relation to the proposed purchase price, and the funds and efforts expended by the Stalking Horse Bidder to consummate this transaction. Hupp Indus., 140 B.R. at 194. The Stalking Horse Bidder submitted a very strong offer after almost a year-long process. Many parties had an opportunity to bid and no party provided an offer higher and better than the Stalking Horse Bidder. Given the additional marketing efforts and potential interest in the Assets, the Debtors believe that the proposed Break-Up Fee and Expense Reimbursement will foster competitive bidding for the assets.

29. Finally, the Break-Up Fee and Expense Reimbursement are the result of good faith, arm's length negotiation between the Debtors and the Stalking Horse Bidder. See In re Integrated Resources Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); 995 Fifth Ave., 96 B.R. at 28 (upholding a break-up fee that was the result of good faith, arm's length agreement and not tainted by self-dealing). Under the circumstances, the Debtors believe that the Breakup Fee and Expense Reimbursement are a fair, reasonable and necessary cost of the administration of the estates and should be approved.

**Procedures for the Assumption and Assignment of Purchased Contracts**

30. At the closing, the Debtors intend to assume and assign to the Successful Bidder (as defined below) certain executory contracts and unexpired leases to be identified in the Cure Notice (as defined below) and on certain schedules to the Stalking Horse APA.[7] A list of all of the Debtors' executory contracts and unexpired leases (collectively, the "Purchased Contracts") will be attached to the Cure Notice; provided, however, the Stalking Horse Bidder may remove any executory contract or unexpired lease from the list of Purchased Contracts up to ten days prior to the Sale Hearing.

31. The Debtors propose to serve a Notice (the "Cure Notice"), in substantially the form attached hereto as Exhibit D, on the counterparties to the Purchased Contracts no later than three business days after entry of the order approving the Bidding Procedures provided, however, that in the event a previously omitted Purchased Contract was not included in the Cure Notice, the Debtors will promptly (but in no event later than two days after discovery thereof) mail and serve a Cure Notice on the additional counterparty. The Cure Notice also will identify the

---

[7] The inclusion of any agreement in the list of Purchased Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserves the right to challenge the status of any agreement included in the list of Purchased Contracts.

amounts, if any, that the Debtors believes are owed to each of the counterparties to the Purchased Contracts in order to cure any defaults that exist under (and to otherwise reinstate without default) such contract (the "Cure Costs"). The Debtors will state in the Cure Notice the date by which any objection to the Cure Costs or the assumption and assignment of the Purchased Contract (including with respect to adequate assurance of future performance) must be filed and served (the "Cure Objection Deadline"), which the Debtors propose to be January 21, 2015 at 5:00 p.m. (prevailing Eastern Time). If a contract or lease is assumed and assigned pursuant to the Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the asset purchase agreement with the Successful Bidder. If an objection is timely filed by a counterparty to an Purchased Contract with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtors propose that such objection must attach a copy of the relevant contract (with all amendments), set forth a specific default under the Purchased Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the counterparty believes any Cure Costs are owing, and state the basis for any other objection to the assumption and assignment of the Purchased Contract.

32. The Debtors will assume the Purchased Contracts, but the Successful Bidder will be responsible (i) for payment of any Cure Costs that may be owed to any counterparty to the Purchased Contracts in accordance with the terms of their asset purchase agreement; and (ii) for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed

assignment of any Purchased Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Purchased Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing. The Debtors further propose that Cure Costs disputed by any counterparty be resolved by the Court at the Sale Hearing.

33. Except to the extent otherwise provided in the agreement with the Successful Bidder, subject to the payment of any Cure Costs, the Successful Bidder, as assignee of an Purchased Contract, will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

**Sale Hearing**

34. The Debtors request that the Court schedule the Sale Hearing on or about February 11**,** 2016. The Debtors propose that objections, if any, to the Sale Motion be filed by 11:59 p.m. (prevailing Eastern Time**)** on February 10, 2016.

