# EXHIBIT B

**ASSET PURCHASE AGREEMENT**

**dated as of November 16, 2015, among**

**TRAVELCENTERS OF AMERICA LLC,**

**LUBE AGGREGATOR, INC.,**

**LUBE HOLDINGS, INC.,**

**and**

**THE OTHER SELLERS NAMED HEREIN**

{5775482:9}

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS .................................................................................................. 2
    Section 1.1    Certain Definitions. ......................................................................... 2
    Section 1.2    Other Definitional and Interpretive Matters. ................................. 15

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF ASSUMED
          LIABILITIES; ALL OTHER LIABILITIES EXCLUDED ......................... 16
    Section 2.1    Purchase and Sale of Assets. ............................................................ 16
    Section 2.2    Excluded Assets. ............................................................................. 18
    Section 2.3    Excluded Liabilities. ....................................................................... 19
    Section 2.4    Assumed Liabilities. ....................................................................... 20
    Section 2.5    Further Conveyances and Assumptions. ........................................ 21
    Section 2.6    Transitional Matters. ..................................................................... 21
    Section 2.7    Purchase of Certain Inventory. ...................................................... 25
    Section 2.8    Allocation of the Purchase Price. ................................................... 25

ARTICLE III CONSIDERATION ..................................................................................... 25
    Section 3.1    Base Cash Component. .................................................................... 25

ARTICLE IV CLOSING AND TERMINATION ............................................................. 26
    Section 4.1    Closing Date. ................................................................................... 26
    Section 4.2    Deliveries by Sellers. ...................................................................... 27
    Section 4.3    Deliveries by Buyer. ....................................................................... 27
    Section 4.4    Termination of Agreement. ............................................................ 28
    Section 4.5    Buyer Deposit. ................................................................................ 29
    Section 4.6    Effect of Termination. .................................................................... 30
    Section 4.7    Expense Reimbursement and Break-up Fee. ................................. 30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS ..................... 31
    Section 5.1    Legal Existence; Power and Authority; Good Standing; Authorization and
             Execution of Agreement. ................................................................ 31
    Section 5.2    No Conflicts; Consents. ................................................................... 31
    Section 5.3    Title to Purchased Assets. .............................................................. 32
    Section 5.4    Real Property. ................................................................................. 32
    Section 5.5    Tangible Personal Property. ........................................................... 33
    Section 5.6    Intellectual Property. ..................................................................... 33
    Section 5.7    Financial Statements. ..................................................................... 34
    Section 5.8    Customer Programs. ....................................................................... 35
    Section 5.9    Financial Advisors. ......................................................................... 35
    Section 5.10   Litigation. ....................................................................................... 35
    Section 5.11   Compliance with Laws. ................................................................... 35
    Section 5.12   Permits. ........................................................................................... 35
    Section 5.13   Liquor Licenses. ............................................................................. 36
    Section 5.14   Purchased Inventory. ...................................................................... 36
    Section 5.15   Contracts. ....................................................................................... 36
    Section 5.16   Taxes. .............................................................................................. 37
    Section 5.17   Labor Matters. ................................................................................ 37
    Section 5.18   Environmental Matters. .................................................................. 37

Section 5.19  Employee Benefits Matters. .......................................................... 38
Section 5.20  No Other Agreements to Purchase. ................................................ 40
Section 5.21  No Other Buyer Representations. ................................................... 40

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ........................... 40**
Section 6.1   Organization and Good Standing. ................................................... 40
Section 6.2   Authorization of Agreement. .......................................................... 40
Section 6.3   Financial Advisors. ......................................................................... 41
Section 6.4   No Conflicts. ................................................................................... 41
Section 6.5   Litigation. ....................................................................................... 41
Section 6.6   Financial Capability. ....................................................................... 41
Section 6.7   Condition of the Business ............................................................... 41

**ARTICLE VII BANKRUPTCY COURT APPROVAL ........................................................ 41**
Section 7.1   Initial Due Diligence. ...................................................................... 41
Section 7.2   Bankruptcy Court Filings. .............................................................. 42
Section 7.3   Buyer Deposit. ................................................................................ 42

**ARTICLE VIII COVENANTS ......................................................................................... 43**
Section 8.1   Access to Information ...................................................................... 43
Section 8.2   Further Assurances. ......................................................................... 43
Section 8.3   Confidentiality. ............................................................................... 43
Section 8.4   Preservation of Records. ................................................................. 44
Section 8.5   Publicity. ......................................................................................... 45
Section 8.6   Operation of Business. .................................................................... 45
Section 8.7   Section 363(b)(1)(A). ..................................................................... 47
Section 8.8   Adequate Assurances Regarding Purchased Contracts and Certain Real
              Property Leases. ............................................................................. 47
Section 8.9   Notification of Certain Matters. ...................................................... 47
Section 8.10  Prospective Employees. .................................................................. 47
Section 8.11  Name Change. ................................................................................. 49
Section 8.12  Liquor License Approvals. .............................................................. 49
Section 8.13  WARN Act Notices. ....................................................................... 50
Section 8.14  Real Property. ................................................................................. 50
Section 8.15  Austintown Interests. ...................................................................... 50

**ARTICLE IX CONDITIONS TO CLOSING ................................................................... 50**
Section 9.1   Conditions Precedent to Obligations of Buyer ................................ 50
Section 9.2   Conditions Precedent to Obligations of Sellers ............................... 51
Section 9.3   Conditions Precedent to Obligations of Buyer and Sellers .............. 52
Section 9.4   Frustration of Closing Conditions. .................................................. 52

**ARTICLE X NO SURVIVAL ......................................................................................... 52**
Section 10.1  No Survival of Representations and Warranties. .............................. 52

**ARTICLE XI TAX MATTERS ....................................................................................... 52**
Section 11.1  Transfer Taxes. ............................................................................... 52
Section 11.2  Prorations. ...................................................................................... 52

**ARTICLE XII MISCELLANEOUS .................................................................................. 53**

| | | |
|---|---|---|
| **Section 12.1** | **Expenses.** | **53** |
| **Section 12.2** | **Submission to Jurisdiction; Consent to Service of Process** | **53** |
| **Section 12.3** | **Waiver of Right to Trial by Jury.** | **53** |
| **Section 12.4** | **Entire Agreement; Amendments and Waivers.** | **53** |
| **Section 12.5** | **Governing Law.** | **54** |
| **Section 12.6** | **Notices.** | **54** |
| **Section 12.7** | **Severability** | **55** |
| **Section 12.8** | **Binding Effect; Assignment.** | **55** |
| **Section 12.9** | **Prorations.** | **56** |
| **Section 12.10** | **Counterparts.** | **56** |

15-52722-amk    Doc 9-2    FILED 11/16/15    ENTERED 11/16/15 16:28:31    Page 5 of 72

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of November __, 2015 (this "Agreement"), is made by and between (i) TravelCenters of America LLC, a Delaware limited liability company ("Buyer"), and (ii) LUBE AGGREGATOR, INC., a Delaware corporation ("Parent"), LUBE HOLDINGS, INC., a Delaware corporation (the "Company"), and each of their respective direct or indirect Subsidiaries listed on the signature page hereto (together with Parent and the Company, each a "Seller" and collectively "Sellers").

### RECITALS

**WHEREAS** Sellers are currently in the business of operating and franchising a chain of full service casual dining restaurants in various locations, offering food and alcoholic beverages under the name "Quaker Steak & Lube®", and related businesses, including the production and distribution of proprietary sauces to franchisees, grocery stores, and other retail outlets; and

**WHEREAS** Sellers intend to file voluntary petitions for reorganization relief (the "Bankruptcy Cases") pursuant to Chapter 11 of Title XI of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and in concert with such filing, seek the entry of an order by the United States Bankruptcy Court for the Northern District of Ohio (Eastern Division) (the "Bankruptcy Court") approving this Agreement and authorizing Sellers to consummate the transactions contemplated hereby and by the other transaction documents; and

**WHEREAS**, prior to the commencement of the Bankruptcy Cases, Buyer is willing to expend substantial time and energy, and to incur substantial costs, in connection with its due diligence review of the Purchased Assets and Business, and to negotiate and enter into a debtor-in-possession credit facility, subject to the prior execution and delivery of this Agreement; and

**WHEREAS** Sellers desire to sell, transfer and assign to Buyer, and subject to the satisfactory completion of its due diligence review, Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities as more specifically provided herein; and

**WHEREAS** Sellers currently anticipate that the Closing Date Working Capital Purchased – Incremental will be approximately $2,660,000 on the Closing Date; and

**WHEREAS** the board of directors, board of managers or applicable governing body of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Sale Order and has approved this Agreement; and

**WHEREAS** the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered in the Bankruptcy Cases.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, Buyer and Sellers hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1   **Certain Definitions**. For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"**Accounts Receivable**" means all accounts, accounts receivable, credit card receivables, contract rights to payment, notes, notes receivable, and vendor rebates of Sellers, including in respect of outstanding bonds issued to third Persons and/or Governmental Bodies.

"**Adverse Environmental Condition**" means any event or condition affecting any parcel of Real Property that constitutes (or that as of the date hereof or the date of the Closing would constitute) a breach of any representation or warranty of the Sellers set forth in <u>Section 5.18</u> hereof, or that would be required to be disclosed on <u>Schedule 5.18</u> (or any part thereof) pursuant to <u>Section 5.18</u>, or that would cause any such representation or warranty to be false (as of the date hereof or the date of the Closing), in each case disregarding any knowledge or materiality qualifiers in such <u>Section 5.18</u>, and disregarding any disclosures on <u>Schedule 5.18</u> (or any part thereof), and in each case determined as if such parcel of Real Property is a Purchased Asset, which event or condition, either individually or in the aggregate with any other such event(s) or condition(s), would reasonably be expected to (i) result in losses, costs, damages, or expenses (including remediation expenses) exceeding $50,000 or (ii) interfere with the use of such parcel of Real Property in connection with the Business as currently conducted or as currently contemplated to be conducted.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Aggregate Consideration**" has the meaning set forth in <u>Section 3.1(a)</u>.

"**Alternative Proposal**" means any agreement to which the Sellers' or any of them is a party, providing for the direct or indirect sale of all or any substantial part of the Purchased Assets or the Business, whether in the form of a merger, stock sale, asset sale, recapitalization, reorganization, joint venture, or other transaction.

"**Approved Budget**" means the budget established pursuant to the DIP Order and any subsequent budget, in form and substance acceptable to Buyer, that collectively extend through and including the Closing Date, as supplemented, modified or amended with the express written consent of Buyer.

"**Assumed Liabilities**" has the meaning set forth in <u>Section 2.4</u>.

"**Austintown JV Entity**" means QSL of Austintown Ohio LLC, an Ohio limited liability company.

"**Austintown RE Entity**" means QSL of Austintown Realty LLC, an Ohio limited liability company.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Base Purchase Price**" means an amount equal to: (i) Twenty-Five Million Dollars ($25,000,000), plus (ii) the Gift Card Adjustment, plus (iii) the Closing Date Working Capital Purchased – Incremental, plus (iv) the Working Capital Adjustments, minus (v) if applicable, the Post-Petition Royalty Account Receivable Adjustment, plus (vi) the Gift Card Account Receivable Adjustment.

"**Base Cash Component**" means an amount equal to: (i) the Base Purchase Price, *minus* (ii) the aggregate amount of all Cure Amounts, as determined by the Bankruptcy Court, if any, under the Purchased Contracts assumed and assigned to Buyer at Closing, *minus* (iii) the Company Transaction Costs.

"**Benefit Plan**" has the meaning set forth in Section 5.19(a).

"**Bidding Procedures Order**" means a final order, in all material respects in the form of Exhibit A, issued by the Bankruptcy Court that, among other things, establishes procedures for an auction process to solicit competing bids and a provision permitting payment of a topping fee and expense reimbursement to Buyer in accordance with this Agreement and consistent in all material respects with the expense reimbursement and break-up fee provisions set forth in Section 4.7.

"**Break-up Fee**" has the meaning set forth in Section 4.7.

"**Business**" means the business and operations of Sellers relating to (i) the operation and franchising of full service casual dining restaurants that offer food and alcoholic beverages, (ii) the purchasing and distribution of supplies and inventory for franchised restaurants, and (iii) the sale of specialty products at restaurant gift shops and online, including producing and selling proprietary sauces to franchisees, grocery stores, and other retail outlets. For the avoidance of doubt, the Business does not include the winding-up of the Closed Facilities, including the disposal of Excluded F&E.

"**Business Day**" means any day on which national banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer Deposit**" has the meaning set forth in Section 7.4.

"**Buyer Employees**" has the meaning set forth in <u>Section 8.10(b)</u>.

"**Buyer HQ Employees**" has the meaning set forth in <u>Section 8.10(b)</u>.

"**Buyer Restaurant Employees**" has the meaning set forth in <u>Section 8.10(a)</u>.

"**Cash**" means all cash on hand and in bank accounts, including all checks received prior to the Closing, whether or not deposited or cleared prior to the Closing.

"**Claim**" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"**Closed Facilities**" means those facilities previously operated by Sellers that were closed prior to the date of this Agreement, except that the Springfield Property shall not constitute a Closed Facility for purposes of this Agreement.

"**Closing**" has the meaning set forth in <u>Section 4.1</u>.

"**Closing Date**" has the meaning set forth in <u>Section 4.1</u>.

"**Closing Date Cash Payment**" means (i) the Base Cash Component, *minus* (ii) the Credit Bid Amount, *less* (iii) the aggregate amount of the Buyer Deposit and all interest thereon released to Sellers at Closing pursuant to <u>Section 3.1(b)</u>.

"**Closing Date Gift Card Liability**" means the face amount of Sellers' liability for Customer Programs as of the Closing Date.

"**Closing Date Working Capital Purchased – Incremental**" has the meaning given to such term in <u>Section 3.1(d)</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company Transaction Costs**" means the sum of the following, to the extent not paid by Sellers from cash on hand prior to the Closing: (i) 100% of any and all bonuses, severance, accrued unpaid vacation pay, equity or incentive compensation, if any, payable to any Business Employees in connection with (including any such amounts accelerated as a result of) the purchase and sale of the Purchased Assets hereunder, and (ii) 50% of all title insurance premiums, survey costs, Transfer Taxes, and title company fees (including all fees and disbursements of the Title Company in connection with the holding and disbursing of the Buyer's Deposit). For the avoidance of doubt, Company Transaction Costs shall not include the fees and expenses of Sellers' legal counsel, financial advisors, consultants, accounting firms, and other professionals arising in connection with this transaction, and Buyer shall have no liability therefor.

"**Contract**" means any written contract, indenture, commitment, purchase or sale order, note, bond, lease, Real Property Lease, Personal Property Lease, franchise agreement or other agreement to which any Seller is a party.

"**Credit Bid Amount**" means: (i) an amount equal to the aggregate amount of all "Obligations" under the DIP Financing (as such term is defined in the DIP Credit Agreement), including all principal, premium (if any), interest, and fees, or (ii) such lesser amount as Buyer shall notify Sellers in writing at least two Business Days prior to the Closing.  For the avoidance of doubt, if Buyer does not notify Sellers in writing of the Credit Bid Amount at least two Business Days prior to the Closing, the Credit Bid Amount shall be the amount determined in accordance with clause (i) of this definition.

"**Credit Card Account Receivable**" has the meaning given to such term in Section 3.1(d)(iii).

"**Cure Amounts**" means any and all amounts required, as a condition to assumption and assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"**Customer Programs**" means any program implemented in the ordinary course of the Business consistent with past practice, as approved by the Bankruptcy Court in Sellers' first day motions, to promote customer interest in the Business, regardless of the original location of the promotion, including but not limited to employee discount, coupon, gift card and gift certificate programs.

"**De-selected Employee**" has the meaning set forth in Section 8.10(a).

"**Designated Locations**" means (i) the restaurants currently operated by Sellers at owned and leased locations set forth on Exhibit 1(a) and Exhibit 1(b), respectively, and (ii) the Springfield Property.

"**Designation Cost Overage**" has the meaning set forth in Section 2.6(c).

"**Designation Notice**" has the meaning set forth in Section 2.6(c).

"**Designation Rights Asset**" has the meaning set forth in Section 2.6(c).

"**Designation Rights Budget**" has the meaning set forth in Section 2.6(c).

"**Designation Rights Period**" means the period commencing on the Closing Date and ending three months after the Closing Date.

"**DIP Credit Agreement**" means that certain Senior Secured, Superpriority Debtor-In-Possession Loan and Security Agreement, dated as of the date hereof, by and among Lube Holdings, Inc., and Quaker Steak & Lube Franchising Corporation as borrowers, the guarantors named therein, and the DIP Lender, as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement and the DIP Order.

"**DIP Financing**" means the debtor-in possession financing facility under the DIP Credit Agreement.

"**DIP Lender**" shall mean Buyer or its designee.

"**DIP Obligations**" shall mean the "DIP Obligations" as defined under the DIP Order.

"**DIP Order**" means any Order of the Bankruptcy Court relating to the DIP Financing.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Employee Claim**" means any Claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any Claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, minimum wage, overtime, tip credit, the Consolidated Omnibus Budget Reconciliation Act, WARN Act, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination or employee benefits.

"**Employee Obligations**" means all wages, bonuses, incentive, equity, equity-based or similar compensation obligations, deferred compensation arrangements, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment of the Employees in respect of the Business.

"**Employees**" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business or are co-employees of any Seller and Fortune Business Solutions, a Professional Employer Organization, in connection with the Business, together with individuals who are hired hereafter in respect of the Business prior to the Closing.

"**Encumbrances**" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, Encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to any Seller personally, other agreement term tending to limit any right or privilege of any Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"**Environmental Claim**" means any Claim arising under any Environmental Law.

"**Environmental Law**" means any Law as in effect from time to time concerning pollution, protection of the environment, protection of worker or public health or safety, the Release of Hazardous Materials; the transportation, handling, use, storage, treatment or disposal of Hazardous Materials; or the remediation or investigation of contamination of air, soil, or surface or ground water by Hazardous Materials; or exposure to Hazardous Materials.

"**Environmental Notice**" any notice required or permitted to be given by any Person under any Environmental Law.

"**Environmental Permit**" means any Permit required or permitted to be issued under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with the Sellers or any of their Affiliates as a "single employer" within the meaning of Section 414 of the Code.

"**Excluded AR**" means any Accounts Receivable (i) arising under any Excluded Contract, (ii) pertaining exclusively to any one or more of the Closed Facilities, or (iii) relating to advances to former or current Employees.

"**Excluded Assets**" has the meaning set forth in Section 2.2, subject to Section 2.6(c).

"**Excluded Claims**" means all Claims and causes of action of Sellers (including any causes of action arising under Chapter 5 of the Bankruptcy Code), arising under or in respect of any Excluded Contract or pertaining exclusively to any one or more of the Closed Facilities.

"**Excluded Contracts**" means all Contracts other than Purchased Contracts, subject to Section 2.6(c).

"**Excluded F&E**" means all Furniture and Equipment that: (i) relates to any of the Closed Facilities or to a Facility that Buyer hereafter designates as an Excluded Asset pursuant to this Agreement, (ii) is located either at a Closed Facility or such Facility designated by Buyer as an Excluded Asset or at a warehouse that is not Leased Real Property, and (iii) is not otherwise used or held for use in the operation of the Business.

"**Excluded Liabilities**" has the meaning set forth in Section 2.3.

"**Excluded Utility Deposits**" means (a) any utility deposits related exclusively to Excluded Assets and (b) to the extent any utility deposits may relate to Excluded Assets and Purchased Assets, any portion of any such utility deposits related to Excluded Assets; provided, that, to the extent the amount of any utility deposits allocable to Excluded Assets and Purchased Assets cannot be readily determined based on utility records, the portion of such utility deposits allocable to the applicable Excluded Assets shall be a portion of such utility deposit equal to the total amount of such utility deposit multiplied by a fraction where the numerator is the number of restaurant locations associated with such utility deposit

for which the assets associated with such location are Excluded Assets and the denominator is the aggregate number of restaurant locations associated with such utility deposit.

"**Facilities**" means all Owned Real Property and all Leased Real Property.

"**Financial Statements**" has the meaning set forth in <u>Section 5.7</u>.

"**Final Order**" means an Order, judgment, or other decree of the Bankruptcy Court or other court of competent jurisdiction that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"**Furniture and Equipment**" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers, including all signage, automotive and other trade dress, artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, kitchen equipment, freezers, refrigerators, and other food storage equipment, shelving, icemakers, warehouse equipment, and miscellaneous office furnishings, tableware, glassware, utensils, and supplies.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Gift Card Account Receivable Adjustment**" means the amount by which at the effective time of the Closing the Purchased Assets that are Accounts Receivable due to any Seller in respect of Sellers' Customer Programs are greater than (in which case such adjustment shall be a positive number) or less than (in which case such adjustment shall be a negative number) $200,000.

"**Gift Card Adjustment**" means and amount equal to (i) <$400,000> (negative four hundred thousand dollars), *plus* (ii) $0.18 for every $1.00 by which the Closing Date Gift Card Liability is less than $2,167,000, *minus* (iii) $1.00 for every $1.00 by which the Closing Date Gift Card Liability is greater than $2,167,000.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Hazardous Materials**" means (a) any pollutant, contaminant, chemical, or waste, or any toxic, radioactive, ignitable, corrosive, reactive, or other hazardous substance, waste or material, and any other substance that is regulated, or could be the basis for liability, under any Environmental Law, including any mixture or solution thereof; (b) petroleum, petroleum-based or petroleum-derived products; (c) polychlorinated biphenyls; (d) friable asbestos; or (e) mercury.

"**HQ Employees**" has the meaning set forth in <u>Section 8.10(b)</u>.

"**Improvements**" means, with respect to any Leased Real Property, all buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to such Leased Real Property.

"**Indebtedness**" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Initial Due Diligence Period**" has the meaning set forth in <u>Section 7.1(b)</u>.

"**Initial Employment Period**" has the meaning set forth in <u>Section 8.10(b)</u>.

"**Intellectual Property**" means all worldwide intellectual property rights of Sellers, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, expressly including all goodwill and any common law rights associated with the foregoing, including without limitation the Registered Marks, (iii) domain names, websites and mobile device applications, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets, confidential business information, recipes, formulas, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, and know-how (collectively, "<u>Trade Secrets</u>"), (vi) licenses relating to any of the foregoing, (vi) registrations and applications for registration and renewal of the foregoing, (vii) databases and data collections, including, without limitation, collections of recipes, current/former menus, and/or consumers (collectively, "<u>Databases</u>"), (viii) all Trade Secrets, copyrights, patent rights and other intellectual property rights in the Technology, and (ix) any past, present or future Claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"**Inventory**" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, including, without limitation, the raw materials, food, liquor, work in process, finished goods, packaging materials, and/or other material used or consumed in connection with the Business.

"**Investment Securities**" means all mutual funds and other investment securities held by Sellers in brokerage accounts, including money-market funds and other short-term investments, including any

such funds or investments treated as cash equivalents under generally accepted accounting principles, but excluding Cash and Register Cash.

"**Knowledge**" means, with respect to Sellers, the knowledge of Greg R. Lippert, Dennis O'Deens, John Lane, and/or Edward ("Zeb") Hastings.

"**Law**" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or Order.

"**Leased Real Property**" means (i) all the land, Improvements, or other interests in real property leased, subleased or licensed by Sellers, at which Sellers currently operate restaurants, all of which are identified on <u>Exhibit 1</u>, and (ii) any other parcel of land, Improvements, or other interests in real property leased, subleased or licensed by Sellers that is currently used or useful in connection with the operation of the Business, to the extent the Real Property Lease pertaining to such Leased Real Property is designated by Buyer as a Purchased Contract pursuant to this Agreement (in each case including any easements, rights or permits appurtenant any to such land, Improvements, or other interests in real property).

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or Claims or any proceedings by or before a Governmental Body, and any appeal from any of the foregoing.

"**Liability**" means any Indebtedness, liability, obligation, commitment, expense, Claim, deficiency, guaranty or endorsement of any type whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"**Lien**" means any lien, Encumbrance, pledge, mortgage, deed of trust, security interest, Claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or Encumbrance.

"**Liquor Licenses**" has the meaning set forth in <u>Section 5.13</u>.

"**Liquor License Approvals**" has the meaning set forth in <u>Section 8.12</u>.

"**Material Adverse Effect**" means any event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have or result in (i) a material adverse effect on the business, assets, results of operations, condition (financial or otherwise) or prospects of the Business or the Purchased Assets, or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than: (a) the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby or with respect to the Sellers; (b) the effect of any change in applicable Law or GAAP or interpretation thereof; (c) changes that generally affect the industries and markets in which Sellers operate; or (d) general changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs) or political conditions; *provided, however*, in the case of clause (c) or clause (d) of

this definition that such changes do not, individually or in the aggregate, have disproportionately negative effect on the Business or the Purchased Assets as compared to other businesses in the casual dining restaurant industry in the geographical locations in which Sellers operate (excluding for this purpose any disproportionate change resulting from the pendency of the Bankruptcy Cases).

"**Multiemployer Plan**" has the meaning set forth in <u>Section 5.19(c)</u>.

"**Negated Credit Bid Amount**" has the meaning set forth in <u>Section 3.1(c)</u>.

"**Operating Leases**" means each Real Property Lease with respect to any of the Leased Real Property listed on <u>Exhibit 1(b)</u>.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties and restrictions imposed on Sellers under the Bankruptcy Code.

"**Owned Real Property**" has the meaning set forth in <u>Section 5.4(a)</u>.

"**Parties**" means Sellers and Buyer.

"**Permits**" means any approvals, authorizations, consents, licenses, permits or certifications of a Governmental Body, including Liquor Licenses.

"**Permitted Exceptions**" means (i) defects, restrictions, easements, and rights of way that are reflected in policies of title insurance provided to Buyer and that do not, and could not reasonably be expected to, interfere with the conduct of, or the use of the Purchased Assets in connection with, the Business, as currently operated or reasonably anticipated to be operated; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease, (vi) any Liens associated with or arising in connection with any Assumed Liabilities, and (vii) such other imperfections in title which would not materially interfere with the use, benefit, or value of the Purchased Assets.

"**Person**" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Personal Property Leases**" has the meaning set forth in <u>Section 5.5</u>.

"**Petition Date**" means the date the Bankruptcy Cases are commenced.

"**Post-Petition Royalty Accounts Receivable Adjustment**" means the amount, if any, by which (a) the amount of all Purchased Assets that are Accounts Receivable (i) arising after the Petition Date, and (ii) due to any Seller in respect of any royalty or franchise fee (excluding any in respect of Sellers' Relentless Promotion and Marketing Fund), including prorated amounts, is less than (b) $350,000. For the avoidance of doubt, if the amount described in clause (a) is greater than or equal to $350,000, then the Post-Petition Royalty Accounts Receivable Adjustment is $0.

"**Prepetition Lender**" means any of the following lenders to a Seller: Wells Fargo Bank, National Association; Wells Fargo Equipment Finance; United Capital Business Lending, Inc.; Cortland Savings and Banking Company; The Farmer's National Bank of Canfield; and Scott's Buffalo Wings, Inc.

"**Prepetition First Lien Obligations**" means all indebtedness and other obligations whatsoever to the Prepetition Lenders, or any of them, including without limitation principal, interest, premium, fees, expenses, and indemnities.

"**Previously Omitted Contract**" has the meaning set forth in Section 2.6(d)(i).

"**Previously Omitted Contract Designation**" has the meaning set forth in Section 2.6(d)(i).

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 2.6(d)(ii).

"**Privacy Policies**" has the meaning set forth in Section 5.6(g).

"**Products**" means any and all products developed, manufactured, procured, marketed or sold by Sellers, whether work in progress or in final form.

"**Purchased Assets**" has the meaning set forth in Section 2.1.

"**Purchased Contracts**" means the Contracts set forth on Schedule 1.1, as such Schedule may be amended from time to time by Buyer in accordance with this Agreement. For the avoidance of doubt, the Purchased Contracts include: (i) all the Operating Leases, (ii) any other Real Property Leases designated by Buyer as a Purchased Contract in accordance with this Agreement, (iii) all franchise agreements, including the franchise agreements for the locations listed on Exhibit 2, (iii) all concession and license agreements, including the concession and license agreements for the locations listed on Exhibit 2A, (iv) all development area contracts, and (v) all associated rights arising from and under the foregoing.

"**Purchased Inventory**" means any Inventory purchased by Buyer pursuant to Section 2.7.

"**Purchased IP**" has the meaning set forth in Section 5.6.

"**Qualified Benefit Plan**" has the meaning set forth in Section 5.19(b).

"**Real Property**" has the meaning set forth in Section 5.4(c).

"**Real Property Leases**" has the meaning set forth in Section 5.4(b).

"**Register Cash**" means the aggregate amount of Cash located on hand as of the Closing at the Facilities.

"**Registered Marks**" means the trademarks and service marks set forth on Schedule 5.6(a)(i), all registrations and applications for registration with respect thereto, and all good will associated therewith.

"**Reimbursed Expenses**" has the meaning set forth in Section 4.7.

"**Rejection Costs**" means any damages and fees resulting from claims from the landlord which are allowed by the Bankruptcy Court in connection with a rejected Operating Lease.

"**Release**" means any spilling, leaking, emitting, discharging, depositing, pumping, injecting, migrating, escaping, leaching, dumping, disposing or other releasing into the environment, whether intentional or unintentional.

"**Restaurant Employee**" has the meaning set forth in Section 8.10(a).

"**Sale Hearing Date**" means the date on which a hearing is scheduled to be held by the Bankruptcy Court on the Sellers' motion seeking approval of the Sale Order, as set by the Bankruptcy Court in connection with its entry of the Bidding Procedures Order.

"**Sale Order**" means an Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit C or as otherwise approved by Buyer in its sole and absolute discretion, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Purchased Assets, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

"**Sauce Business Accounts Receivable**" has the meaning given to such term in Section 3.1(d)(iv).

"**Selected Restaurant Employee**" has the meaning set forth in Section 8.10(a).

"**Sellers**" has the meaning set forth in the Preamble.

"**Seller Documents**" has the meaning set forth in Section 5.1.

"**Seller Marks**" has the meaning set forth in Section 8.11.

"**Seller Names**" has the meaning set forth in Section 8.11.

"**Software**" means, except to the extent generally available for purchase from third Persons, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report

formats, firmware, development tools, templates, menus, buttons and icons and (iii) all documentation including user manuals and other training documentation related to any of the foregoing.

"**Specified Employees**" means each of the Employees specified in a letter from Buyer to Sellers dated as of two Business Days prior to the Sale Hearing Date.

"**Springfield Property**" means all rights, titles, and interests of Sellers in real property commonly described as 1121 Linconshire Blvd, Springfield IL.

"**Tax Return**" means all returns, declarations, reports, estimates, claims for refund, information returns and statements required to be filed in respect of any Taxes, including any Schedule or attachment thereto and any amendment thereof.

"**Taxes**" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheatment or unclaimed property, and estimated taxes, and together with all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in this clause (i), (ii) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person, (iii) any liability for the payment of any amounts as a result of being a party to any tax sharing or allocation agreements or arrangements (whether or not written) or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person, and (iv) any liability for the payment of any of the foregoing types as a successor, transferee or otherwise.

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business or in the design, development, reproduction, maintenance or modification of, any of the Products.

"**Termination Date**" has the meaning set forth in <u>Section 4.4(c)(vi)</u>.

"**Title Company**" means First American, or such other title company as Buyer shall select.

"**Trade Secrets**" has the meaning set forth above in the definition of Intellectual Property.

"**Transfer Taxes**" means sales, use, stamp, documentary stamp, recording, transfer, excise, or similar fees or Taxes or governmental charges (including any interest and penalty thereon) payable in

connection with Sellers' transfer of the Purchased Assets to Buyer pursuant to this Agreement, including any Taxes imposed by any Governmental Body in connection with any transfer of liquor or spirits hereunder, the transfer of any Liquor License, or otherwise in connection with any Liquor License Approval.

"**Working Capital Adjustments**" means the sum of (i) the face amount on the Closing Date of any Purchased Asset that is a prepaid amount , *plus or minus* (ii) the amount determined pursuant to Section 11.2 and/or Section 12.9 (but, in each case, without duplicating any payment therefore), *plus* (iii) the face amount on the Closing Date of all deposits that are Purchased Assets described in Section 2.1(l) , *plus* (iv) the face amount on the Closing Date of all Purchased Assets that are accrued rebates which have been confirmed by vendors.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto.

Section 1.2    **Other Definitional and Interpretive Matters**.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein, and are an integral part of this Agreement. Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule unless explicitly cross-referenced. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.   Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions, and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF ASSUMED LIABILITIES; ALL OTHER LIABILITIES EXCLUDED

Section 2.1     **Purchase and Sale of Assets**. On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. "**Purchased Assets**" shall mean all of Sellers' right, title and interest in, to and under all the following assets of Sellers, wherever located (but excluding Excluded Assets) as of or after the Closing:

(a)     All Owned Real Property;

(b)     all Sellers' rights, titles, and interests in respect of Leased Real Property at which Sellers currently operate restaurants, including all Sellers' rights and interests in respect of the Operating Leases, and all Sellers' rights, titles, and interests in respect of any other Real Property Leases that constitute Purchased Contracts, together with all Sellers' rights, titles, and interests in and to all improvements, fixtures, and other appurtenances thereto;

(c)     all Sellers' rights, titles, and interests in respect of Sellers' Austintown, Ohio joint venture, including all Sellers' beneficial and record ownership interest in, and management, operating, and other rights pertaining to, the Austintown JV Entity and the Austintown RE Entity, whether arising under contract, by statute, or otherwise (the "**Austintown Interests**");

(d)     all Accounts Receivable of Sellers other than Excluded AR, together with any accrued unpaid financing charges or interest payable to any Seller in respect thereof (regardless of whether any such Account Receivable is due or past due);

(e)     all Cash including all Register Cash (but not including Investment Securities);

(f)     all Furniture and Equipment, wherever located, other than Excluded F&E;

(g)     the Purchased IP, including (i) the Registered Marks set forth on Schedule 5.6(a)(i) and all goodwill related thereto, and (ii) all other Intellectual Property of Sellers set forth on Schedule 5.6(a)(ii), including, without limitation: (A) all restaurant architectural and interior designs, layouts, décor, tableware, signage, menus, uniform designs and any other trade dress or distinctive features that contribute to the look, feel and/or atmosphere of the restaurants; (B) all menus, recipes, sauce formulas, cooking instructions and other documentation related to restaurant operation and food preparation; (C) all Databases including personally identifiable information associated with former,

current and prospective restaurant customers, including, without limitation, loyalty program databases; and (D) all marketing materials and websites associated with the Business.

(h)      all Purchased Contracts;

(i)      all Software and Technology;

(j)      all Documents of Sellers, including Documents relating to Purchased Contracts, Accounts Receivable (other than Excluded AR), Liquor Licenses, Buyer Employees, Products, services, marketing, advertising, promotional materials, Intellectual Property, Software, and Technology, and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, wherever located, but excluding any Documents (A) exclusively relating to any Excluded Asset or (B) as set forth in Section 2.2(e);

(k)      all Permits held by Sellers (including all Liquor Licenses), to the extent transferrable, other than any Liquor License in any jurisdiction where the Law does not permit Buyer to take title to such Liquor License until it obtains the requisite approvals from the pertinent Governmental Body (in which case Sellers shall transfer, assign convey and deliver each such Liquor License to Buyer upon issuance of the requisite approval therefor from the relevant Governmental Body), but excluding any Permits exclusively relating to any Excluded Asset;

(l)      (A) all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise), but excluding any deposits that are not transferable to Buyer as a matter of law, and excluding any deposits that constitute Excluded Utility Deposits; and (B) all other prepaid charges and expenses of Sellers, but excluding those arising under any Excluded Contract or pertaining exclusively to any one or more of the Closed Facilities;

(m)      all rights under insurance policies and rights to proceeds thereof relating to the Purchased Assets (other than any directors and officers insurance policy);

(n)      all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties;

(o)      all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets;

(p)      subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all goodwill and other intangible assets associated with the Business and/or the Purchased Assets, including customer and supplier lists and the goodwill associated with the Intellectual Property owned by Sellers;

(q)      all Claims and causes of action of Sellers, including all causes of action arising under Chapter 5 of the Bankruptcy Code, arising under or in respect of the Business or any Purchased Assets (but excluding any such Claims and causes of action pertaining exclusively to any Excluded Assets);

(r)     subject to the provisions of Section 363(b)(1)(A) of the Bankruptcy Code, all rights to the telephone and facsimile numbers and e-mail addresses used by Sellers, as well as rights to receive mail and other communications addressed to Sellers (including mail and communications from customers, suppliers, distributors and agents);

(s)     all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of the Purchased Assets, including all property and assets used or useful in the conduct of the "sauce" business operated by Sellers, as set forth on Schedule 2.1 (as such Schedule may be amended from time to time by Buyer in accordance with this Agreement); and

(t)     all other assets, properties, rights, Claims and causes of action of any Seller of any kind or nature whatsoever not otherwise described above but that are not expressly designated as Excluded Assets.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until two Business Days prior to the Closing Date (except that Buyer may not add as a Purchased Asset anything specifically listed in Section 2.2 below as an Excluded Asset, other than Excluded Contracts); provided, however, that no such addition shall result in any adjustment of the Base Purchase Price.

Furthermore, Buyer may, from time to time, remove any Purchased Contract from Schedule 1.1 and/or any other Purchased Asset from this Section 2.1 (other than the Owned Real Property) in its sole and absolute discretion until ten Business Days prior to the Sale Hearing Date and elect to treat such Contract, Permit and/or other asset in accordance with Section 2.6(c) or as an Excluded Asset.  If Buyer elects to treat any Operating Lease as an Excluded Asset at Closing or as a Designation Rights Asset that is rejected by Sellers in accordance with Section 2.6(c), Buyer shall pay to Sellers the Rejection Costs related to such Operating Lease.  Buyer's rights under this Section 2.1 are separate from and in addition to its rights under Section 8.14(b).

Section 2.2     **Excluded Assets**.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "**Excluded Assets**" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets and Designation Rights Assets, including without limitation each of the following assets:

(a)     All Investment Securities;

(b)     all Excluded AR, all Excluded Claims, all Excluded F&E, and all deposits that are not transferable to Buyer as a matter of Law or that constitute Excluded Utility Deposits;

(c)     all Excluded Contracts;

(d)     all Inventory, except for any Inventory purchased by Buyer pursuant to Section 2.7;

(e)     any (i) confidential personnel and medical records pertaining to any Employee; (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or

other entity filings; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any portions of such retained books and records that related to the Business or the Purchased Assets; (ii) minute books, stock or membership interest records and corporate seals; and (iii) documents relating to proposals to acquire the Business by Persons other than Buyer;

(f)     all of Sellers' rights under this Agreement and the other documents and agreements executed in connection with the transactions provided for herein;

(g)     all rights and interests in connection with, and assets of, any Employee Benefit Plan;

(h)     all rights under or arising out of insurance policies that are non-assignable as a matter of Law;

(i)     the capital stock or other equity interests of any Seller; and

(j)     any Liquor Licenses relating to any Closed Facility, or relating to any other Facility that has been designated by Buyer as an Excluded Asset pursuant to this Agreement.

Section 2.3     **Excluded Liabilities**. Buyer will not assume or have any responsibility with respect to any Liability of Sellers (or any predecessor or Affiliate of Sellers) of any nature whatsoever not expressly included within the definition of Assumed Liabilities (collectively, the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, Parties acknowledge and agree that each and all of the following are Excluded Liabilities:

(a)     all Taxes (i) imposed on any Seller for any period (including, for the avoidance of doubt, Transfer Taxes), or (ii) arising out of or related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending prior to the Closing;

(b)     all costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including all accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases;

(c)     any and all Liabilities to the extent arising out of or related to any of the Excluded Assets;

(d)     all Liabilities of Sellers under this Agreement or the Seller Documents;

(e)     all Liabilities which may become due or owing under the Purchased Contracts (i) with respect to the period prior to the Closing or (ii) after the Closing but which arise out of or relate to any breach that occurred prior to the Closing, other than any Cure Amounts pertaining to the Purchased Contracts;

(f)     all Indebtedness owed by any Seller or any predecessor of any Seller;

(g)     all Employee Obligations to any Employee arising out of such Employee's employment by Sellers;

(h) any Employee Claims of any Employee arising out of such Employee's employment by Sellers;

(i) any WARN Act Liabilities arising on or prior to the Closing Date;

(j) any ERISA Liabilities arising on or prior to the Closing Date;

(k) any Claim arising prior to Closing and not expressly assumed pursuant to this Agreement;

(l) any Liability to any stockholder or other equity holder of any Seller or any predecessor of any Seller;

(m) any Liability arising out of or related to any Legal Proceeding commenced or threatened against any Seller or any predecessor of any Seller;

(n) any Liability for infringement or misappropriation of any intellectual property arising out of or related to any conduct of any Seller or operation of the Business on or before the Closing;

(o) any Liability, whether administrative, civil or criminal in nature, relating to any Liquor License or the sale or service of alcohol beverages thereunder, where the circumstances upon which such Liability is predicated occurred prior to the Closing unless expressly assumed by Buyer;

(p) except for the costs pursuant to the Designation Rights Budget to the extent set forth in <u>Section 2.6(c)</u>, any Liability of any Seller based upon any Seller's acts or omissions occurring before or after the Closing unless expressly assumed by Buyer; and

(q) all other Liabilities and obligations for which Buyer does not expressly assume any liability, including without limitation any Liabilities listed on <u>Schedule 5.9</u>.

Section 2.4 **<u>Assumed Liabilities</u>**. From and after the Closing Date, Buyer shall pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, the Assumed Liabilities, as defined herein. The "**Assumed Liabilities**" include and are limited to each of the following:

(a) all Liabilities under the Purchased Contracts accruing on or after the Closing Date;

(b) all Liabilities with respect to the ownership and use of the Purchased Assets by Buyer after the Closing;

(c) all ordinary course Liabilities existing on the Closing Date with respect to Customer Programs;

(d) all Liabilities relating to amounts required to be paid or otherwise satisfied by Buyer hereunder;

(e)     all costs pursuant to the Designation Rights Budget to the extent set forth in Section 2.6(c);

(f)     the Company Transaction Costs, to the extent taken into account for purposes of calculating Base Cash Component; and

(g)     the aggregate Cure Amounts, as determined by the Bankruptcy Court, if any, pertaining to all Purchased Contracts assumed and assigned to Buyer in accordance with this Agreement.

Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated.

Section 2.5     **Further Conveyances and Assumptions**.

(a)     From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, licensure and permit filings, assumptions, releases, and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, good and indefeasible title to all the Owned Real Property, and all other properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents, and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the payment of the Base Cash Component and the assumption of the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)     If following the Closing, the Sellers receive or become aware that they hold any property, right, Claim, demand or asset which constitutes a Purchased Asset then the Sellers shall transfer such property, right, Claim, demand or asset to the Buyer as promptly as practicable for no additional consideration.

(c)     If following the Closing, the Buyer receives or becomes aware that it holds any property, right, Claim, demand or asset which constitutes an Excluded Asset, then the Buyer shall transfer such property, right, Claim, demand or asset to the Sellers as promptly as practicable for no additional consideration.

Section 2.6     **Transitional Matters**.

(a)     From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b)     Buyer will use reasonable efforts to retain and make available to Sellers and Sellers' successors, including, but not limited to, any liquidating trustee, until the earliest of (i) the closing of the Bankruptcy Cases; (ii) the date an Order is entered dismissing the Bankruptcy Cases, and (iii) two years following the Closing Date, the Documents delivered by Sellers to Buyer and any electronic mail correspondence relating to the Bankruptcy Cases, if reasonably needed by Sellers or Sellers' successors for liquidation, winding up, Tax reporting or other proper purposes; provided, that

Sellers or Sellers' successors will use reasonable efforts to retain copies of Documents and any electronic mail correspondence relating to the Bankruptcy Cases and the Parties otherwise will reasonably cooperate to minimize inconvenience to Buyer.

(c)  Designation Rights.

(i)  During the Designation Rights Period, Sellers shall (A) not reject any Contract unless such Contract is expressly designated by Buyer in writing as an Excluded Contract, Buyer fails to pay amounts owed with respect to such Contract pursuant to the Designation Rights Budget in accordance with this Agreement (after having been afforded written notification and an opportunity to cure such failure in accordance with this Agreement), or as otherwise agreed to in writing by Buyer, and (B) hold all Permits and other assets specified by Buyer in writing in abeyance pending designation for assignment or exclusion by Buyer in accordance with this Section 2.6(c).

(ii)  Any Contract not designated by Buyer in writing as either a Purchased Contract or an Excluded Contract, and any Permits and other assets designated in writing by Buyer, in each case at least two Business Days prior to Closing, shall constitute a "**Designation Rights Asset**." Buyer shall have the right, by written notice to Sellers within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in this Section 2.6(c), and (B) any Designation Rights Asset that is not a Contract shall be held by Sellers in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Buyer in accordance with this Section 2.6(c). With respect to any Designation Rights Asset: (i) Buyer shall be solely responsible for and directly pay for all costs associated with the continuation, operation or holding by Sellers of such Designation Rights Asset, as set forth in a budget proposed by Sellers and approved by Buyer no later than ten days prior to the Closing Date (such budget, including any amounts required to be included pursuant to Section 2.6(c)(viii), the "**Designation Rights Budget**"), for the period from the Closing through 15 days after the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the assignment or exclusion of such Designation Rights Asset; (ii) Buyer shall fully indemnify Sellers in connection with any costs and expenses set forth in the Designation Rights Budget that are incurred by Sellers in connection with the continuation or holding by Sellers of the Designation Rights Assets (including any Designation Rights Asset which becomes an Excluded Asset) and in the case whereby Buyer cannot directly pay the costs associated with the continuation or holding by Sellers of such Designation Rights Asset, shall promptly reimburse Sellers for such cost, in each case other than costs and expenses as a result of Sellers' gross negligence or willful misconduct; (iii) all consideration received by Sellers in respect of, and other benefits deriving from, such Designation Rights Asset (including Designation Rights Assets sold or assigned to third parties in accordance with Section 2.6(c)(iii) below) shall be promptly delivered to Buyer; (iv) if such Designation Rights Asset is a Real Property Lease and if Buyer is granted access to and uses such property prior to designating such Real Property Lease as a Purchased Contract, Buyer shall purchase insurance (including liability and casualty policies) covering such real property consistent with Sellers' past practices and shall name Sellers as additional insured under such policies; and (v) the foregoing shall not affect the validity of the transfer to Buyer of any other Purchased Asset whether or not related to such Designation Rights Asset. For the avoidance of doubt, Buyer shall retain the right to use all Furniture, Equipment, supplies and Inventory at any Designated Location, and to receive all the proceeds from any sale or use of such Furniture, Equipment, supplies and Inventory, during the

Designation Rights Period. Notwithstanding anything herein to the contrary, if Buyer fails to pay when due any costs associated with the continuation or holding by Sellers of any Designation Rights Asset set forth in the Designation Rights Budget in accordance with this Section 2.6(c)(ii), then such Designation Rights Asset shall be deemed, upon delivery of three Business Days' prior written notice from Sellers to Buyer of such breach and an opportunity to cure during such three Business Day time period, an Excluded Asset for all purposes under this Agreement, except with respect to Buyer's obligations to pay all amounts associated with such Designation Rights Asset as provided in the Designation Rights Budget with respect thereto. In the event that the costs associated with any Designation Rights Asset exceed the Designation Rights Budget (a "**Designation Cost Overage**"), Buyer shall not be liable for such Designation Cost Overage, other than as a result of damage or destruction of any Real Property Lease or as a result of the Buyer's gross negligence or willful misconduct.

(iii)     As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "**Designation Notice**") from Buyer during the Designation Rights Period requesting assumption, assignment and sale of any Designation Rights Asset to Buyer or a third party, Sellers shall, subject to Buyer or such third party demonstrating adequate assurance of future performance thereunder and paying all Cure Amounts to the extent required by Section 365 of the Bankruptcy Code, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume, assign and sell to Buyer or such third party the applicable Designation Rights Asset pursuant to Section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, Section 365 of the Bankruptcy Code.

(iv)     Following 15 days after the earlier of (A) the end of the Designation Rights Period and (B) the date of Sellers' receipt of written notice from Buyer designating the exclusion of a Designation Rights Asset, a Designation Rights Asset shall be deemed to be an Excluded Asset for all purposes under this Agreement except with respect to Buyer's obligations to pay all amounts associated with such Designation Rights Asset as provided in the Designation Rights Budget with respect thereto. For the avoidance of doubt, Buyer's obligations with respect to the costs and expenses of maintaining the Designation Rights Assets and the other obligations, including the obligation to maintain insurance, as provided in Section 2.6(c)(ii) hereof shall continue through the end of such period set forth in this Section 2.6(c)(iv).

(v)     Sellers and Buyer agree and acknowledge that the covenants set forth in this Section 2.6(c) shall survive the Closing.

(vi)     Notwithstanding anything in this Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Buyer or its designee pursuant to this Section 2.6(c), such Designation Rights Asset shall be deemed a Purchased Asset for all purposes under this Agreement and no further consideration (except for the applicable Cure Amount with respect to Designation Rights Assets that are Contracts, to the extent not theretofore paid) shall be required to be paid for any Designation Rights Asset that is assumed, assigned and sold to Buyer or its designee.

(vii)     Sellers shall use reasonable best efforts to extend the deadline for assumption or rejection of any Designation Rights Asset that is a Real Property Lease for the maximum permitted period of time under Section 365 of the Bankruptcy Code.

(viii)   If the Parties hereto intend for any Purchased Contracts or other assets relating to a specific Designated Location to be transferred to Buyer at Closing (and all conditions specified in <u>Article IX</u> have been met with respect to such assets) but Buyer has not obtained Liquor License Approvals necessary to sell alcohol at such Purchased Restaurant and applicable Law prohibits the operation of such Purchased Restaurant by Buyer (including the sale of alcohol at such Purchased Restaurant) pursuant to a management agreement or similar provision, then (A) any Purchased Contracts or other assets associated with such Purchased Restaurant shall be deemed to be Designation Rights Assets as of the Closing for all purposes and in all respects and (B) the Designation Rights Budget shall include all costs associated with the continuation, operation or holding by Sellers of such Designation Rights Asset. Buyer shall notify Sellers of all Purchased Contracts and other assets that Buyer believes may be subject to this <u>Section 2.6(c)(viii)</u> no later than 15 days prior to the Closing Date; *provided*, that any amounts included in the Designation Rights Budget pursuant to this <u>Section 2.6(c)(viii)</u> shall be removed from the Designation Rights Budget (and, for the avoidance of doubt, all Purchased Contracts and other assets associated with such Purchased Restaurant shall not be deemed to be Designation Rights Assets at Closing) if the Liquor License Approvals for the applicable Purchased Restaurant are obtained by Buyer prior to or at Closing, and Sellers shall provide Buyer with a revised Designation Rights Budget reflecting the foregoing one day prior to the Closing Date. Notwithstanding anything to the contrary herein, with respect only to Purchased Contracts or other assets deemed to be Designation Rights Assets at Closing pursuant to this <u>Section 2.6(c)(viii)</u>, Buyer shall have the option to extend the Designation Rights Period for an additional 30 days upon written notice to Sellers no later than 10 days prior to the date on which the Designation Rights Period would otherwise end.

(d)     <u>Previously Omitted Contracts</u>.

(i)      If prior to or following Closing it is discovered that a Contract should have been listed on <u>Schedule 5.15</u> but was not listed on <u>Schedule 5.15</u>, (any such Contract, a "**Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof (but in no event later than two Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all proposed Cure Amounts (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Sellers, no later than five Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated in accordance with this <u>Section 2.6(d)(i)</u> as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)     If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 2.6(d)(i)</u>, Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the proposed Cure Amounts with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this <u>Section 2.6(d)</u> with no adjustment to the Base Cash Component. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven days to object, in writing to the Sellers and Buyer, to the Cure Amount and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Buyer, Sellers shall obtain an Order of the Bankruptcy Court fixing the Cure Amounts and

approving the assumption of the Previously Omitted Contract. Subject to the determination of the Cure Amount pursuant to this Section 2.6(d)(ii) (which Cure Amount shall be acceptable to Buyer in its sole discretion, if greater than the Cure Amount set forth on Sellers' notice under Section 2.6(d)(i)), any such Previously Omitted Contract designated as Assumed by Buyer hereunder shall constitute a Purchased Contract for all purposes hereof, and Schedule 1.1 shall be amended accordingly.

Section 2.7 **Purchase of Certain Inventory**. In addition to the purchase and sale of the Purchased Assets as provided herein, Buyer shall purchase at Sellers' original cost (taking into account any previously paid rebates and replacement allowances, but not taking into account any rebates or replacement allowances earned prior to Closing, to the extent that the right to receive such rebate constitutes a Purchased Asset), such Inventory as is in readily saleable condition as determined by physical inventory within five Business Days prior to the Closing; provided that any such sale of alcoholic beverage inventories shall be subject to compliance with applicable Law. Buyer and Seller shall mutually agree upon a third party to conduct a physical inventory count. The amount determined to be payable for the Inventory pursuant to this Section 2.7 shall be taken into account in determining the Closing Date Working Capital Purchased – Incremental. Inventory purchased by Buyer pursuant to this Section 2.7 shall constitute Purchased Assets hereunder.

Section 2.8 **Allocation of the Purchase Price**. The Aggregate Consideration shall be allocated among the Purchased Assets in accordance with Section 1060 of the Code, as determined by Buyer in good faith. Buyer and Sellers shall not take any action or position in a Tax Return or Tax proceeding inconsistent with the obligations set forth in this Section 2.8, except as may otherwise be required by applicable Law.

## ARTICLE III
## CONSIDERATION

Section 3.1 **Base Cash Component**.

(a) In consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the aggregate consideration payable by Buyer hereunder (collectively, the "**Aggregate Consideration**") shall be: (i) the Base Cash Component, payable in accordance with Section 3.1(b); and (ii) the assumption of the Assumed Liabilities, including the Cure Amounts, by Buyer at Closing.

(b) At the Closing the Base Cash Component shall be payable as follows:

(i) Buyer shall pay an amount equal to the Closing Date Cash Payment by wire transfer of immediately available funds to an account designated by Company (on behalf of the Sellers) in writing at least two Business Days prior to the Closing;

(ii) Buyer and the Company shall give joint written instructions to the Title Company, directing the Title Company to pay and deliver to the Company (on behalf of the Sellers) the aggregate amount of the Buyer Deposit, including all interest thereon.

(iii) Buyer shall pay an amount equal to the Credit Bid Amount by, in Buyer's sole discretion: (A) delivering to Sellers fully executed releases and waivers from the DIP Lender under the DIP Credit Agreement, with respect to all or a part of Sellers' obligations thereunder or (B) with the

written consent of the DIP Lender, assuming all or a part of Sellers' obligations under the DIP Credit Agreement and providing Sellers with fully executed releases and waivers from the DIP Lender thereunder; provided that the Credit Bid Amount is paid in whole pursuant to the preceding clause (A), clause (B) or any combination thereof; and

(iv)     Buyer shall assume the Assumed Liabilities, including the Cure Amounts and other obligations of Sellers under the Purchased Contracts, by executing and delivering to Sellers the Assignment and Assumption Agreement.

(c)     Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment. If, for any reason, Buyer's ability to credit bid all or any portion of the Credit Bid Amount pursuant to Section 363(k) of the Bankruptcy Code is not allowed by the Bankruptcy Court (such portion, a "**Negated Credit Bid Amount**"), the obligation of Buyer to deliver the portion of the Base Cash Component attributable to the Credit Bid Amount shall be reduced dollar-for-dollar by the Negated Credit Bid Amount, no other component of the Base Cash Component shall be increased, decreased or otherwise modified, and the failure by Buyer to credit bid any Negated Credit Bid Amount shall not constitute a breach of this Agreement by Buyer.

(d)     "Closing Date Working Capital Purchased – Incremental" shall mean the sum of the following Purchased Assets, defined and valued as of the effective time of the Closing as follows:

(i)     Cash in banks, which shall be valued as the sum of (A) cash actually in Sellers' bank accounts that are transferred to Buyer (either by transfer of accounts, or by transfer of the cash in the accounts); *plus* (B) the amount of any checks or other transfers received by any Seller prior to Closing but credited (or to be credited) after Closing to an account transferred to Buyer, *minus* (C) the amount of any check in transit or other transfer made by any Seller prior to Closing but paid (or to be paid) after Closing from any account transferred to Buyer.

(ii)     Register Cash, which shall be valued as set forth in the definition thereof.

(iii)     Credit Card Accounts Receivable, which shall mean any Purchased Asset that is an Account Receivable due to any Seller from any credit card company and which shall be valued at face amount.

(iv)     Inventory purchased pursuant to Section 2.7, which shall be valued as described in Section 2.7.

(v)     Sauce Business Accounts Receivable, which shall mean any Purchased Asset that is an Account Receivable relating to the sale of Sellers' proprietary sauces, which shall be valued at face amount.

## ARTICLE IV
## CLOSING AND TERMINATION

Section 4.1     **Closing Date**.  Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the

Assumed Liabilities provided for in Article II hereof (the "**Closing**") shall take place remotely via electronic communication (or at such place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The date on which the Closing shall be held is referred to in this Agreement as the "**Closing Date**," and the Closing shall be deemed effective as of 11:59 PM on the day immediately preceding the Closing Date.

Section 4.2 **Deliveries by Sellers**. At the Closing, Sellers shall deliver to Buyer:

(a) a duly executed bill of sale and assignment;

(b) duly executed assignments of the U.S. trademark registrations and applications included in the Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Intellectual Property;

(c) a duly executed quit claim deed in such form as shall be reasonably acceptable to Buyer, transferring fee title of each parcel of Owned Real Property to Buyer;

(d) the officer's certificate required to be delivered pursuant to Section 9.1(a), Section 9.1(b) and Section 9.1(e);

(e) a certificate signed by the chief executive officer, chief financial officer, and principal accounting officer of the Company, in each case in their capacities on behalf of the debtors in possession and not in their individual capacities, certifying to the best of their knowledge after reasonable due inquiry the amounts as of the Closing Date of each of (i) the Gift Card Adjustment, (ii) the Closing Date Working Capital Purchased – Incremental (including the respective amounts of Cash in banks, Register Cash, Credit Card Accounts Receivable, the Sauce Business Accounts Receivable, and Seller's net purchase price for the Inventory to be purchased by Buyer pursuant to Section 2.7), (iii) the Working Capital Adjustments (including each component in the definition thereof), (iv) the Post-Petition Royalty Account Receivable Adjustment, (v) the Gift Card Account Receivable Adjustment, in each case together with such back-up or other documentation therefor as Buyer shall reasonably request;

(f) all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary or appropriate to convey the Purchased Assets to Buyer.

Section 4.3 **Deliveries by Buyer**. At the Closing, Buyer shall deliver to Sellers:

(a) the Base Cash Component, including the Closing Date Cash Payment, in immediately available funds, as provided in Section 3.1(b);

(b) the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b);

(c) evidence of a credit against the DIP Obligations pursuant to Section 363(k) of the Bankruptcy Code equal to the Credit Bid Amount; and

(d)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers, as may be necessary or appropriate to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    **Termination of Agreement**. This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

(b)    by Sellers or Buyer:

(i)    if any of the conditions set forth in <u>Section 9.3</u> shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party; or

(ii)    if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(c)    by Buyer:

(i)    if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> and which breach cannot be cured or has not been cured by the earlier of (A) ten Business Days after the giving of written notice by Buyer to Sellers of such breach and (B) the Termination Date;

(ii)    in the event that (A) the hearing on the motion to approve the Bidding Procedures Order has not been completed on or before January 8, 2016, (B) the Bankruptcy Court has not entered the Bidding Procedures Order on or before January 12, 2016, and/or (C) the Bidding Procedures Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(iii)    if the Sale Order with respect to the transactions contemplated by this Agreement has become a Final Order, and (A) Buyer has provided Sellers with written notice that it is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in <u>Article IX</u> have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (C) the Closing Date does not occur within five Business Days after Buyer providing Sellers with such notice;

(iv)    if, prior to the Closing, the Bankruptcy Court enters an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the Sellers' Bankruptcy Cases, or appoint a trustee in any of the Sellers' Bankruptcy Case or appoint a responsible officer or an examiner with enlarged powers to operate the Business or dispose of assets relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under

Bankruptcy Code Section 1106(b), or such an Order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within 14 days after the entry thereof;

      (v)     if Sellers enter into an Alternative Proposal;

      (vi)    if the Closing shall not have occurred on or before the close of business on the date which is 40 days after the entry of the Sale Order or such later date as determined by Buyer in its sole discretion (the "**Termination Date**"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a breach of any of the representations, warranties, covenants or agreements contained in this Agreement by Buyer, which would give the Sellers a right not to close pursuant to Article IX, then the Buyer may not terminate this Agreement pursuant to this Section 4.4(c)(vi);

      (vii)   if any of the conditions to the obligations of Buyer set forth in Section 9.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer; or

      (viii)  during the Initial Diligence Period only, in accordance with Section 7.1(c);

    (d)     by Sellers:

      (i)     if any condition to the obligations of Sellers set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

      (ii)    if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach cannot be cured or has not been cured by the earlier of (A) ten Business Days after the giving of written notice by Sellers to Buyer of such breach and (B) the Termination Date; or

      (iii)   if the Closing shall not have occurred on or before the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a breach of any of the representations, warranties, covenants or agreements contained in this Agreement by the Sellers, which would give the Buyer a right not to close pursuant to Article IX, then the Sellers may not terminate this Agreement pursuant to this Section 4.4(d)(iii);

      (iv)   if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (A) the Sellers have provided Buyer with written notice that it is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in Article IX have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (C) the Closing Date does not occur within five Business Days after the Sellers providing the Buyer with such notice;

      (v)     if Sellers enter into and consummate an Alternative Proposal.

    Section 4.5    **Buyer Deposit**.

(a)     If this Agreement is terminated pursuant to Section 4.4(d)(ii) or (iv), then Sellers shall retain the Buyer Deposit and Buyer shall be deemed to have fully released all Claims to the Buyer Deposit. The Parties expressly agree and acknowledge that Sellers' actual damages in the event of such a breach by Buyer would be extremely difficult or impracticable to ascertain and that the Buyer Deposit represents the parties' reasonable estimate of such damages. Notwithstanding any other provision of this Agreement, Sellers shall have no other remedy for any breach by Buyer under this Agreement and Sellers' right under this Section 4.5(b) shall be (i) full liquidated damages for any and all failures to act, defaults or breaches hereunder by Buyer and (ii) constitute a full release and discharge of all Claims for damages for such failures to act, defaults or breaches and Sellers shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Buyer or any of its members, shareholders, officers, directors, or Affiliates with respect thereto.

(b)     If this Agreement is terminated in any manner (including without limitation any termination by Buyer pursuant to Section 4.4(c)), *other than* a termination by Sellers pursuant to Section 4.4(d)(ii) or (iv), Sellers shall promptly return to Buyer the Buyer Deposit and execute all documentation reasonably required by the Buyer in connection therewith.

Section 4.6     **Effect of Termination**. In the event that this Agreement is validly terminated in accordance with Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers, except as expressly provided in Section 4.7; provided, however, that the obligations of the Parties set forth in Section 4.5, Section 4.7, Section 8.3(a), Section 8.5 and Article XII hereof shall survive any such termination and shall be enforceable hereunder.

Section 4.7     **Expense Reimbursement and Break-up Fee**.  Anything contained herein to the contrary notwithstanding, if this Agreement is terminated at any time before the Closing pursuant to Section 4.4(c)(i), Section 4.4(c)(v), or Section 4.4(d)(v) and in any such case, the Company or any of its Affiliates consummates a transaction pursuant to any Alternative Proposal within 24 months after the date of this Agreement, Seller shall (A) reimburse Buyer for its out-of-pocket expenses (including reasonable attorney's fees) incurred in connection with the transactions contemplated by this Agreement in an amount not greater than $500,000 (the "**Reimbursed Expenses**") and (B) pay Buyer a fee (the "**Break-up Fee**") equal to $750,000 [i.e., 3% of the $25 million Base Purchase Price hereunder], which represents Buyer's fee for its work in (x) establishing a bid standard or minimum for other bidders, (y) placing estate property in a sales configuration made attractive to other bidders to the auction contemplated by the Bid Procedures Order and (z) for serving, by its name and its expressed interest, as a catalyst for other bidders. The Break-up Fee and Reimbursed Expenses shall be due and payable as allowed administrative priority expenses of Seller under Section 503(b)(1) of the Bankruptcy Code upon the earliest to occur of the consummation of any transaction pursuant to an Alternative Proposal, the consummation of a plan of reorganization or plan of liquidation in the Bankruptcy Case, any dismissal of the Bankruptcy Case, and any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer that:

Section 5.1 **Legal Existence; Power and Authority; Good Standing; Authorization and Execution of Agreement**. Each Seller is an entity duly organized, validly existing and in good standing under the laws of its state of incorporation or formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted. Except as a result of the commencement of the Bankruptcy Cases, each Seller is qualified to do business and is in good standing in all jurisdictions where it conducts business or is otherwise required by Law to be so qualified, including each jurisdiction in which a Designated Location is located. Subject to the entry of the Sale Order: (a) each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "**Seller Documents**"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms.

Section 5.2 **No Conflicts; Consents**.

(a) None of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), any such conflicts, violations, defaults, terminations, modifications, accelerations or cancellations that would not have, and could not reasonably be expected to have, a Material Adverse Effect on the ownership and operation of the Business.

(b) Subject to entry of the Sale Order, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any

other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a Material Adverse Effect on the ownership and operation of the Business.

Section 5.3 **Title to Purchased Assets**. Other than the real property subject to the Real Property Leases and the personal property subject to the Personal Property Leases, Sellers have good title to the Purchased Assets including the Purchased Inventory and, at the Closing, the Sellers, pursuant to the Sale Order, shall transfer good title in, to and under (subject to the Purchased Contracts (other than Purchased Contracts assumed or assigned post-Closing) being assumed and assigned in accordance with Section 2.1) all of such Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions, to the fullest extent available under Section 363(f) of the Bankruptcy Code. The Purchased Assets constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used or held for use by Sellers in connection with operating, in all material respects, the Business in the ordinary course, or otherwise necessary for Buyer to conduct and operate, in all material respects, the Business in the ordinary course immediately after the Closing. No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in, the Purchased Assets or assets that are used or useful in the operation of the Business (other than franchisees in the Ordinary Course of Business, in accordance with their respective franchise agreements).

Section 5.4 **Real Property**.

(a) Exhibit 1(a) sets forth each parcel of real property owned by any of the Sellers, whether or not currently operated by Sellers in connection with the Business (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "**Owned Real Property**"), including with respect to each property, the address location and use. Sellers have delivered to Buyer copies of the deeds and other instruments (as recorded) by which Sellers acquired each such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Sellers with respect to each such parcel. With respect to each parcel of Owned Real Property:

(i) Sellers have good and marketable fee simple title, free and clear of all Encumbrances except Permitted Exceptions;

(ii) Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(iii) there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b) Exhibit 1(b) sets forth a complete list of all real property and interests in real property leased by Sellers at which Sellers currently operate restaurants. Schedule 5.4(b) sets forth a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which any of the Sellers holds or occupies any Leased Real Property, including the Operating Leases (collectively, the "**Real Property Leases**"). Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee, free and clear of all Liens of any nature whatsoever except Permitted Exceptions.

(c)     No Seller has received notice of (i) any violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting any Owned Real Property or Leased Real Property (collectively, the "**Real Property**"), (ii) any existing, pending or threatened condemnation proceedings affecting any Real Property, or (iii) any existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to have an adverse effect on value of any Real Property or the use of such Real Property in connection with the Business as currently operated and proposed to be operated. No material part of any Real Property has been damaged or destroyed by fire or other casualty.

Section 5.5     **Tangible Personal Property**. Schedule 5.5 sets forth all leases of personal property ("**Personal Property Leases**") relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business. Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

Section 5.6     **Intellectual Property**.

(a)     Schedule 5.6(a)(i) sets forth an accurate and complete list of all registered trademarks service marks owned or used by Sellers in connection with the Business. Schedule 5.6(a)(ii) sets forth an accurate and complete list of all other trademarks, service marks, trade names, and other Intellectual Property owned or used by Sellers in connection with the Business (together with the Registered Marks, collectively, the "**Purchased IP**"). None of the Registered Marks is licensed by Sellers from third parties and, except as expressly set forth on Schedule 5.6(a)(ii), none of the other Purchased IP is licensed by Sellers from third parties.  Sellers own all right, title and interest to, or are licensees with respect to, the Purchased IP, and can convey such property free and clear of Liens (other than Permitted Exceptions) pursuant to the Sale Order. With respect to the Registered Marks and all other Purchased IP owned by Sellers for which applications for registration have been filed, all such applications and/or registrations are in good standing, with all fees paid in full and filings made to date.

(b)     To the Knowledge of Sellers, Sellers have not infringed upon, misappropriated, or violated any intellectual property right of any other Person, or engaged in false advertising or unfair competition, in the operation of the Business.

(c)     To the Knowledge of Sellers, no Person is engaging in any activity that infringes any Purchased IP.  No Claim has been asserted to any Seller that the use of any Purchased IP or the operation of the Business infringes or violates the Intellectual Property rights of any third party.

(d)     Company has provided Buyer with true and complete copies of all agreements, licenses, covenants-not-to-sue, and other documents or correspondence relating to the Purchased IP, including all such agreements, licenses, covenants-not-to-sue, and other documents or correspondence between any of the Sellers and SOPUS Products or any affiliate or any prior registered owner of the registered trademark for "Quaker State® Motor Oil" and/or any and all related names and marks. There are no geographical or other restrictions or limitations on Sellers' rights to use the marks "Quaker Steak®", "Quaker Steak® and Lube" or any other Purchased IP in connection with the operation of the Business.  No agreement, license, covenant-not-to-sue, or other document or correspondence required to be provided pursuant to the first sentence of this Section 5.6(d) imposes any restrictions or limitations that would affect the ability of Buyer and its franchisees and Affiliates from selling "Quaker Steak® and

Lube" products and operating "Quaker Steak® and Lube" restaurants at truck stops and travel centers owned or operated by Buyer any place in the world. The Intellectual Property and the rights under the Purchased Contracts include the rights to use all Intellectual Property required to operate the Business as currently conducted.

(e)     Schedule 5.6(e) sets forth an accurate and complete list of all Software used by Sellers in connection with the Business, and identifies which such Software is licensed by Sellers from third parties. The Purchased Contracts include the contracts applicable to all third party Software used by Sellers in connection with the Business, and the licenses set forth therein represent all Software licenses necessary to operate the Business as currently conducted.

(f)     Sellers have maintained commercially reasonable practices to protect the confidentiality of the Sellers' confidential information and Trade Secrets related to the Business, including, without limitation, as such confidential information and Trade Secrets relate to the recipes and sauce formulas of the Business.

(g)     All current and former employees and contractors of the Sellers who contributed to the development of the Technology of the Business have executed agreements assigning to the Sellers' the Intellectual Property in such Technology.

(h)     Schedule 5.6(h) identifies and generally describes each Database maintained by Sellers in connection with the Business. Sellers have maintained privacy policies available on all website and other end used facing portals that detail Sellers' privacy policies and practices in connection with the Business (the "**Privacy Policies**"). Sellers have complied at all times and in all material respects with all of the Privacy Policies and with all applicable Laws pertaining to privacy or the Databases, including with respect to the collection, storage, transmission, transfer (including cross-border transfers), disclosure, destruction and use of personal data. Sellers have adopted and maintain commercially reasonable securities policies with respect to each such Database. No material breach or violation of any such security policy to protect any such Database has occurred or is threatened; and, there has been no unauthorized or illegal use of or access to any of the data or information in any Database or any personally identifiable data held by Sellers.

Section 5.7    **Financial Statements**. Sellers have delivered to Buyer true and correct copies of (i) the consolidated balance sheets of Company and its subsidiaries as at fiscal year-end for their 2014, 2013, and 2012 fiscal years, and the related consolidated statements of income and of cash flows of Company and its subsidiaries for the fiscal years then ended (which balance sheets and consolidated statements of income and cash flows have been audited by the Company's independent public accountants as at fiscal year-end 2013 and 2012, and for the fiscal years then ended, respectively), and (ii) the unaudited consolidated balance sheet of Company and its subsidiaries as of August 9, 2015, and the related consolidated statement of income and cash flows of Company and its subsidiaries for the 32 weeks then ended (such audited and unaudited statements, including the related notes and Schedules thereto, are referred to herein as the "**Financial Statements**"). Each of the audited Financial Statements has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Company and its subsidiaries as of the dates and for the periods indicated therein, subject to normal year-end adjustments. Each of the unaudited Financial Statements has been prepared in good faith,

based on the books and records of the Sellers in accordance with the historical accounting principles of the Company and its subsidiaries consistently applied, except for the absence of complete notes, and are true and correct in all material respects. No Seller has any Indebtedness or any other Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of Company and its Subsidiaries, except for liabilities and obligations (a) reflected or reserved against in the Company's consolidated balance sheet as of August 9, 2015 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since August 9, 2015 (none of which are, individually or in the aggregate, material to the Company and its subsidiaries, taken as a whole), (c) which have been discharged or paid in full prior to the date of this Agreement, or (d) incurred pursuant to the transactions contemplated by this Agreement. Since fiscal year-end 2013, to the Knowledge of Sellers, no Seller has received any complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls. The books and records of the Company and its subsidiaries on which the Financial Statements have been prepared were maintained in the ordinary course of business and the Sellers have no reason to believe that the Financial Statements contain any material misstatement or omission. To Sellers' Knowledge, the Financial Statements, and the books and records of the Company and its Subsidiaries on which they are based, have not been affected by any fraud or misconduct.

Section 5.8 **Customer Programs**. Schedule 5.8 sets forth a description of all Customer Programs in effect, including applicable expiration policies and other terms and conditions, and stating the aggregate dollar amount of Liabilities outstanding under each such Customer Program as of the last day of each of the four most recent fiscal quarters.

Section 5.9 **Financial Advisors**. No Person has acted, directly or indirectly, as a broker, finder, or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof, in each case other than as set forth on Schedule 5.9 (which shall include the name and contact information for each such broker, finder, or financial advisor amount of any such fee or commission or like payment).

Section 5.10 **Litigation**. Except as set forth on Schedule 5.10 and other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Sellers' Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby.

Section 5.11 **Compliance with Laws**. Except as set forth on Schedule 5.11, Sellers have conducted and are presently conducting the Business in compliance with all material applicable Laws in all material respects.

Section 5.12 **Permits**. Schedule 5.12 sets forth all material Permits used by Sellers in the Business other than the Liquor Licenses. Sellers are in compliance with the material terms of all such Permits, except where such non-compliance would not be material to the ownership and operation of the Business and all such Permits are valid and in full force and effect, and no Legal Proceeding is pending

or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

Section 5.13 **Liquor Licenses**. Schedule 5.13 sets forth a complete and correct list as of the date of this Agreement of all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller, including the Person in whose name such license is issued, date of issuance and renewal date (collectively, the "**Liquor Licenses**"). Each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller, subject to and in accordance with all applicable provisions of the Liquor Licenses. To the Knowledge of Sellers, except as set forth on Schedule 5.13, since fiscal year-end 2014, (i) there have been no Legal Proceedings brought or threatened to be brought by or before a Governmental Body in respect of any such Liquor License or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License is subject to any due but unpaid tax obligation owed to a Governmental Body, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Body to be revoked, limited or not renewed.

Section 5.14 **Purchased Inventory**.

(a) The Purchased Inventory is owned by Sellers, and no Purchased Inventory is held on a consignment basis;

(b) None of the Purchased Inventory has been part of a current or past product recall, except for any such recall as would not be material to the Purchased Inventory taken as a whole;

(c) The Purchased Inventory is in compliance in all respects with all United States state and federal standards and guidelines for such products as of the date hereof, except for any such non-compliance as would not be material to the Purchased Inventory taken as a whole; and

(d) The Purchased Inventory is in good and workable condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be, except for such failure to be in such condition which would not have a Material Adverse Effect on the Purchased Inventory taken as a whole.

Section 5.15 **Contracts**. Schedule 5.15 contains a complete list of all Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement. Except as set forth in Schedule 5.15, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. The Purchased Contracts include all Contracts material to the ownership and/or operation of the Business, including all Operating Leases, franchise and concession agreements in connection with the Designated Locations. Sellers have not, and, to Sellers' Knowledge, no other party to any Purchased Contract has, commenced any action against any of the parties to any Purchased Contract or given or received any written notice of any default or violation under any Purchased Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the

payment of the applicable Cure Amounts. Each Purchased Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 5.16 **Taxes**. Except as such payment or any enforcement action is stayed as a result of the Bankruptcy Case:

(a) All Tax Returns required to have been filed by Sellers have been duly filed, all such Tax Returns are true, correct and complete in all material respects, and all Taxes required to be paid have been paid;

(b) No federal or state income Tax Return audits are pending with respect to any Seller, except for those set forth on <u>Schedule 5.16</u>;

(c) No Seller has received written notice from any Governmental Body of future federal or state income Tax Return audits;

(d) There are no material liens with respect to Taxes upon any of the Purchased Assets, other than Liens for Taxes not yet due and payable; and

(e) No Seller has (i) waived any statute of limitations in respect of any Tax Returns that have not been filed as of the date hereof or (ii) agreed to any extension of time with respect to the assessment of Taxes for which such Taxes have not been paid as of the date hereof.

Section 5.17 **Labor Matters**. No Seller is a party to any labor or collective bargaining agreement or workplace rules with respect to its Employees. No Employee of any Seller is represented by any labor organization and no labor organization or group of Employees of any Seller has made a pending demand for recognition or request for certification. There are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller. No Seller has an 'on call' policy requiring any Restaurant Employee to be available to work without providing compensation for such availability.

Section 5.18 **Environmental Matters**.

(a) The operations of Sellers with respect to the Business and the Purchased Assets are currently and have been in compliance with all Environmental Laws in all material respects. Seller has not received from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b) Seller has obtained and is in material compliance with all Environmental Permits (each of which is disclosed in <u>Schedule 5.18(b)</u>) necessary for the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets and all such Environmental Permits are in full force and effect, and Seller has no Knowledge of any condition, event or circumstance that might prevent or impede, after the Closing Date, the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets. With respect to any such Environmental Permits, Seller is not aware of any condition, event or circumstance that might

prevent or impede the transferability of the same, and has not received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same. Seller has no Knowledge of any hazardous or noxious mold condition affecting any Owned Real Property or Leased Real Property.

(c)    None of the Business or the Purchased Assets or any real property currently owned, leased or operated by Seller in connection with the Business is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)    There has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the Business or the Purchased Assets or any real property currently owned, leased or operated by Sellers in connection with the Business, and Sellers have not received any Environmental Notice that any of the Business or the Purchased Assets or real property currently owned, leased or operated by Seller in connection with the Business (including soils, groundwater, surface water, buildings and other structure located thereon) has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, Seller.

(e)    Except as set forth on <u>Schedule 5.18(e)</u>, there are no active or abandoned aboveground or underground storage tanks any real property currently owned, leased or operated by Sellers in connection with the Business.

(f)    <u>Schedule 5.18(f)</u> contains a complete and accurate list of all off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by Seller in connection with the Business or the Purchased Assets as to which Seller may retain liability, and none of these facilities or locations has been placed or proposed for placement on the National Priorities List (or CERCLIS) under CERCLA, or any similar state list, and Seller has not received any Environmental Notice regarding potential liabilities with respect to such off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by Seller.

(g)    None of the Sellers has retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

(h)    Seller has provided or otherwise made available to Buyer and listed in <u>Schedule 5.18(h)</u>: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models and other similar documents with respect to the Business or the Purchased Assets or any real property currently owned, leased or operated by Seller in connection with the Business which are in the possession or control of Seller related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current or future Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

Section 5.19    **Employee Benefits Matters**.

(a)    <u>Schedule 5.19</u> contains a true and complete list of each employee benefit plan or arrangement (regardless of whether the plan is an employee benefit plan for purposes of Section 3(3) of

ERISA), which is or has been maintained, sponsored, contributed to, or required to be contributed to by the Sellers for the benefit of any current or former employee or independent contractor of the Business, or under which the Sellers have or may have any Liability (each, a "**Benefit Plan**").

(b)     With respect to each Benefit Plan, the Sellers have provided or made available to the Buyer accurate, current and complete copies of each of the following: (i) the plan document together with all amendments; (ii) where applicable, copies of any trust agreements, insurance policies and contracts, administration agreements and similar agreements; (iii) copies of any summary plan descriptions, summaries or material modifications, employee handbooks and any other written communications relating to any Benefit Plan; (iv) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code (each a "**Qualified Benefit Plan**"), a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service; (v) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the most recently filed Form 5500, with schedules attached; (vi) copies of material notices, letters or other correspondence from the Internal Revenue Service or Department of Labor relating to the Benefit Plan; and (vii) copies of any financial statements prepared in connection with any open audits of any Benefit Plans.

(c)     Each Benefit Plan (other than any multiemployer plan within the meaning of Section 3(37) of ERISA (each a "**Multiemployer Plan**")) has been established, administered and maintained in all material respects in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code). Each Benefit Plan that is a Qualified Benefit Plan is so qualified and has received a favorable and current determination letter from the Internal Revenue Service, or with respect to a pre-approved plan, can rely on an opinion or advisory letter from the Internal Revenue Service to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code and nothing has occurred that could reasonably be expected to cause the loss of such qualification. Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject the Sellers to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code.  All benefits, contributions and premiums relating to each Benefit Plan have, in all material respects, been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with GAAP.

(d)     None of the Sellers or any of their respective ERISA Affiliates has incurred or reasonably expects to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA or related provisions of the Code relating to employee benefit plans.

(e)     None of the Sellers or any of their respective ERISA Affiliates contributes, is required to contribute, or has any Liability with respect to a Multiemployer Plan or to a plan that is subject to Title IV of ERISA; and except as set forth on Schedule 5.19, no Benefit Plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(f)     Other than as required under Section 601 et seq. of ERISA or other applicable Law, no Benefit Plan provides post-termination or retiree welfare benefits to any individual for any

reason, and none of the Sellers or any of their respective ERISA Affiliates have any Liability to provide post-termination or retiree welfare benefits to any individual.

(g)　　　There is no pending or, to the Sellers' Knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the three years prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(h)　　　Each individual who is classified by the Sellers as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Benefit Plan.

Section 5.20　　**No Other Agreements to Purchase**. Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business.

Section 5.21　　**No Other Buyer Representations**. Notwithstanding anything contained in this Agreement to the contrary, Sellers acknowledge and agree that Buyer and each of its directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives are not making any representation or warranty whatsoever, express or implied, beyond those expressly given by Buyer in Article VI hereof (as modified by the Schedules hereto).

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 6.1　　**Organization and Good Standing**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 6.2　　**Authorization of Agreement**. Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer. This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3     **Financial Advisors**. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof.

Section 6.4     **No Conflicts**. None of the execution and delivery by Buyer of this Agreement or any of the other documents to be executed by the Buyer in connection herewith, the consummation of the transactions contemplated hereby or thereby, or compliance by the Buyer with any of the provisions hereof or thereof will result in the conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provision of the certificate of incorporation and by-laws or comparable organizational documents of Buyer except as would not have a material and adverse effect on the ability of Buyer to consummate the transactions contemplated hereby and fulfill its obligations hereunder.

Section 6.5     **Litigation**. There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might materially and adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby.

Section 6.6     **Financial Capability**. Buyer (i) has, as of the date hereof, and will have as of the Closing, either itself or through its parent entity, sufficient funds to make all cash payments required to be made by Buyer in connection with the Closing of the transactions contemplated by this Agreement; (ii) has, as of the date hereof, and will have as of the Closing the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind which would impair or adversely affect such resources and capabilities.

Section 6.7     **Condition of the Business**. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers and each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives are not making any representation or warranty whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL

Section 7.1     **Initial Due Diligence**.

(a)     Sellers shall use best efforts to complete the preparation of the Disclosure Schedules and Exhibits referred to herein by November 30, 2015, and shall be permitted to create additional Disclosures Schedules not listed herein as of the date of this Agreement to allow disclosures to Sections set forth in Article V, other than Sections 5.1, 5.2, 5.3, 5.4, 5.6, 5.7 and 5.9; provided, that

<u>Schedule 5.4(b)</u> shall not disclose Real Property Leases that are not in the dataroom on the date hereof without the consent of Buyer (the "**Permitted New Disclosure Schedules**"). Except for the Permitted New Disclosure Schedules, Sellers shall not be permitted to create new Disclosures Schedules to any other Section of this Agreement.

(b)     During the period commencing on the date of this Agreement and continuing until the later of (i) December 15, 2015 and (ii) two weeks after the date on which Sellers provide written notice to Buyer that they have completed the preparation of the Disclosure Schedules and Exhibits in accordance with <u>Section 7.1(a)</u>, or if sooner, until Buyer notifies the Company in writing that Buyer has completed its initial due diligence review (such period, the "**Initial Due Diligence Period**"), Buyer shall have access to the information described in <u>Section 8.1</u>, to complete its initial due diligence review of the Business and confirm its intentions to complete the asset purchase contemplated hereby on the terms and subject to the conditions set forth herein.

(c)     Anything contained herein to the contrary notwithstanding, Buyer shall have the right, in its sole discretion, to terminate this Agreement without liability, by written notice to the Company given at any time during the Initial Due Diligence Period. For the avoidance of doubt, upon any termination of this Agreement pursuant to this <u>Section 7.1(c)</u>, Buyer shall be entitled to the immediate return of the Buyer Deposit, together with all interest thereon, and the Company shall join in any joint written instruction to that effect to the Title Agent.

Section 7.2     **Bankruptcy Court Filings**. Sellers shall (A) use commercially reasonable efforts to obtain entry of the Bidding Procedures Order by December 15, 2015 and (B) use commercially reasonable efforts to obtain entry of the Sale Order by March 31, 2016. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code. Sellers shall consult with Buyer and its representatives concerning any Order of the Bankruptcy Court relating to this Agreement and the Bankruptcy Cases and provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such Order), Sellers shall diligently defend against such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Sellers shall consult with Buyer regarding the status of any such actions. Any material changes to the form of the Bidding Procedures Order or the Sale Order must be approved by Buyer. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

Section 7.3     **Buyer Deposit**. Within three Business Days after the date hereof, Buyer shall deliver to the Title Company a cash deposit (the "**Buyer Deposit**") in the amount of $2,500,000 (i.e., 10% of the $25 million Base Purchase Price hereunder). The Buyer Deposit shall be held by held in

escrow by the Title Company in an interest bearing account, in accordance with this Agreement and Title Company's standard escrow procedures applicable thereto. If the Closing occurs, the Buyer Deposit shall be applied toward payment of the Base Cash Component and the balance (if any) shall be returned to Buyer. The rights of Buyer with respect to the return of the Buyer Deposit shall be governed by Section 3.1(b), Section 4.5(a), and Section 7.1(b), as applicable. Sellers' right to retain the Deposit shall be governed by Section 4.5(b).

## ARTICLE VIII
## COVENANTS

Section 8.1 **Access to Information**. Sellers agree that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees and representatives (including their respective legal advisors and accountants), to make such reasonable investigation and inspection of any and all properties, businesses and operations of Sellers and the Business and such examination of the books, records and financial condition of Sellers, the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to the Business. Sellers will allow Buyer to conduct Phase 1 testing on the Owned Real Property and if the Phase 1 report prepared for Buyer recommends a Phase II, Sellers will permit a Phase II on the Owned Real Property. Sellers will use commercially reasonable efforts to obtain any landlord or other third party consents required to allow Buyer to conduct Phase 1 testing on the Leased Real Property, and if any Phase 1 report prepared for Buyer recommends a Phase II on any Leased Real Property, Sellers will use commercially reasonable efforts to obtain any landlord or other third party consents required to allow a Phase II at such Leased Real Property.

Section 8.2 **Further Assurances**. Each of Sellers and Buyer shall use commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement. In furtherance of the foregoing, (i) Buyer shall retain to the fullest extent allowed by applicable Laws the right to sell and transfer to a legally qualified purchaser any Liquor License once Buyer secures the appropriate Liquor License Approval pursuant to applicable Legal Requirements, and (ii) upon Buyer's written request, Sellers shall use commercially reasonable efforts to cooperate with Buyer to sell and transfer such Liquor License(s) designated by Buyer and held by Sellers to one or more third parties identified by Buyer to the extent that such sale and transfer is permitted by applicable Law, and the proceeds of any such sale and transfer shall inure to Buyer.

Section 8.3 **Confidentiality**.

(a)    Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 8.1, and the consummation of the transactions

contemplated hereby, is confidential and proprietary. Prior to the Closing, Buyer shall not use or disclose such confidential information for any purpose except the evaluation of the transaction contemplated hereby, negotiation and preparation of definitive documentation relating thereto, good faith efforts to consummate such transaction in accordance herewith, business preparations for the integration and/or operation of the Business and related matters, and shall take such steps to safeguard such confidential information and protect it against disclosure, misuse, espionage, loss and theft as it takes with respect to its own comparable information, except (i) as otherwise provided by Law, Order, or legal process, (ii) with the consent of Sellers, not to be unreasonably withheld, or (iii) to the extent that any such information is developed independently by Buyer or made available to Buyer from another source, in either case without breach of any duty to Sellers, or becomes public through no fault of Buyer or any of its agents, representatives or Affiliates.

(b)     Following the Closing, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware. Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft. In furtherance and not in limitation of the foregoing, following the Closing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (i) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.3(b) or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than Buyer, a current or former employee of any Seller, or a Person known by any Seller to be bound by an obligation of confidentiality to any Seller, or (ii) any of the discussions or negotiations conducted with Buyer in connection with this Agreement, provided, that Sellers shall be entitled to disclose (A) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee or parties in interest in the Bankruptcy Cases, (B) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), Legal Proceeding or Governmental Authority, or (C) any information to Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required. Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business or Buyer shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business and Buyer, respectively.

Section 8.4     **Preservation of Records**. Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it or their respective Affiliates relating to the pre-Closing Business for a period of two years from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Buyer or any of their Affiliates or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and

each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such two year period, such Party shall first give 20 days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that 20-day period, to take possession of the records within 30 days after the date of such notice.

Section 8.5 **Publicity**. Neither Sellers, on the one hand, nor Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Buyer or Sellers, such press release or other public announcement is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement. Notwithstanding the foregoing, the Parties may disclose the existence and terms of this Agreement in such manner as (i) shall be required to comply with the Bidding Procedures Order, and/or (ii) as required by Buyer or any parent entity to comply with any requirements of state or federal securities law or regulation or the rules and listing standards of the New York Stock Exchange.

Section 8.6 **Operation of Business**. Until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, operate the Business in the Ordinary Course of Business and in accordance with the Approved Budget. Sellers shall use commercially reasonable efforts to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than effects on such relationships as may result from the non-payment of prepetition Claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business and in accordance with the Approved Budget, and (F) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers. Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, Sellers may not, without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed), take any of the following actions with respect to the Business:

(a) (i) modify in any material manner the compensation of any of the directors, Employees, or officers, or accelerate the payment of any such compensation (other than in the Ordinary Course of Business), (ii) grant, other than year-end bonuses in the Ordinary Course of Business, any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director, Employee or officer, or (iii) change the title, authority or duties of any director, Employee or officer;

(b) engage any new Employee other than in the Ordinary Course of Business, provided, however, that Sellers shall not engage any new Employee above the restaurant level whose aggregate annual compensation exceeds $50,000;

(c)     remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business);

(d)     sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any Purchased Asset (other than sales of Inventory in the Ordinary Course of Business and other than any Liens provided for in the DIP Order);

(e)     amend, terminate or renew any (i) Purchased Contract or Designation Rights Asset that is a Contract (other than any Real Property Lease) with an aggregate value in excess of $25,000, or (ii) Real Property Lease;

(f)     fail to pay any required filing, processing or other fee, or fail to use commercially reasonable efforts to maintain the validity of Sellers' rights in, to or under any Intellectual Property;

(g)     fail to use commercially reasonable efforts to maintain all Permits of Sellers, including those used in the operation of the Business;

(h)     engage in any transaction with any Affiliate (other than the other Sellers), significant shareholder, officer or director of any Seller (other than in the Ordinary Course of Business), incur or assume any long term or short term debt with or on behalf of any such Person or guarantee, endorse or otherwise be liable or responsible (whether directly, indirectly, contingently or otherwise) for the obligations of any such Person, for the sake of clarity, the Sellers may continue to enter into transactions in the Ordinary Course of Business (except as required in connection with the Bankruptcy Cases) with other Sellers prior to the closing of the transactions contemplated hereby;

(i)     make any change in their method of accounting, except in accordance with GAAP;

(j)     enter into any Contract that would survive the Closing (other than in the Ordinary Course of Business and provided that the term of such Contract does not exceed one year and that such Contract does not create an obligation of any Seller in excess of $25,000);

(k)     return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

(l)     fail to maintain any insurance policy in effect on the date hereof or amend any such policy other than in the Ordinary Course of Business;

(m)     accelerate the payment of any obligation, Liability or Indebtedness of any Seller;

(n)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions or any Liens created consistent with the DIP Financing;

(o)     acquire any material properties or assets or sell, assign, license, transfer, convey, lease or otherwise dispose of any material properties or assets (except pursuant to an existing Contract for fair consideration in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

(p) except with respect to remodeling, enter into any commitment for any expenditures in excess of $25,000 for any individual commitment and $100,000 for all commitments in the aggregate;

(q) absent Bankruptcy Court approval, compromise, settle or agree to settle any pending or threatened action, suit or Legal Proceeding, or consent to the same, other than compromises, settlements or agreements that involve only the payment of money damages not in excess of $25,000 in the aggregate; and

(r) agree, whether in writing or otherwise, to do any of the foregoing.

Nothing contained in this Agreement shall (i) give Buyer, directly or indirectly, the right to control or direct Sellers' operations prior to the Closing, (ii) give Sellers, directly or indirectly, the right to control or direct Buyer's operations prior to the Closing and (iii) prohibit Sellers from paying any and all 503(b)(9) Claims, Claims which if unpaid would result in a mechanics lien and/or Claims related to the Perishable Agricultural Commodities Act (PACA), all only as authorized by a Bankruptcy Court Order and only to the extent permitted to be paid pursuant to the Approved Budget. Prior to the Closing, each of Sellers and Buyer shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 8.7 **Section 363(b)(1)(A)**. Buyer shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

Section 8.8 **Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases**. With respect to each Purchased Contract and Real Property Lease set forth on Schedule 1.1, Buyer shall provide adequate assurance of the future performance of such Purchased Contract and Real Property Lease by Buyer as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

Section 8.9 **Notification of Certain Matters**. Sellers, on the one hand, and Buyer on the other hand, shall each promptly inform the other in writing of the occurrence of any event or circumstance that has prevented or is reasonably expected to prevent any Party from fulfilling the conditions to closing set forth in Article IX.

Section 8.10 **Prospective Employees**.

(a) Buyer currently intends to offer employment to all or substantially all persons currently employed by any Seller (and/or co-employed by any Seller and a professional employer organization) at the restaurant level at any of the Designated Locations who are (A) in good standing and (B) not currently on leave (other than a scheduled leave approved by the employer not to exceed 30 days) (collectively, "**Restaurant Employees**"). Buyer and Sellers shall coordinate in good faith to communicate this goal to Restaurant Employees promptly following the execution and delivery of this Agreement. Following such communication with the employees, Buyer and Sellers shall coordinate in good faith to arrange for Buyer or its representative to meet with all Restaurant Employees and to review such information about the responsibilities, schedule, and performance of such Restaurant

Employees (including communicating with their respective immediate supervisors), as Buyer shall reasonably request. If, following such meetings and reviews, Buyer determines in good faith that it will not offer employment to any Restaurant Employee (a "**De-selected Employee**"), Buyer shall not have any obligation to hire or offer employment to such De-selected Employee, and Sellers shall promptly notify each De-selected Employee of such determination. All Restaurant Employees other than the De-selected Employees shall constitute "**Selected Restaurant Employees**" as such term is defined herein. The terms of employment offered to any Selected Restaurant Employee (including compensation and benefits, if any) shall be determined by Buyer in its sole and absolute discretion. Any Selected Restaurant Employee actually employed by Buyer from and after the Closing Date is referred to herein as a "**Buyer Restaurant Employee.**" Immediately prior to the Closing, Sellers shall terminate the employment of all Buyer Restaurant Employees.

(b) Buyer currently intends to offer temporary employment for an initial period of four months (the "**Initial Employment Period**") or substantially all persons currently employed by Seller (and or co-employed by any Seller and a professional employer organization) at the regional or headquarters level, other than the Specified Employees, who are (A) in good standing and (B) not currently on leave (other than a scheduled leave approved by the employer not to exceed 30 days) (collectively, "**HQ Employees**"). Buyer and Sellers shall coordinate in good faith to arrange for Buyer or its representative to meet with all HQ Employees and to review such information about the responsibilities, schedule, and performance of such Restaurant Employees (including interviewing their respective immediate supervisors), as Buyer shall reasonably request.  Any HQ Employee actually employed by Buyer from and after the Closing Date is referred to herein as a "**Buyer HQ Employee**," and the Buyer Restaurant Employees and Buyer HQ Employees are referred to herein collectively as the "**Buyer Employees.**" Immediately prior to the Closing, Sellers shall terminate the employment of all Buyer HQ Employees. During the Initial Employment Period, Buyer HQ Employees shall be entitled to compensation at substantially the same rate as the average base salary or average base wages paid to such persons in respect of their employment by Sellers during the six-month period immediately preceding the date of this Agreement (on an annualized basis).  Following the Initial Employment Period, (i) each Buyer HQ Employee that is employed by Buyer on the last business day of the Initial Employment Period shall be entitled to an additional month of compensation at the same rate (either as severance or as bonus, as applicable, and (ii) Buyer shall determine in its sole discretion whether or not to offer continued employment to such Buyer HQ Employee and, if so, the terms of employment to be offered to each such Buyer HQ Employee (including compensation and benefits, if any), and the place of employment.

(c) Subject to obtaining any employee consents required by Law with respect to disclosure of health related information, Sellers shall deliver to Buyer on or before the Closing Date all personnel files and employment records relating to the Buyer Employees (including completed I-9 forms and attachments with respect to all Buyer Employees, except for such employees as Sellers certify in writing are exempt from such requirement). Sellers shall not, and shall not attempt to, engage or transfer the services of any of the prospective Buyer Employees to any other business operated by Sellers or their successors, or otherwise interfere in the reasonable efforts of Buyer to hire such prospective Buyer Employees; provided, however, that in the event Buyer engages and then later terminates the services of any Business Employee, Sellers may later re-engage the services of such individuals. Buyer shall be provided access to, and be allowed to communicate with, any Business Employees.

(d)     Following Closing, Buyer shall make commercially reasonable efforts to ensure that the Buyer Employees receive credit for all of their service with Sellers under any applicable welfare and benefit plans for purposes of eligibility and vesting (but not for purposes of accrual of benefits under a defined benefit pension plan). Buyer shall also use commercially reasonable efforts to ensure that no pre-existing condition, limitation or exclusion shall apply to participation and coverage for such Buyer Employees under any group welfare or health benefit plan offered by Buyer to Buyer Employees. For the avoidance of doubt, Buyer shall not be liable or responsible for the payment of any benefit or bonus that may accrue or may have accrued for the benefit of any employees of Sellers (including any Buyer Employees) through the Closing Date under any benefit or bonus plan or arrangement that may be or have been maintained by any Seller, including any such bonus plan or arrangement that may be characterized as a "stay" or "retention" bonus.

(e)     Nothing herein expressed or implied is intended to confer on any Person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this <u>Section 8.10</u>.

(f)     Nothing contained in this Agreement shall confer upon any Business Employee, Buyer Employee, or other Person any right with respect to continued employment by and Seller or continuance of employment by Buyer. Nothing contained in this <u>Section 8.10</u> or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Buyer Employee or any change in the employee benefits available to any individual Buyer Employee. Nothing herein shall obligate Buyer to employ any Buyer Employee for any particular length of time following the Closing Date.

Section 8.11     **Name Change**. Within 21 days after the Closing, but except as may be required for filings with the Bankruptcy Court, Sellers shall take all steps necessary to effect a change in their respective corporate names to remove the words "Quaker Steak", "Lube", "QSL", "QS&L" and any other names utilized by Sellers in the Business as reasonably identified by Buyer (collectively, the "**Seller Names**") from such names Sellers agree that they shall (i) as promptly as practicable after the Closing Date and in any event within 14 days following the Closing Date, cease to make any use of the Seller Names or any service marks, trademarks (including the Registered Marks), trade names, identifying symbols, logos, emblems, signs or insignia related thereto or any of the Intellectual Property or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "**Seller Marks**"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business. As promptly as practicable, Sellers shall remove, strike over, cover, block or substantially obliterate all Seller Marks from any vehicles, displays, signs, promotional materials or other similar materials then owned by them. Sellers also shall act promptly to amend or have reissued each Liquor License that Sellers intend to retain following the Closing Date containing or including any of the Seller Names as an identification of the licensee, so that said license is amended or reissued without any reference to any of the Seller Names. Sellers shall not file a motion in the Bankruptcy Court to convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code after the Closing until they have complied in full with their obligations set forth in this Agreement and the Management Agreement and have provided 14 days' written notice to Buyer.

Section 8.12     **Liquor License Approvals**. Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Body or third party with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to transfer and/or

issuance of the Liquor Licenses to Buyer ("**Liquor License Approvals**"), and if reasonably requested by Buyer, initiating and/or participating in such Legal Proceedings as Buyer may reasonably request to obtain such Liquor License Approvals.

Section 8.13 **WARN Act Notices**. At any time prior to Closing, following notice by the Buyer that it does not intend to keep a location open following the Closing, Sellers shall promptly analyze whether WARN Act notices are required to be sent to the Employees of such locations and, if Sellers determine that WARN Act notices are required to be sent, Sellers shall promptly send such WARN Act notices.

Section 8.14 **Real Property**. At any time prior to ten Business Days prior to the Sale Hearing Date, Buyer may elect to treat any Facility as an Excluded Asset if it discovers an Adverse Environmental Condition or any Encumbrance that is not a Permitted Exception, in either case on the Facility Buyer desires to exclude. The exclusion of any Facility pursuant to this Section 8.14 shall result in a reduction of the Aggregate Consideration equal to the Assigned Value set forth on Schedule 8.14 opposite such Facility. If the existence of any Adverse Environmental Condition or any Encumbrance that is not a Permitted Exception on the Facility causes any representation and warranty in this Agreement to be inaccurate, Buyer's sole and exclusive remedy under this Agreement shall be to treat such Facility as an Excluded Asset as provided in this Section 8.14. If Buyer elects not to treat such Facility as an Excluded Asset under this Section 8.14, the representations and warranties of Sellers herein shall be amended automatically so that such Environmental Condition or Encumbrance does not result in an inaccuracy of any such representations and warranties. Buyer's rights under this Section 8.14 are separate from and in addition to its rights under the last paragraph of Section 2.1.

Section 8.15 **Austintown Interests**. If the transfer of the Austintown Interests as set forth in Section 2.1(c), is not approved by the Bankruptcy Court on terms that confirm Buyer's authority to operate the Austintown JV Entity and Austintown RE Entity as managing member, then at any time within five days of the hearing at which such approval is denied, Buyer may elect to treat the Austintown Interest as an Excluded Asset. The exclusion of the Austintown Interest pursuant to this Section 8.15 shall result in a reduction of the Aggregate Consideration equal to the Assigned Value set forth on Schedule 8.14 opposite the Austintown Interest. If Sellers' inability to transfer the Austintown Interest as set forth in Section 2.1(c) causes a breach of any covenant in this Agreement, Buyer's sole and exclusive remedy under this Agreement shall be as set forth in this Section 8.15. If Buyer elects not to treat the Austintown Interest as an Excluded Asset under this Section 8.15, Sellers will be deemed to have fulfilled any covenants under this Agreement with respect to the transfer of the Austintown Interest.

## ARTICLE IX
## CONDITIONS TO CLOSING

Section 9.1 **Conditions Precedent to Obligations of Buyer**. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    The representation and warranties of Sellers set forth in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the

Closing Date, and the representations and warranties of Sellers set forth in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date;

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

(c)     Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 4.2 and a consolidated balance sheet as of November 30, 2015;

(d)     Buyer shall have obtained all material Permits reasonably necessary to operate the Business, or as to any material Permits necessary to operate the Business that have not been obtained, such Permits shall be in full force and effect as Designation Rights Assets pursuant to Section 2.6(c)(viii) (or pursuant to such other plan or arrangement for transitioning any non-transferable Permits and assets as the Parties shall mutually agree);

(e)     From the date hereof through the Closing Date, (i) there shall have been no Material Adverse Effect and (ii) the Sellers shall have delivered to Buyer a certificate, dated as of the Closing Date, to such effect;

(f)     The Purchased Assets shall be assumed, assigned and sold to Buyer, as the case may be, by Order of the Bankruptcy Court satisfactory to Buyer in its sole and absolute discretion;

(g)     The Bidding Procedures Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer); and

(h)     The Sale Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer).

Section 9.2     **Conditions Precedent to Obligations of Sellers**. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except, in all cases, (i) to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and (ii) to the extent that any inaccuracy in such representations and warranties, individually or in the aggregate would not reasonably be expected to materially and adversely affect Buyer's ability to consummate the transactions contemplated by this Agreement; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(b) Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect;

(c) Buyer shall have delivered, or caused to be delivered, to Sellers the Base Cash Component in accordance with <u>Section 3.1</u>; and

(d) Buyer shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>.

Section 9.3 **<u>Conditions Precedent to Obligations of Buyer and Sellers</u>**. The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law):

(a) there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

Section 9.4 **<u>Frustration of Closing Conditions</u>**. Neither Sellers nor Buyer may rely on the failure of any condition set forth in <u>Section 9.1</u>, <u>Section 9.2</u> or <u>Section 9.3</u>, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

**ARTICLE X**
**<u>NO SURVIVAL</u>**

Section 10.1 **<u>No Survival of Representations and Warranties</u>**. The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof. The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

**ARTICLE XI**
**<u>TAX MATTERS</u>**

Section 11.1 **<u>Transfer Taxes</u>**. Buyer and Sellers shall each be responsible for 50% of all Transfer Taxes.

Section 11.2 **<u>Prorations</u>**. All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Sellers and Buyer as of 12:01 a.m. (New York time) on the day following the Closing Date. If the exact amount of any real or personal property Taxes is not known on the Closing Date, the apportionment shall be based upon a reasonable amount, without subsequent adjustment.

# ARTICLE XII
## MISCELLANEOUS

Section 12.1 **Expenses**. Except for (a) Transfer Taxes (which shall be governed by Section 11.1, and (b) the Buyer Deposit that may become owed by Buyer to Sellers pursuant to Section 4.5(b), if any, each of Sellers and Buyer shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 12.2 **Submission to Jurisdiction; Consent to Service of Process**.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.6 hereof; provided, however, that if the Bankruptcy Cases have closed or the Bankruptcy Court refuses to exercise jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of Ohio (Eastern Division) and any appellate court thereof, for the resolution of any such Claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.6.

Section 12.3 **Waiver of Right to Trial by Jury**. Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 12.4 **Entire Agreement; Amendments and Waivers**. This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder

shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.5 **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in the State of Delaware.

Section 12.6 **Notices**. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Sellers, to:
Lube Holdings, Inc.
Quaker Steak & Lube Franchising Corporation
101 Chestnut Ave.
Sharon, PA 16146
Attention: Greg Lippert
Telecopier: (724) 981-5946
Email: glippert@thelube.com

with a copy to (which shall not constitute notice):

McDonald Hopkins LLC
600 Superior Avenue, E., Suite 2100
Cleveland, Ohio 44114
Attention: Scott Opincar
Telecopier: (216) 348-5474
Email: sopincar@mcdonaldhopkins.com

If to the Buyer, to:

c/o TravelCenters of America LLC
Mark R. Young
Executive Vice President
and General Counsel
Two Newton Place
255 Washington Street
Newton, MA 02458
Telecopier:  (617) 969-4697
Email: MYoung@ta-petro.com

with a copy to (which shall not constitute notice):

Drinker, Biddle & Reath LLP
1177 Avenue of the Americas
New York, New York 10036
Attention: Marc Leaf and James Millar
Email: marc.leaf@dbr.com and james.millar@dbr.com

Each Party entitled to notice may change the address to which notices, requests, demands, Claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

Section 12.7  **Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 12.8  **Binding Effect; Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided in this Section 12.8. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand, (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer intends to (and may, without the consent of Sellers) assign its rights, interests, and obligations hereunder to one or more of its designees; provided, further, that no such assignment by Buyer to any such designee(s) shall relieve Buyer of its obligations under this Agreement prior to the Closing, which shall remain binding upon Buyer until the Closing (and after the Closing Buyer shall have no obligations under this Agreement).

Section 12.9 **Prorations**. Rents, franchise payments, and other amounts constituting Accounts Receivable or Assumed Liabilities hereunder shall be prorated as of the Closing Date as customary in connection with the purchase and sale of commercial real estate.

Section 12.10 **Counterparts**. This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**
                                  **LUBE AGGREGATOR, INC.**
**LUBE HOLDINGS, INC.**
**QUAKER STEAK AND LUBE FRANCHISING CORPORATION**
**QSL INTELLECTUAL PROPERTIES CORP.**
**QSL SAUCES, INC.**
**BEST WINGS USA, INC.**
**QSL OF INDEPENDENCE OHIO INC.**
**QSL OF SHEFFIELD, INC.**
**QSL OF VERMILION, INC.**
**QSL OF WHEELING, INC.**
**QSL OF LAKEWOOD, INC.**
**QSL OF SPRINGFIELD REALTY, INC.**
**QSL RICHARDSON, INC.**
**QSL OF MEDINA, INC.**
**QSL OF MEDINA REALTY**
**QSL OF WARREN, INC.**
**QSL OF NEWPORT NEWS, INC.**
**QSL OF HARRISONBURG, INC.**
**QUAKER STEAK & WINGS, INC.**

By: _Gregory N Lippett_

Name: _Gregory R. Lippeit_
Title: _CEO_

**BUYER:**

TRAVELCENTERS OF AMERICA LLC

By:_____
    Name:
    Title:

Mark R. Young
Executive Vice President
and General Counsel

# SCHEDULE 5.6(a)(i)

## REGISTERED MARKS

| MARK | OWNER | STATUS | SERIAL # | REGISTRATION # | DATE OF REGISTRATION |
|------|-------|--------|----------|----------------|----------------------|
| BAVARIAN FUN FEST | Quaker Steak & Lube Franchising Corporation | Registered | 73400541 | 1343388 | 6/1 8/85 Renewed 9/25/2007 |
| QUAKER STEAK & LUBE® | QSL Intellectual Properties Corp | Registered | 73/186,984 | 1,130,163 | 01/29/1980 Renewed 1-29-2010 |
| ONTENNA | QSL Intellectual Properties Corp | Registered | 75/596,637 | 2,285,610 | 10/12/1999 Renewed 10/12/2009 |
| GOLDEN GARLIC | QSL Intellectual Properties Corp | Registered | 76/224,688 | 2,555,610 | 04/02/2002 Renewed 4/12/2010 |
| ARIZONA RANCH | QSL Intellectual Properties Corp | Registered | 76/224,690 | 2,544,689 | 03/05/2002 Renewed |
| LEADED LUBE-N-ADE | QSL Intellectual Properties Corp | Registered | 76/477,950 | 2,810,118 | 02/03/2004 |
| THUNDER ALLEY | QSL Intellectual Properties Corp | Registered | 76/477,828 | 2,859,510 | 07/06/2004 |
| AIN'T NO SECRET IT'S THE SAUCE | QSL Intellectual Properties Corp | Registered | 76/477,829 | 2,771,489 | 10/07/2003 |
| WING-O-METER | QSL Intellectual Properties Corp | Registered | 76/477,830 | 2,771,490 | 10/07/2003 |
| PHIL-M-UP | QSL Intellectual Properties Corp | Registered | 76/477/951 | 2,771,492 | 10/07/2003 |
| BUCKEYE BBQ | QSL Intellectual Properties Corp | Registered | 76/477,953 | 2,788,571 | 12/02/2003 |
| LOUISIANA LICKERS | QSL Intellectual Properties Corp | Registered | 78/400,034 | 2,943,925 | 04/26/2005 |
| QUAKER STEAK & WINGS | QSL Intellectual Properties Corp | Registered | 75/108,588 | 2,083,548 | 07/29/97 Renewed 07/29/2007 |
| MUNCH BUCKET OF BOLTS | QSL Intellectual Properties Corp | Registered | 76/477,955 | 2,771,494 | 10/07/2003 |
| THE LUBE | QSL Intellectual Properties Corp | Registered | 76/493,983 | 2,880,832 | 09/07/2004 |
| QUAKER STEAK & LUBE BEST WINGS | QSL Intellectual Properties Corp | Registered | 77/241,753 | 3,536,015 | 11/25/2008 |
| SPRINTSTER | QSL Intellectual Properties Corp | Registered | 85/247,810 | 4,026,171 | 09/03/2011 |
| PICK-UP WINGO WINDOW | QSL Intellectual Properties Corp | Registered | 85/247,812 | 4,034,473 | 10/04/2011 |
| THAI 'R' CRACKER | QSL Intellectual Properties Corp | Registered | 85/247,813 | 4,026,172 | 09/13/2011 |
| LUBEBURGER | QSL Intellectual Properties Corp | Registered | 85/247,810 | 4,157,577 | 06/12/2012 |
| MAGNA FRIES | QSL Intellectual | Registered | 85/247,806 | 4,163,972 | 06/26/2012 |

| MARK | OWNER | STATUS | SERIAL # | REGISTRATION # | DATE OF REGISTRATION |
|---|---|---|---|---|---|
| | Properties Corp | | | | |
| BAR JAR | QSL Intellectual Properties Corp | Registered | 85/550,836 | 4,205,359 | 09/11/2012 |
| L. CHEAPO | QSL Intellectual Properties Corp | Pending | 86/005,162 07/09/2013 | | |

**SCHEDULE 5.9**

<u>FINANCIAL ADVISORS</u>

Mastodon Ventures, Inc.

Inglewood Associates LLC

# SCHEDULE 8.14

## ASSIGNED VALUE

| Unit name | Store-level EBITDA | SL EBITDA at 5.0x |
|---|---|---|
| Sharon | $277,302 | $1,386,510 |
| Valley View | 595,055 | 2,975,275 |
| Sheffield | 69,847 | 349,237 |
| Austintown[1] | 570,668 | 2,853,338 |
| Vermilion | 169,650 | 848,252 |
| Wheeling | 519,374 | 2,596,871 |
| Boardman | 262,256 | 1,311,281 |
| Lakewood | (11,848) | 0 |
| Medina[2] | 129,065 | 645,325 |
| Warren | 324,300 | 1,621,500 |
| Harrisonburg | (99,700) | 0 |
| Newport News | 145,659 | 728,297 |
| Total | 2,951,629 | 15,315,887 |

Note: Store-level EBITDA is based on LTM P9-2015 results

[1] Represents QSL's 75% interest in the Austintown restaurant

[2] Excludes intercompany cash rent as Medina is a fee simple store

## COMPANY OPERATED STORES

## **EXHIBIT 1(a)**

### **Owned locations**

| | | | | |
|---|---|---|---|---|
| Medina | 4094 Pearl Road | Medina | OH | |
| Sharon | 101 Chestnut Ave. | Sharon | PA | |
| Cadillac Sauce | 101 Chestnut Ave. | Sharon | PA | |
| Tully's Bar | 101 Chestnut Ave. | Sharon | PA | |
| Springfield | 1121 Lincolnshire Blvd | Springfield | IL | (Closed) |

## EXHIBIT 1(b)

### Leased locations

| | | | |
|---|---|---|---|
| Boardman | 435 Boardman-Poland Rd | Boardman | OH |
| Harrisonburg | 350 University Blvd. | Harrisonburg | VA |
| Lakewood | 15312 Detroit Avenue | Lakewood | OH |
| Newport News | 12832 Jefferson Avenue | Newport News | VA |
| Sheffield | 4900 Transportation Drive | Sheffield Village | OH |
| Valley View | 5935 Canal Rd | Valley View | OH |
| Vermilion | 5150 Liberty Ave | Vermilion | OH |
| Warren | 2191 Millennium Blvd | Cortland | OH |
| Wheeling | 45 Satterfield Dr. | Tridelphia | WV |

## <u>EXHIBIT 2</u>

### <u>LIST OF FRANCHISE LOCATIONS</u>

| | | | |
|---|---|---|---|
| Bloomsburg | 211 Columbia Mall Drive | Bloomsburg | PA |
| Brick Township | 1036 Cedar Bridge Avenue | Brick | NJ |
| Bristol | 629 State Street | Bristol | VA |
| Canton | 6075 Dressler Road | North Canton | OH |
| Charleston | 131 Cross Terrace Blvd. | Charleston | WV |
| Colerain | 3737 Stone Creek Rd | Colerain | OH |
| Columbia | 941 Spears Creek Court | Columbia | SC |
| Columbus | 8500 Lyra Drive | Columbus | OH |
| Council Bluffs | 3320 Mid America Drive | Council Bluffs | IA |
| Cranberry | 1298 Freedom Rd | Cranberry | PA |
| Edison | 561 US Route 1 | Edison | NJ |
| Erie | 7851 Peach St | Erie | PA |
| Florence | 8025 Action Blvd | Florence | KY |
| Greenville | 10 Chrome Drive | Greenville | SC |
| Janesville | 3111 Wellingtown Court | Janesville | WI |
| Johnstown | 1425 Scalp Avenue | Johnstown | PA |
| League City | 2502 South Gulf Freeway | League City | TX |
| Mechanicsburg | 165 Gateway Drive | Mechanicsburg | PA |
| Mentor | 7834 Reynolds Road | Mentor | OH |
| Middleton | 2259 Deming Way | Middleton | WI |
| Milford | 590 Chamber Drive | Milford | OH |
| New Berlin | 4900 S. Moorland Road | New Berlin | WI |
| Clearwater | 10400 49th St. N. | Clearwater | FL |
| Pleasant Hills | 511 Clairton Blvd. | Pleasant Hills | PA |
| Portage | 6245 Ameri Plex Drive | Portage | IN |
| Robinson | 110 Andrew Drive | Pittsburgh | PA |
| State College | 501 Benner Pike | State College | PA |
| Sulphur | 535 North Cities Service Highway | Sulphur | LA |
| Westminster | 10392 Reed Street | Westminster | CO |
| York | 1411 Kenneth Road | York | PA |

| Grand Isle | 3335 Wood River Rd | Grand Island | NE |
| Pohatcong | 1304 Route 22 | Phillipsburg | NJ |
| Gonzales | 2706 Cabela's Pkwy | Gonzales | LA |
| Sevierville | 1431 Parkway | Sevierville | TN |
| Sandusky | 2003 Cleveland Rd | Sandusky | OH |

# EXHIBIT 2A

## LIST OF ANCILLARY LOCATIONS

**Ancillary Locations**

| | | | | | | |
|---|---|---|---|---|---|---|
| Oakland (Express), PA | 3602 Forbes Ave | Pittsburgh | PA | Franchise | Joll Group | Franchised License |
| Cleveland Airport, OH | 5300 Riverside Drive | Cleveland | OH | Franchise | Aramark | Agreement |
| Slippery Rock University | 1 Morrow Way | Slippery Rock | PA | Franchise | AVI Foodservice | License Agreement |
| Kent State University | 1 Midway Drive | Kent | OH | Franchise | Sodexho | License Agreement |
| Cadillac Sauce | 101 Chestnut Ave | Sharon | PA | Company | QSL Corporate | Part of Sharon |
| Pittsburgh Airport, PA | 1000 Airport Blvd | Pittsburgh | PA | Franchise | Aramark | License Agreement |
| Tully's Bar | 101 Chestnut Ave | Sharon | PA | Company | QSL Corporate | Part of Sharon |

**Stadiums**

| | | | | | | |
|---|---|---|---|---|---|---|
| Quicken Loans, OH | 1 Center Court | Cleveland | OH | Concession | Aramark | Concession |
| PNC, PA | 115 Federal Street | Pittsburgh | PA | Concession | Joll Group/Aramark | Concession |
| Heinz, PA | 100 Art Rooney Ave | Pittsburgh | PA | Concession | Joll Group/Aramark | Concession |
| FirstEnergy Stadium | 100 Alfred Lerner Way | Cleveland | OH | Concession | | Not renewed |
| Rogers Center, ON | 1 Blue Jays Way | Toronto | ON | Concession | Aramark | Not renewed |