35. At the Sale Hearing and pursuant to the Sale Motion, the Debtors will seek Court approval of the sale of the assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than any permitted encumbrances) with all such liens, claims, encumbrances and interests to attach to the proceeds of the sale, except as otherwise provided, with the same validity and in the same order of priority as they attached to the assets prior to the sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Purchased Contracts pursuant to section 365 of the Bankruptcy Code. The Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the sale of the Assets and related

assumption and assignment of the Purchased Contracts is fair, reasonable and in the best interest of the Debtors' estates.

### Notice of Bidding Procedures, Auction and Sale Hearing

36. The Debtors request that the Court approve the manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit E (the "Sale and Bidding Procedures Notice"), which the Debtors will serve on the following parties: (a) the U.S. Trustee; (b) counsel to the Official Committee of Unsecured Creditors; (c) counsel to DIP Lender; (d) counsel to Prepetition Secured Lenders; (e) all parties known to be asserting a lien on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtors' assets; (f) all known counterparties to the Purchased Contracts; (g) all entities known to have expressed an interest in bidding on the Assets; (h) the state taxing authorities where the Debtors' operate; (i) District Director of Internal Revenue; (j) all other parties that filed a notice of appearance and demand for service of papers in the Debtors' bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order; (k) all of the Debtors' insurance companies; (i) the Office of the United States Attorney; and (j) all of the Debtors' known equity holders.

37. The Debtors also propose to serve a sale notice (the "Sale Notice") substantially in the form attached hereto as Exhibit F on all known creditors of the Debtors. The Debtors also propose that no later than 30 days prior to the Sale Hearing, they be authorized, but not directed, to publish the Sale Notice in the Wall Street Journal (Midwestern edition), the Sharon (PA) Herald and any other restaurant or franchise-based publication the Debtors deem proper under the circumstances.

38. The Debtors propose to serve the Sale and Bidding Procedures Notice and the Sale Notice within three business days from the date of entry the Bidding Procedures Order, by first-class mail, postage prepaid, on the appropriate parties as described above. Both the Sale and Bidding Procedures Notice and the Sale Notice will provide that any party that has not received a copy of this Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to McDonald Hopkins LLC, 600 Superior Avenue, E., Suite 2100, Cleveland, Ohio 44114, Attention: Scott N. Opincar, Esq. and Michael J. Kaczka, Esq.

39. Assuming that the Court approves the schedule proposed in this Motion, the Debtors submit that such notice is sufficient under the circumstances, and request that the Court find that no further notice of the relief requested herein is required.

## Notice

40. Notice of this Motion has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the Northern District of Ohio; (ii) those creditors listed on the Debtors' Consolidated List of Creditors Holding 20 Largest Unsecured Claims; (iii) Wells Fargo, National Association; (iv) United Capital Business Lending, Inc.; (v) The Cortland Savings & Banking Company; (vi) The Farmers National Bank of Canfield; (vii) Scott's Buffalo Wings, Inc.; (viii) TravelCenters of America LLC; and (ix) the District Director of Internal Revenue. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

WHEREFORE, the Debtors request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>: (a) approving the Bidding Procedures for the sale of substantially all of the Debtors' assets, (b) authorizing and scheduling an auction; (c) scheduling a hearing for approval of the sale of the Assets free and clear of liens and the assumption of certain executory contracts and unexpired leases to successful bidder; (d) approving the payment of the Breakup Fee and Expense Reimbursement to the Stalking Horse Bidder on the terms set forth above and in Section 4.7 of the Staking Horse APA; (e) approving procedures and setting deadlines for the assumption and assignment of executory contracts and unexpired leases, including cure amount relating thereto; (f) approving certain deadlines and the form, manner and sufficiency of the Sale and Bidding Procedures Notice, the Sale Notice and the Cure Notice; and (g) granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: November 16, 2015

Respectfully submitted,

/s/Michael J. Kaczka
Scott N. Opincar (0064027)
Michael J. Kaczka (0076548)
McDONALD HOPKINS LLC
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION